Deposition of Benny Jackson, taken May 10, 2017

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2                      OXFORD DIVISION

3
   JAMES BENNY JACKSON                          PLAINTIFF
4
   VS.                          NO. 3:16CV189-DMB-RP
5
   OIL-DRI CORPORATION OF AMERICA AND
6  BLUE MOUNTAIN PRODUCTION COMPANY             DEFENDANTS

7

8

9  ********************************************************

10
                 DEPOSITION OF BENNY JACKSON
11

12 ********************************************************

13

14

           TAKEN AT THE INSTANCE OF THE DEFENDANTS
15       IN THE LAW OFFICES OF WAIDE & ASSOCIATES
        332 NORTH SPRING STREET, TUPELO, MISSISSIPPI
16      ON MAY 10, 2017, BEGINNING AT 10:40 A.M.

17

18

19              APPEARANCES NOTED HEREIN

20

21

22 Reported by:  KATHRYN H. BOYER, CSR #1349

23 _____

                ADVANCED COURT REPORTING
24                    P.O. BOX 761
                 TUPELO, MS  38802-0761
25                  (662) 690-1500
```

EXHIBIT
A
tabbies

**Deposition of Benny Jackson, taken May 10, 2017**

1  don't remember -- I don't remember the person's name

2  that told me, but --

3      Q.    Okay.  So then you went to talk to the human

4  resources manager at the time, Howell Duncan?

5      A.    That's correct.

6      Q.    Okay.  Were you interviewed by Howell Duncan?

7      A.    I was.

8      Q.    Were you hired?

9      A.    I was.

10     Q.    Okay.  With regard to the work at Blue

11  Mountain Production Company, was there any employment

12  prior to Blue Mountain that you had that related in any

13  way to the job you were going to be doing at Blue

14  Mountain?

15     A.    Could you be more specific as to --

16     Q.    Let's start with -- the job you hired into at

17  Blue Mountain, what was that?

18     A.    It was -- at the time, the job was called

19  chemical operator.

20     Q.    Okay.  And what were your duties as a chemical

21  operator?

22     A.    I was responsible for the material that the

23  operators had to package.  I had to make sure that the

24  correct material went to the correct packing line and

25  also had to make sure that any additives that were

**Deposition of Benny Jackson, taken May 10, 2017**

1  needed in the product that was put on there, I was

2  responsible for the quality of the product.

3      Q.   Okay.  Do we agree that the product -- the end

4  product to be packaged was absorbent clay?

5      A.   I would agree.

6      Q.   Okay.  Now with regard to the fact that you

7  were hired into that job by Howell Duncan, prior to

8  that, did you have any experience that related to the

9  job of chemical operator that you, of course, were

10  going to be doing for Blue Mountain?

11      A.   I had previous experience in quality control

12  at BenchCraft.

13      Q.   What experience did you have at BenchCraft in

14  quality control?

15      A.   Well, I was responsible for the quality of the

16  leather furniture that we produced at BenchCraft.

17      Q.   And in terms of being responsible for the

18  quality of the leather furniture, what were your duties

19  to assure that the leather furniture did have the

20  quality required by BenchCraft?

21      A.   Part of my job was to inspect the leather when

22  we received it, make sure that it was a quality product

23  and that we could use it in our furniture.

24      Q.   Okay.  Is my understanding correct that

25  BenchCraft made leather furniture?

Deposition of Benny Jackson, taken May 10, 2017

1  A. That's correct.

2  Q. With regard to your Blue Mountain employment,

3 do you recall when you were hired?

4  A. I believe it was February of 2000.

5  Q. Okay.  I believe you testified just a minute

6 ago that you were hired into the job of chemical

7 operator.

8  A. That's correct.

9  Q. Okay.  Do you recall your pay rate?

10  A. No, sir, I do not.

11  Q. Okay.  Do you recall who your supervisor or

12 supervisors were?

13  A. Kevin Jones.

14  Q. Anyone else?

15  A. Mike Johnson and, of course, Danny Yancy was

16 the plant manager.

17  Q. Okay.  As a chemical operator, did you have

18 any other duties than what you've already described in

19 your testimony this morning?

20  A. Well, those duties could change.  I had to --

21 at times, I had to work in the dye room or slurry room,

22 as it was called, mix dye.

23  Q. Uh-huh (indicating yes).

24  A. At times, that was part of that job.  The

25 duties and responsibilities changed and evolved as I

**Deposition of Benny Jackson, taken May 10, 2017**

1     Q.   Was that because the plant was busy?

2     A.   Yes, sir.

3     Q.   Okay.  And then moving forward, 2014 into

4 2015, what days of the work week were you working

5 typically?

6     A.   I don't recall.  I know we -- we had a lot of

7 orders.  We were working a lot of hours.  I don't

8 recall having many days off, but to be specific, I

9 don't remember.

10    Q.   Okay.  Take me through -- before you took your

11 FMLA leave in 2015, take me through a typical workday

12 in terms of a day in your life at work.  When did it

13 start?  What did you do sequentially through the day

14 and how did it end?

15    A.   I'll try to recall the best I can.  My typical

16 workday would start at 4:45 a.m.  I would arrive early

17 to try to prepare the product so when the packaging

18 team came in at 5:00, that they would be ready to start

19 work.

20    Q.   What did you have to do to prepare the product

21 for the packaging team?

22    A.   First -- first thing you would do is you would

23 make a short tour of the area that you worked in to

24 make sure that there was not any problems as far as a

25 dye leak, there was not any problems in the dye room,

Deposition of Benny Jackson, taken May 10, 2017

1  process as you've just testified about?

2      A.   Well, it was everyone's responsibility.  As

3  far as anyone else in my department working with me,

4  no, sir.

5      Q.   Okay.  Was it --

6      A.   I worked with the operators and with the

7  supervisors to try to insure that we had a quality

8  product.

9      Q.   Did anyone else work on the chemical platform?

10     A.   Not on my shift, no, sir.

11     Q.   Were there people on other shifts that did

12 your exact same job?

13     A.   There was.

14     Q.   Who -- who were the people that did your job

15 on the other shifts?

16     A.   At that particular time, George.  I can't

17 recall his last name.  I can't recall his last name.

18     Q.   But his first name was George?

19     A.   Yes.

20     Q.   Okay.  Anyone else do your job on other

21 shifts?

22     A.   No, sir.

23     Q.   So you and George were the only two people who

24 did this particular job?

25     A.   Yes, sir.

**Deposition of Benny Jackson, taken May 10, 2017**

1    Q.    Who did you complain to?

2    A.    Almost anyone that would listen.

3    Q.    Who did you complain to that was a member of

4  management or a representative of Oil-Dri?

5    A.    Danny Yancy.

6    Q.    Anyone else?

7    A.    Just the -- Mike Johnson, Donald Yancy, Tyler

8  Cohea.

9    Q.    Did you complain about the same thing or

10  different things to these different supervisors?

11    A.    I think it was the same thing.  Yes.

12    Q.    Okay.  What did you complain to them about?

13    A.    About the dusty conditions that was from the

14  additives that we were putting in the scoopable

15  products.

16    Q.    With regard to the dusty conditions, do you

17  agree that Blue Mountain Production Company processes

18  absorbent clay?

19    A.    I would.  Yes, sir.

20    Q.    And by the nature of the processing and

21  packaging, it creates dust --

22    A.    Yes, sir.

23    Q.    -- from the absorbent clay?

24    A.    I would agree.

25    Q.    Okay.  When you say you complained about the

Deposition of Benny Jackson, taken May 10, 2017

1    leave toward the end of April 2015?

2        A.    That's correct.

3        Q.    Okay.  Do you recall, as you previously just

4    testified, that your doctor prescribed this as part of

5    your treatment?

6        A.    That's correct.

7        Q.    Do you recall making the request to Oil-Dri to

8    be off consistent with your doctor's request that you

9    be off?

10       A.    I do.

11       Q.    Okay.  And do you recall the -- that your

12   request was granted?

13       A.    I do.

14       Q.    Do you recall any communications at this time

15   about that request with Oil-Dri representatives and who

16   you spoke with?

17       A.    I spoke with Rhonda Barnes on the phone.

18       Q.    Okay.  And what did you tell Rhonda Barnes?

19       A.    I don't really recall the exact conversation.

20   I just told her that the doctor had told me that I

21   needed to be off work and I need to be on family

22   medical leave.  Specific wise, I don't recall exactly

23   our conversation.

24       Q.    Okay.  Do you recall any conversation from

25   Rhonda Barnes or anyone else at Oil-Dri which they told

Deposition of Benny Jackson, taken May 10, 2017

1     you, your request for leave has been granted?

2        A.    That -- she told me that day on the phone that

3     it had been granted.

4        Q.    I see.   So you had one conversation with

5     Rhonda Barnes in which you both requested leave and she

6     told you that it had been granted?

7        A.    Well, we had had a previous conversation about

8     -- about this because I was thinking that maybe I would

9     have to go on family medical leave and we had -- we had

10     had a previous conversation about it before this date.

11        Q.    Okay.   Do you recall that previous

12     conversation?

13        A.    Some of it.   Yes, sir.

14        Q.    Okay.   When did that occur?

15        A.    I would say approximately two weeks before

16     this date.

17        Q.    Okay.   Before the approval?

18        A.    Yes, sir.

19        Q.    Okay.   In that first conversation, was this in

20     person or by phone?

21        A.    It was in person.

22        Q.    Okay.   And what did you tell Rhonda in that

23     initial conversation and what did she tell you?

24        A.    As best I recall, I was sick.   I was very

25     sick.   I was sick when we had our conversation.   I was

Deposition of Benny Jackson, taken May 10, 2017

Page 53

```
 1   struggling to get up and get to work every day.  I was
 2   worried that I had COPD because that's what the
 3   radiologist had said I had and I knew COPD was bad.  I
 4   was afraid that there's a possibility that I might not
 5   could come back to work at all, but I was assuming at
 6   that time that I was probably going to have to be off
 7   work for a period of time and --
 8       Q.   What did she tell you in this first
 9   conversation?
10       A.   We talked about the fact that I could go on
11   family medical leave.  We also talked about the fact
12   that I had worked 15 years and that there's a
13   possibility that I could retire.  We also talked about
14   if I could come back, if I could work in a different
15   area.  I don't recall anything else that we discussed
16   that day.
17       Q.   Okay.  Do you know what happened after that by
18   which these papers which are shown as Exhibit 1 were
19   completed in order that you could qualify for FMLA
20   leave?
21       A.   Are you asking me do I remember when I filled
22   the papers out?  Is that the question?
23       Q.   Well, yes.  Did you fill any papers out for
24   your leave?
25       A.   I don't remember.  I really don't remember.  I
```

Deposition of Benny Jackson, taken May 10, 2017

Page 55

1    A.    Best of my memory.

2    Q.    Okay.  Now as I think you previously

3  testified, with regard to Exhibit 1, these are not

4  documents that you've previously seen?

5    A.    I don't recall seeing these.  No, sir.

6    Q.    Okay.

7    A.    I mean, I don't see anything that I've signed,

8  so --

9    Q.    With regard to Dr. Wilons' diagnosis that you

10 needed to be away from your work area for a period of

11 time to improve your COPD, did you speak to anyone

12 other than Rhonda Barnes at Oil-Dri about your

13 condition or about your leave?

14   A.    At that time?

15   Q.    Yes.

16   A.    Not that I recall.

17   Q.    Now with regard specifically to breathing

18 problems, was Dr. Wilons the first doctor that you went

19 to with regard to breathing problems?

20   A.    He was the first specialist that I went to.

21 Yes.

22   Q.    Okay.

23   A.    The only one.

24   Q.    Okay.  Now did Dr. Wilons subsequently release

25 you to return to work?

Deposition of Benny Jackson, taken May 10, 2017

1    A.    He did.

2    Q.    And did he release you without any

3  restrictions?

4    A.    No, sir.  He released me with restrictions.

5    Q.    What were the restrictions?

6    A.    That I not be exposed to the same environment,

7  not -- not do the same job.

8              MR. WOODRUFF:  Go off the record a

9  second?

10             MR. MOELLER:  Yes.

11             (After a discussion off the record and a

12  lunch break, the deposition continued as follows:)

13    Q.    (Mr. Moeller)  Mr. Jackson, is it your

14  testimony that you were released with restrictions;

15  that you could not return to the same environment?

16    A.    That's correct.

17    Q.    And that was Dr. Wilons that released you with

18  those restrictions?

19    A.    That's correct.

20    Q.    Okay.  And do those restrictions continue to

21  -- through today?

22    A.    Yes, sir.

23    Q.    Do you recall your contact with Oil-Dri when

24  you were released on or about July 15, 2015?

25    A.    To the best of my knowledge, it was a

Deposition of Benny Jackson, taken May 10, 2017

1  telephone conversation with Ms. Barnes.

2      Q.   Okay.  Who called whom?

3      A.   I called her.

4      Q.   What did you tell her?

5      A.   Well, first I asked her -- I asked her had

6  anything changed as far as any job openings that I

7  could do and she said, no.  And I told her that if that

8  was the case, then I felt like I'd just go ahead and

9  retire.

10     Q.   Now when you said, had anything changed about

11 job openings that you could do, what -- and she said,

12 no, did you discover at anytime later or whatever

13 whether her statements were true or not?

14     A.   I would have to say no.  As far as later, you

15 know, I don't know any of the circumstances after that.

16     Q.   Okay.  To make this question simple, based on

17 what she told you that day in that telephone

18 conversation, do you know whether any part of her

19 statement was not true?

20     A.   Well, it was my understanding at times before

21 then -- I wouldn't say on July 15th, but at previous

22 times there had been forklift openings and also there

23 was a shipping opening.

24     Q.   What do you base your understanding on that

25 there could have been forklift openings at the time

Deposition of Benny Jackson, taken May 10, 2017

1    Q.   Did you -- but do you know whether or not, as
2  you pointed out in talking with the MSHA
3  representative, whether or not forklift certification
4  remained a requirement for somebody to operate a
5  forklift at an MSHA-covered facility such as Oil-Dri?
6    A.   I do not know if that was a requirement or
7  not.  I do not know.
8    Q.   Okay.  And when we refer to MSHA, do you agree
9  that we are referring to the Mind, Safety, Health
10  Administration?
11    A.   I do.
12    Q.   Okay.  Mr. Jackson, I believe we have
13  established that you were out on FMLA leave from
14  sometime in April through on or about July 15, 2015; is
15  that correct?
16    A.   Yes, sir.  That's correct.
17    Q.   Okay.  So you were, of course, out on FMLA
18  leave, so you were not available for work during that
19  period of time; is that correct?
20    A.   That's correct.
21    Q.   Now with regard to your possible return on or
22  about July 15, 2015, when you were released, as you
23  say, with restrictions, do you know whether or not
24  there was a forklift position available?
25    A.   On July 15th, no.  I do not positively know

Deposition of Benny Jackson, taken May 10, 2017

1   that there was or was not.

2       Q.   Okay.  Do you know -- you mentioned the

3   position of packaging operator, I believe, as another

4   possible position that you were interested in.

5       A.   Packaging operator?

6       Q.   Excuse me.  Correct me.  What other position

7   had you mentioned to Rhonda Barnes?

8       A.   I think a shipping clerk.

9       Q.   Okay.  Excuse me.  Shipping clerk.  Now with

10  regard to a shipping/receiving clerk, do you know

11  whether or not on July 15th there was any opening?

12      A.   No, sir, I do not know.

13      Q.   Did you ever post for such an opening?

14      A.   Did I?

15      Q.   Yes.

16      A.   No, sir.

17      Q.   Okay.  And you were aware of the fact that

18  there was a posting policy.

19      A.   Yes, sir.  A policy.  Yes, sir.

20      Q.   Okay.  By way of example, I show you what I'll

21  ask the court reporter to mark as Exhibit 3.

22              (Thereupon, the document referred to was

23  marked as Exhibit No. 3)

24      Q.   Is that a typical job posting notice --

25      A.   Yes, sir.

Deposition of Benny Jackson, taken May 10, 2017

1  day or two or what?

2      A.   It was for -- I believe Oil-Dri paid for one

3  night lodging and they paid me mileage up there and

4  back and expenses.

5      Q.   Okay.

6      A.   Like, two days' expenses.

7      Q.   Did you drive?

8      A.   Yes, sir.

9      Q.   Oh.  Okay.  Do you recall when the awards

10 ceremony was?

11     A.   No, sir, I don't exactly.

12     Q.   Okay.  What was the next contact you had with

13 Oil-Dri following the awards ceremony?

14     A.   I had called Rhonda Barnes and asked her about

15 my retirement check and she had told me that she would

16 check on it, try to find out, you know, what was going

17 on with it.

18     Q.   Yes.

19     A.   And then the next contact I remember was

20 Amanda called me and asked me to come to Ripley.

21     Q.   Amanda Hill?

22     A.   Yes.

23     Q.   Okay.  Do you recall when Amanda Hill

24 contacted you?

25     A.   I don't recall the exact date.  I believe it

Deposition of Benny Jackson, taken May 10, 2017

1     was in September.

2         Q.   And at Amanda Hill's request, did you go to

3     Ripley?

4         A.   I did.  Yes, sir.

5         Q.   And did you meet with Amanda?

6         A.   I did.

7         Q.   Did you meet with anybody else?

8         A.   I believe his name was Ron Parks.

9         Q.   Okay.  Did you previously know Ron Parks?

10        A.   I had met him when I was in Chicago.

11        Q.   I see.  Do you know who Ron Parks is, that is,

12    what his job was?

13        A.   I did.  I don't recall what his exact title

14    is, but, yes, I did know who he was.  Yes, sir.

15        Q.   Okay.  And tell me about the meeting in Ripley

16    with Amanda Hill and Ron Parks.  Number one, where was

17    it?

18        A.   It was in the office at Ripley, across the

19    street, I believe.  Not positive about which room we

20    were in, but we were in an office at Ripley plant.

21        Q.   Ripley plant is distinguished from the Blue

22    Mountain Production Company plant?

23        A.   Separate.  Yes.

24        Q.   Yes.  Okay.  And who started the conversation?

25        A.   You know, I don't recall.  It was a formal --

Deposition of Benny Jackson, taken May 10, 2017

1  or statement to this?

2      A.   I don't recall what my statement was.  My

3  reaction to it was, you know, this is something that I

4  was not aware of and never heard of and why was I not

5  informed of this before now, before it's too late?  Why

6  did we not have an annual review of this?  Why don't we

7  look at the annual hours of each employee each year?

8  Is that up to the employee or is that up to management?

9  That was some of my, you know --

10     Q.   What was Amanda Hill's or Ron Parks' response?

11     A.   I don't recall.  I mean, it was cordial.  It

12 wasn't -- you know, I don't recall anything -- you

13 know, I hope I wasn't (inaudible), but I was upset.  I

14 mean, they -- you know --

15     Q.   Was there any further discussion in this

16 meeting?

17     A.   There was.  They said I had an option and I

18 asked them what that was and they said, if you would

19 come back to work -- and I don't remember the amount of

20 time that I would have to work to qualify, but it would

21 only be a partial -- like, 60 percent, I'm guessing.  I

22 don't remember the exact number.  It was almost a

23 50 percent reduction in what my benefit would have been

24 and then my next question to them was:  Okay.  If I

25 come back, what will I be doing?  They said, well,

Deposition of Benny Jackson, taken May 10, 2017

1   you'll be doing the same job that you were doing

2   because we're shorthanded at that position. And I

3   said, well, I mean, that's the reason I'm off now is

4   because that job is what made me sick and my doctor

5   would not release me to go back to that job, so, you

6   know, I just don't think I could do it.

7         And I did tell them that I would think about

8   it for a few days because that was kind of a sudden

9   thing to me and I didn't want to make a decision real

10   quick, but that was my response that day and then I did

11   inform Amanda a few days later -- I don't remember

12   exactly -- that -- and I think I did mention in the

13   meeting that -- that I hoped that I could drive the

14   school bus some. I was a relief driver, but that

15   didn't -- that didn't work out. I think I only drove

16   one time. And that I had started my Social Security

17   and I could only earn so much money during the year and

18   I'd already met that maximum amount for that year and I

19   was already drawing my Social Security, and so, it was

20   kind of a conundrum for me. At that very moment, you

21   know, I couldn't make a decision, but a few days later,

22   I did call her back and inform her that I would not

23   come back if I had to come back to the same -- same job

24   I had when I left.

25      Q.   When you called Amanda Hill and told her that

Deposition of Benny Jackson, taken May 10, 2017

1    Q.   Now with regard to the retirement benefits,

2   what was the retirement benefit you expected to

3   receive?

4    A.   That is configured on a dollar basis

5   multiplied times the number of years you worked and I

6   -- my number was, I think, $246.  I'm not positive, but

7   it's real close to that number --

8    Q.   Okay.

9    A.   -- that I expected to receive.

10    Q.   Now other than the breathing issues that you

11   have testified about and the FMLA leave that you took,

12   while employed by Oil-Dri, did you have any other

13   actual or possible disability?

14    A.   No, sir, not -- not that I recall.

15    Q.   Okay.  Now are you familiar with the company's

16   EEO policy?  Equal Employment Opportunity policy.

17    A.   Yes, sir.  I think I'm --

18    Q.   Okay.

19    A.   -- fairly aware of that.

20    Q.   And do you know that it prohibits

21   discrimination against disability and that it offers

22   reasonable accommodations for disabilities?

23    A.   I know that's what it states.  Yes, sir.

24    Q.   Okay.  Did you -- you know, on -- anytime on

25   or after July 15th when you were -- you say you were

Deposition of Benny Jackson, taken May 10, 2017

1    A.    Yes, sir.

2    Q.    Okay.  And that answer is correct, right?

3          MR. WOODRUFF:  Objection.

4    Q.    (Mr. Moeller)  Did you not fill this out

5    saying --

6    A.    I did.

7    Q.    -- you did not have a disability?

8    A.    I did.  Yes.

9    Q.    Okay.  So was that true?

10         MR. WOODRUFF:  Objection.

11   Q.    (Mr. Moeller)  I take it that based upon your

12   testimony a minute ago that you said all these answers

13   were true and correct, so is that correct?

14         MR. WOODRUFF:  Objection.  You can

15   answer.

16   A.    Pardon?

17         MR. WOODRUFF:  You can answer.

18   A.    Okay.  Again, I asked -- I asked the lady at

19   the same office up there, she said, have you filed for

20   disability?  I said, no, ma'am, I have not.  She was

21   talking about Social Security disability.  She said,

22   well, then your answer will be no.

23   Q.    (Mr. Moeller)  Of course, that's not what the

24   question says, is it?

25         MR. WOODRUFF:  Objection.

Deposition of Benny Jackson, taken May 10, 2017

1     Q.   (Mr. Moeller)  Okay.  And what is the name of

2 this lady?

3     A.   I don't recall the lady's name.

4     Q.   Now after filling out this form, did you, in

5 fact, file for Social Security disability?

6     A.   No.

7     Q.   You've never filed for Social Security

8 disability?

9     A.   No.

10     Q.   Have you filed for any form of disability?

11     A.   No, sir.

12     Q.   Now in filling out this form, Exhibit 4,

13 weren't you clearly stating that you were ready,

14 willing and able to work?

15     A.   Yes, sir.

16          MR. MOELLER:  Ask the court reporter to

17 mark as Exhibit 5 the next document.

18          (Thereupon, the document referred to was

19 marked as Exhibit No. 5)

20     Q.   (Mr. Moeller)  Do you see that document?

21     A.   Yes, sir.

22     Q.   And have you seen it before?

23     A.   (Witness reviewing document).  I think I

24 recall getting this letter here from the employment

25 security commission.

Deposition of Benny Jackson, taken May 10, 2017

1  that is, the section immediately below your name,

2  states:  Quote, information submitted indicates you

3  failed to meet work search requirements from June 26,

4  2016, to July 2, 2016?

5      A.    Yes, sir.

6      Q.    Okay.  Do you recall receiving this notice of

7  nonmonetary decision?

8      A.    I don't recall this specific one.  I do recall

9  receiving --

10     Q.    Okay.  Do you recall receiving as shown on the

11 top page of Exhibit 5 various e-mails of factfinding by

12 the Mississippi Department of Employment Security

13 indicating other work weeks in which they found that

14 you had an inadequate work search?

15     A.    I see that on this document.  Yes, sir.

16     Q.    Have the court reporter hand you what has been

17 marked for identification as Exhibit 7.

18              (Thereupon, the document referred to was

19 marked as Exhibit No. 7)

20     Q.    Okay.  Do you recall seeing this doctor

21 certificate filled out by Dr. Michael Wilons, that is,

22 your lung specialist, on your behalf in December 2015?

23     A.    Yes, sir.

24     Q.    Have you seen this document before?

25     A.    I don't recall seeing it, but -- but, yes,

**Deposition of Benny Jackson, taken May 10, 2017**

Page 86

1    sir.  I mean, my signature's on it and it's dated.

2    Q.   Do you see where under number four, it says:

3    Did you advise this individual to leave work?  And

4    Dr. Wilons puts an X in the "yes" box and says that was

5    on April 27, 2015?

6    A.   Yes, sir.

7    Q.   Do you see under number five where he says,

8    quote, have you released this individual to return to

9    their usual work, end quote, and he puts an X in the

10   "yes" box?

11   A.   See that.  Yes, sir.

12   Q.   Do you see where in the next line it has a

13   place to explain restrictions?

14   A.   Yeah.

15   Q.   You see where it says:  If no, explain any

16   restrictions.  Do you see where he's left that blank?

17   A.   Yes, sir.

18   Q.   Does that refresh your recollection that

19   Dr. Wilons had released you to do your -- of course, in

20   the words of this form "your usual job"?

21          MR. WOODRUFF:  Objection.

22   Q.   (Mr. Moeller)  Usual work.  According to this

23   form, had Dr. Wilons released you to do your usual

24   work?

25          MR. WOODRUFF:  Objection.  Can I just say

**Deposition of Benny Jackson, taken May 10, 2017**

1  sure what he was gonna do I think would be the best

2  answer I could give you.

3      Q.   I see.  Any other conversations about any job

4  in 2014/2015 with anybody at Oil-Dri?

5      A.   Not that I recall.

6      Q.   Okay.  Now once you said on July 15 that you

7  thought you would retire, did you do anything yourself

8  to confirm your eligibility for 15 years of service?

9      A.   On my own, no, sir.  I assumed that I had met

10  the requirements for full retirement and pension

11  benefits.

12      Q.   And what did you base that assumption on?

13      A.   On my conversation with Ms. Rhonda Barnes.

14      Q.   And, again, I'm not asking you to repeat what

15  you've already said, but is there anything else that

16  she said to you when you say "your conversation with

17  Rhonda Barnes" that we have not -- that you've not

18  already testified to in this deposition?

19      A.   Well, I think I've already testified, but I

20  will -- if I haven't, I will repeat that she did sit

21  down and configure what my monthly payment would be on

22  my pension before we talked about -- you know, we were

23  talking about options at the time.

24      Q.   Okay.

25      A.   What my options would be.

View Sides Correspondence      https://internalaccessms.mdes.ms.gov/accessms/linkaction.do?ui501...

DHS-005

### UI-501 Initial Claim For Benefits

| CLAIMS OFFICE USE ONLY | | | |
|---|---|---|---|
| FILED BY : | jamesjackson0166 | COMPLETED BY : | jamesjackson0166 |
| FILING LOCATION : | WIN Job Center (Resource Center) | DATE FILED : | 11/16/2015 |

| PERSONAL INFORMATION | | | | | |
|---|---|---|---|---|---|
| Social Security Number : | | | | | |
| First Name : | JAMES | Middle Initial : | B | Last Name : | JACKSON |
| Date Of Birth : | | Gender : | Male | | |
| Ethnicity : | Not Hispanic | Race : | White | | |
| Other last name(s) worked under : | | | | | |
| Are you a U.S citizen? | | | YES | | |
| If No, provide Alien Document Type: | | | | | |
| If No, provide Alien Document Number: | | | | | |
| If No, provide Alien Document Expiration Date: | | | | | |
| Are you a military veteran, transitional veteran, or spouse of a military veteran? | | | NO | | |
| What is the highest grade you completed in school? | | | 4 Years of College | | |

| CONTACT DETAILS | |
|---|---|
| Mailing Address : | |
| Residential Address : | |
| County of Residence : | |
| Telephone : | |
| Second Telephone : | |
| Preferred way to contact you : | Mail |
| Email Address : | |

| EMPLOYER HISTORY | |
|---|---|
| Employer Name : | BLUE MOUNTAIN PRODUCTION COMPANY |
| Date Worked From : | 02/02/2000 |
| Date Worked To : | 07/15/2015 |
| Mailing Address : | |
| Job Location : | |
| Job Title : | Quality Control |
| Telephone : | |
| Rate of Pay : | 16.00/Hour |
| Reason For Separation : | Lack of work / Laid off |
| Requalifying Status : | N/A |
| Are you receiving or have you applied for a retirement or pension payment of any kind? | [ ] Yes [x] No |
| If yes, provide the date you received or will receive the pension | |
| Are you being paid by the employer for time off work during a period of business interruption? | [ ] Yes [x] No |
| Updated By: jamesjackson0166 | Updated On: 11/16/2015 01:07:45 |

| ELIGIBILITY INFORMATION | |
|---|---|
| 1. Do you have a disability? | [ ] Yes [x] No |
| 2. Were you employed with the federal government performing federal civilian service? | [ ] Yes [x] No |
| If Yes, provide the following: | |
| a. Indicate the last date of your employment with the federal government: | |
| b. Where did you work: | |
| 3. Were you discharged from the U.S. Military? | [ ] Yes [x] No |
| If Yes, provide the following: | |
| a. Date of Discharge: | |
| b. Branch of Service: | |
| 4. Have you worked outside the state in the last two years(24 months)? | [ ] Yes [x] No |
| 5. Do you have a definite date to return to work with your employer? | [ ] Yes [x] No |
| a. If Yes, indicate the date you expect to return to work: | |
| 6. Have you applied for Unemployment Insurance in any state other than MISSISSIPPI in the last 12 months? | [ ] Yes [x] No |
| a. If Yes, list the states where you applied: | |
| 7. Are you unemployed as a result of a major disaster declared by the President of the United States? | [ ] Yes [ ] No |

| ABLE AND AVAILABLE DETAILS | |
|---|---|
| 1. Are you currently self-employed? | [ ] Yes [x] No |


EXHIBIT

1/19/2017 9:55 AM

JBJ-000437

View Sides Correspondence                    https://internalaccessms.mdes.ms.gov/accessms/linkaction.do?ui501...

| | |
|---|---|
| 2. Have you refused an offer of work since your last day of employment? | [ ] Yes [x] No |
| 3. Are you presently attending school or training? | [ ] Yes [x] No |
| 4. Can you accept full-time work immediately? | [x] Yes [ ] No |
|    a. If No, select all the reasons that apply | |

| | |
|---|---|
| 1. Do you wish to have 10% of your benefit payments withheld for federal income tax? | [x] Yes [ ] No |
| 2. Do you normally work in MISSISSIPPI? | [ ] Yes [ ] No |

[Close]

1/19/2017 9:55 AM

JBJ-000438

**UI-538**

Mississippi Department of Employment Security [M|D|E|S]
## DOCTOR'S CERTIFICATE

Date Mailed: 12/01/2015

**CLAIMANT INFORMATION**

JAMES B JACKSON                                                  SSN:

RECEIVED DEC 1 0 2015

I certify that I have filed a claim for Unemployment Insurance benefits and hereby authorize the completion of this form for the Mississippi Department of Employment Security for Unemployment Insurance purposes only. This form must be returned to MDES within seven (7) days of the date mailed.

_J Benny Jackson_                                    12/03/2015
Claimant Signature                                        Date

**MEDICAL INFORMATION** (To be completed by physician)

1. This individual is being treated for: SHORTNESS OF BREATH INFLAMMATION INFECTION LUNG

2. Date individual was first treated: 4 / 27 / 2015

3. Date individual was last seen: 11 / 01 / 2015

4. Did you advise this individual to leave work?   ☑ Yes   ☐ No   If Yes, date: 4-28-15

5. Have you released this individual to return to their usual work?   ☑ Yes   ☐ No   If Yes, date released: 11-18-15

   If No, explain any restrictions:

**PREGNANCY INFORMATION / PRENATAL** (To be completed by physician)

1. What is the expected date of delivery? ____/____/____

2. Is this individual able to work now?   ☐ Yes   ☐ No   If No, date she became unable to work ____

**PREGNANCY INFORMATION / PRENATAL** (To be completed by physician)

1. Date of delivery: ____/____/____   2. Date individual may return to usual work ____

**CONTACT INFORMATION**

Physician's Signature: _Michael D Wilms_

Physician's Printed Name: MICHAEL D WILMS

Clinic/Hospital Name: MEMPHIS LUNG PHYSICIANS

Address: 6025 WALNUT GROVE R.M. MEMPHIS TN 38120

Phone: (901) 169-5816   Ext:   Date: 12-7-2015

TO RETURN, USE ONE OF THE FOLLOWING METHODS:
Mail:   Follow the instructions on the reverse side.
Fax:    601-321-6139

EXHIBIT
7
Jackson

JBJ-000443

BEFORE THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION

MWCC NO. 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B

JAMES BENNY JACKSON            CLAIMANT

VS.

BLUE MOUNTAIN PRODUCTION CO.          EMPLOYER

AND

LIBERTY MUTUAL FIRE INSURANCE COMPANY       CARRIER

> RECEIVED
> JAN 0 3 2017
> DOCKET ROOM
> M.W.C.C.

### APPLICATION FOR APPROVAL
### OF COMPROMISE SETTLEMENT

COMES NOW James Benny Jackson, claimant in the above-styled and numbered cause, and files this his application with the Mississippi Workers' Compensation Commission, praying the approval by said Commission of a certain offer of compromise and settlement submitted to your claimant by Blue Mountain Production Co. and Liberty Mutual Fire Insurance Company, employer and carrier respectively, and in support thereof, would show the Commission as follows, to-wit:

Claimant alleges that he received accidental injuries and that his accidental injuries were received or became manifested on or about November 21, 2014, January 2, 2015, and April 28, 2015, in Tippah County, Mississippi, arising out of and in the course and scope of his employment with said employer; November 21, 2014, occurring when claimant slipped and fell injuring his lower right extremity; January 2, 2015, occurring when preparing clay caused respiratory exposure; April 28, 2015, occurring when as a result of cumulative trauma while preparing clay claimant injuring his right upper extremity. Employer and carrier have denied the occurrence of any and all accidents and/or injuries. Claimant never reported any injuries or conditions to the employer until claimant

D0683014.1



decided to retire. The average weekly wage at the time of the injuries was $641.60. Claimant has been paid no disability payments.

Claimant treated with Family Clinic of Falkner, Dr. Michael Wilons, Dr. Hanna Mitias.

Family Clinic of Falkner referred claimant to a pulmonologist in 2015 for breathing problems possibly related to work, but also noted his history of alcoholism and years of steroid use due to arthritis. Dr. Michael Wilons at Memphis Lung Physicians took claimant off work on April 27, 2015, to remove him from exposure to dust and chemicals, and his breathing improved. Claimant's breathing returned to baseline within 6 to 7 weeks of removal from exposure. Dr. Wilons confirmed in November 2015 it was related to work because claimant retired in the summer and had no problems since then. After tapering off medications, claimant had remarkable worsening of airflow obstruction at his next visit, but on his last visit in April 2016, Claimant's pulmonary function had returned to normal other than an acute infection. Dr. Wilons answered a questionnaire stating claimant's breathing problems were related to his work, he was unable to work from April 27, 2016, through June 30, 2016, and he had no permanent restrictions. Dr. Wilon's questionnaire is attached hereto as Exhibit "A" and incorporated herein by reference.

Claimant had treated with Dr. Mitias for multiple issues since the late 90's. He had ankle surgery, surgery to repair a torn meniscus in his left knee, left carpal tunnel release, and treatment for osteoarthritis in both knees and his shoulder. He was diagnosed with severe bilateral carpal tunnel syndrome in 2002.

On April 29, 2014, claimant complained of numbness and tingling in his right hand for several months, and the impression was right carpal tunnel syndrome. On October 7, 2014, Dr. Mitias noted that claimant desired to have a lap band procedure, and Dr. Mitias noted losing weight

would probably take care of his carpal tunnel syndrome as it could be due to obesity. He also noted it would help his knees.

Claimant returned December 9, 2014, with right knee pain describing a fall at work after slipping on wet cat litter and twisting his knee two to three weeks earlier. Dr. Mitias' impression was a lateral meniscus tear. The pain was a new type of pain different from claimant's prior and ongoing knee complaints, and Dr. Mitias thought this new pain was related to a work injury. Claimant continued to treat with Dr. Mitias, but none of the records mention the meniscus tear. His knee complaints consistently refer to osteoarthritis and injections to relieve the pre-existing arthritic pain. He also received injections for carpal tunnel syndrome. On September 8, 2016, Dr. Mitias recommended a right carpal tunnel release. A copy of Dr. Mitias' records are attached hereto as composite Exhibit "B" and incorporated herein by reference.

Your claimant would further show unto the Commission that he has contended, and now contends, that he is entitled to compensation whereas said employer and carrier have contended, and now contend, that your claimant is not entitled to any further compensation, and in no event, to the amount thereof demanded by the claimant. In order to compromise and finally settle the disagreement as to the extent of disability suffered by your claimant, the said employer and carrier have offered to pay your claimant the sum of $22,000.00, all inclusive, without discount, in addition to any compensation and medical benefits heretofore paid, in complete settlement of all claims of every kind and nature, arising out of or in any way related to this claim or those injuries or conditions alleged herein, with claimant responsible for payment of all outstanding and future medical expenses. The parties herein agree that the settlement amount includes any back temporary total disability benefits owed to claimant.

D0683045.1                                          3

Employer and carrier would show that the purpose of this settlement is to compromise a doubtful and disputed claim, avoid litigation, and to buy peace, and that no payments made or other consideration given shall be construed as an admission of liability, all liability being expressly denied.

The claimant has filed for Social Security, but was denied and is not eligible for Medicare at this time. The total settlement is as follows: $22,000.00 less attorney fees of $5,000.00 and $5,000.00 for future medical. This leaves a balance of $12,000.00 for permanent partial disability benefits. Pursuant to the Mortality Table, the claimant is expected to live 999.44 more weeks. If the $12,000.00 was divided by this many weeks, the claimant would receive $12.01 per week in Workers' Compensation benefits as it relates to Social Security Disability benefits.[1]

Claimant affirmatively states on his oath that he is not a Medicare or Medicaid recipient and that he has been paid no benefits under either of those programs for these alleged injuries or otherwise. The employer and carrier rely on those sworn assertions of claimant regarding those issues as part of the agreement to settle this case, and claimant agrees to indemnify the employer and carrier for any adverse consequences they might experience should it be found that claimant has not been truthful regarding these assertions.

The Medicare Secondary Payer Act, 42 U.S.C. §1395y(b)(2), ("MSP") provides that any money received for settlement is a primary payment to Medicare. Further, the MSP also provides that Medicare does not pay for any item or service if there is a primary payment or payor. The regulations, 42 C.F.R. §411.46 provide that if any amount paid for settlement is intended to compensate the individual for all future medical expenses related to the claimed injuries, conditions

---

[1]Employer and carrier do not participate in this request.

4

or diseases, Medicare payments for such services are excluded until medical expenses related to the injuries, conditions or diseases equal the amount of these payments. Claimant is not expected to become a Medicare beneficiary within 30 months. The total settlement amount is under $250,000.00. As such, this case does not meet CMS' review thresholds. Further, employer and carrier have denied and continue to deny compensability of this claim, and therefore, dispute any liability for any medical treatment obtained by claimant.

Your claimant further shows that this request and application are made pursuant to the provisions of Section 71-3-29 of Mississippi Code Annotated (1972), and that this case comes within the purview of such section for the reason that it is impossible to determine the exact extent of the disability suffered by your claimant, and it would be to the best interest of your claimant for the Commission to allow said employer and carrier to settle and compromise said differences herein with your claimant, and to allow said payment to be made in full discharge of all responsibility of said employer and carrier under the terms of the Mississippi Workers' Compensation Act, or otherwise.

Your claimant would further show that he has employed the services of L. Shane Tompkins, attorney at law, of Columbus, Mississippi, that said attorney has rendered valuable services in bringing about the aforesaid offer of compromise and settlement, and that your claimant has agreed to pay said attorney, subject to approval by this Commission, $5,000.00. Your claimant now avers that this Commission should authorize him to pay to said attorney the sum of $5,000.00.

WHEREFORE, PREMISES CONSIDERED, your claimant prays that this application be considered at the next meeting of this Commission, and that upon due consideration, the Commission will enter an order approving said compromise and settlement as set forth above as a full and complete settlement, accord and satisfaction for all disability of every kind and nature

D0683045.1

5

sustained by your claimant as a result of the injuries or conditions which occurred or became manifested on or about November 21, 2014, January 2, 2015 and April 28, 2015, and that said payment, when made, shall fully acquit and discharge said employer and carrier from any further liability because of, arising out of, or in any way connected with said accidental injuries or conditions.

Your claimant prays that this Commission will authorize and empower him to execute any and all receipts, releases, acquittances, and every instrument required by said employer and carrier to effectuate the purposes hereof.

Claimant further prays that this Commission will authorize and empower him to pay to L. Shane Tompkins, attorney, the sum of $5,000.00.

Respectfully submitted,

JAMES BENNY JACKSON

RECEIVED
JAN 03 2017
DOCKET ROOM
M.W.C.C.

D06B3045.1

6

STATE OF MISSISSIPPI

COUNTY OF Lownds

THIS DAY PERSONALLY CAME AND APPEARED BEFORE ME, the undersigned authority in and for the state and county aforesaid, the within named James Benny Jackson, who acknowledged that he did sign and execute the above and foregoing Application for Approval of Compromise Settlement on the day and year therein mentioned and for the intent and purposes therein expressed.

SWORN TO AND SUBSCRIBED BEFORE ME, this the 28th day of

_____, 2016.

_____
NOTARY PUBLIC

My commission expires:

APPROVED BY:

_____
I. SHANE TOMPKINS - MSB #100011
ATTORNEY FOR CLAIMANT
TOMPKINS LAW FIRM
POST OFFICE BOX 1804
COLUMBUS, MS 39703
TELEPHONE: (662)328-7557
FACSIMILE: (662)594-2535
EMAIL: shane@tompkinslawfirm.com

MWCC NO. 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B

RECEIVED
JAN 03 2017
DOCKET ROOM
M.W.C.C.

D0683045.1                    7

## JOINDER OF EMPLOYER AND CARRIER

COME NOW Blue Mountain Production Co. and Liberty Mutual Fire Insurance Company, employer and carrier, respectively of the claimant, James Benny Jackson, by their attorneys, Daniel Coker Horton & Bell, P.A., and join with the claimant in his Application for Approval of Compromise Settlement, and hereby affirm all things therein set forth.

BLUE MOUNTAIN PRODUCTION CO. AND LIBERTY MUTUAL FIRE INSURANCE COMPANY, EMPLOYER AND CARRIER

BY: DANIEL COKER HORTON & BELL, P.A., THEIR ATTORNEYS

BY: _____
OF COUNSEL

GEORGE E. READ - MSB # 8757
DANIEL COKER HORTON & BELL, P.A.
265 NORTH LAMAR BOULEVARD, SUITE R
POST OFFICE BOX 1396
OXFORD, MS 38655-1396
TELEPHONE: (662)232-8979
FACSIMILE: (662)232-8940
EMAIL: gread@danielcoker.com

MWCC NO. 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B

4366-131689, 4366-131690, 4366-131691/kg



D0683045.1

8

From:                                    04/26/2016 15:42    #386 P.002/003



**TOMPKINS LAW FIRM**

L. SHANE TOMPKINS, ESQ                           ASHLEE P. BRYAN, PARALEGAL

MARK JACKSON, ESQ                                DRITANIE SPURR, PARALEGAL

DEBORAH R. MOORE, PARALEGAL                      PAM WYCKOFF, PARALEGAL

April 20, 2016

*Via Fax: 901 767 6591*
Dr. Michael Wilons, MD
Memphis Lung Physicians Foundation
6025 Walnut Grove Road, #508
Memphis, TN 38120

Re: *James Benny Jackson v. Blue Mountain Production*
    *Dates of Injury/Illness: April 28, 2015*
    *MWCC No: 1603043 P 1437*

Dear Dr. Wilons:

Our office has been retained to represent Mr. Jackson in the above captioned workers' compensation matter. A medical records authorization is attached for your convenience. We are alleging that Mr. Jackson developed a respiratory condition late in December 15, 2014, due to his exposure to dust and other chemicals while working for the Employer, Blue Mountain Production, which produces cat litter. I have enclosed your medical records from April 29, 2015 to November 10, 2015. However, it is my understanding that Mr. Jackson was also seen by you on April 19, 2016. After reviewing the enclosed records, I would appreciate your response to the following questions:

1) What is your diagnosis for the condition Mr. Jackson was suffering from as of April 27, 2015?

   _Bronchospastic airway disease_

2) Is it your opinion that Mr. Jackson's exposure to dust and other chemicals at work caused aggravated, exacerbated or accelerated the condition you diagnosed for the Claimant in response your response to question #1 of this letter?  ✓ yes ____ no

3) If yes, what period of time was Mr. Jackson unable to work due to the condition you diagnosed in your response to question #1 of this letter?

   _4-27-15 → 6-30-15_

RECEIVED
JAN 03 2017
DOCKET ROOM
M.W.C.C.

MAILING ADDRESS                  PHONE: (662) 328-7557        PHYSICAL ADDRESS
P.O. BOX 1804                    FAX (866) 594 2535           301 5TH STREET SOUTH, SUITE B
COLUMBUS, MISSISSIPPI 39703      WWW.TOMPKINSLAWFIRM.COM      COLUMBUS, MISSISSIPPI 39701

EXHIBIT
A

From:                                    04/26/2016 15:42    #388 P.003/003

Page 2
Dr. Michael Wilous
April 30, 2016

4)  What permanent restrictions if any, would you assign, secondary to the condition you diagnosed for
    Claimant in your response to question #1 of this letter?    No restrictions

I would like to thank you in advance for responding to this letter.

                                        Sincerely,

                                        Tompkins Law Firm

                                        // Shane Tompkins, Esq.

LST/dm
Enclosures
c: B. Jackson
   Employer-Carrier