# James Benny Jackson v. Oil-Dri Corporation of America, et al.

**Michael Wilons, M.D.**

**August 17, 2017**



Mississippi - Louisiana - Tennessee - New York
www.brookscourtreporting.com



EXHIBIT

F

Michael Wilons, M.D. 8/17/2017

```
 1   was marked for identification.)

 2        Q.   When did you first begin treating

 3   Mr. Jackson?

 4        A.   First time I saw Mr. Jackson was on

 5   4/27/15.

 6        Q.   What was the purpose of his visit?

 7        A.   He came to the office because he had been

 8   ill since December with recurrent respiratory

 9   issues, been treated with multiple rounds of

10   antibiotics and steroids and had not improved.  And

11   he was I believe referred by his physician to see if

12   there's anything else we could do to improve his

13   pulmonary status.

14        Q.   And what was his diagnosis?

15        A.   At that time I think they were talking

16   that he might have COPD.  But our pulmonary studies

17   showed that he had some air flow obstruction but had

18   significant reversibility and tests suggested that

19   there was lateral reversibility to his airway

20   problems.

21        Q.   And so what course of treatment did you

22   recommend?

23        A.   Well, I started him on an active program

24   of bronchodilators and steroids and suggested since
```

Michael Wilons, M.D. 8/17/2017

1    re-exacerbations of what he went through that took

2    several months to get over.

3       Q.   If you would, I'm going to hand you

4    Exhibit 1, because when I reviewed your record of

5    that visit, I see no mention of any work

6    restrictions at all.

7       A.   Actually, I remember talking with him,

8    asking him did they have any opportunities for you

9    to do something where you are not exposed to the

10   dust and the chemicals.  I got the complete record

11   here.  And I don't specifically have anything

12   documented.  But that was part of our discussions,

13   trying to limit exposure.

14      Q.   Is that not something you would normally

15   include in your records if you had a discussion

16   about limiting exposure at work?

17      A.   Normally it would be.  But there's a lot

18   of times you say things in a discussion with a

19   patient, you don't document every word.

20      Q.   I'm going to mark this letter as Exhibit

21   3.

22               (Thereupon, Deposition Exhibit No. 3

23   was marked for identification.)

24      Q.   So, this letter is dated July 15, 2015 and

Michael Wilons, M.D. 8/17/2017

```
 1   it's to Mr. Jackson, correct?

 2       A.    Uh-huh.

 3       Q.    And it indicates that his respiratory

 4   problems have resolved and his pulmonary function

 5   test is normal, correct?

 6       A.    Right.

 7       Q.    It doesn't say anything about any work

 8   restrictions, correct?

 9       A.    No, it doesn't.  Also, it's not there

10   either, but when I have a patient who's had

11   respiratory issues and it's possibly related to

12   work, I usually say one of the only ways we are

13   going to find out if the work is really the source,

14   if you go back and you have recurrent episodes, that

15   sort of confirms it.

16       Q.    Do you know whether Mr. Jackson attempted

17   to return to work after your July 15, 2015 visit?

18       A.    I don't specifically know, but I think he

19   really talked about retiring and didn't return to

20   work.

21       Q.    So you never filled out any sort of

22   paperwork that indicated that he had work

23   restrictions; is that correct?

24       A.    I don't believe so, unless that FMLA --
```

Michael Wilons, M.D. 8/17/2017

```
 1      Q.    Other than the FMLA paperwork --
 2      A.    Yeah.
 3      Q.    -- you've never filled out any paperwork?
 4      A.    No, not that I remember.
 5      Q.    Let me get my question out so she can put
 6  it on the record.
 7      A.    Okay.
 8      Q.    Other than FMLA paperwork, you haven't
 9  filled out any paperwork or given any statements
10  that he would have any restrictions at work; is that
11  correct?
12      A.    I don't believe so.
13      Q.    But that is correct, yes?
14      A.    That's correct, yes.
15      Q.    Do you know whether Mr. Jackson has ever
16  filed for Social Security Disability benefits?
17      A.    I don't know.
18      Q.    Do you know whether he has filed for
19  disability retirement?  Like sometimes you can get
20  early retirement because you're disabled.  Do you
21  know whether he's filed for that?
22      A.    I do not know.
23      Q.    Do you know whether he filed for Workers'
24  Comp benefits?
```

Michael Wilons, M.D. 8/17/2017

```
 1     A.   I do not know.
 2          MS. CANNADY:  I'm going to mark Exhibit 4.
 3               (Thereupon, Deposition Exhibit No. 4
 4   was marked for identification.)
 5     Q.   Mr. Jackson did file for Workers' Comp
 6   benefits and I'm going to hand you his settlement
 7   paperwork.
 8          Do you recall this document that you
 9   received from his Workers' Compensation attorney?
10     A.   I don't recall it specifically.  But I
11   apparently saw it.
12     Q.   If you would, look down at question 3 and
13   read that into the record for me, please.
14     A.   What time was Mr. Jackson unable to work?
15   Your response 4/27 to 6/30/15.
16     Q.   If would you flip over to number 4 and
17   read that question and the response for me.
18     A.   What permit restrictions would you assign
19   secondary to the condition you diagnosed?  I said no
20   restrictions.
21          MS. CANNADY:  We're marking the
22   designation as number 5.
23               (Thereupon, Deposition Exhibit No. 5
24   was marked for identification.)
```

Michael Wilons, M.D. 8/17/2017

1       Q.   Have you ever seen this document before,

2  Dr. Wilons?

3       A.   I do not recall seeing this document.

4       Q.   If you would, look over the portion that's

5  related to you.

6            Do you have any opinions to offer

7  regarding that we haven't discussed regarding

8  Mr. Jackson's diagnosis?

9       A.   No.  I think the thing about returning

10  back to work was after we talked about going back to

11  work and he's talking about retirement, I said

12  that we asked -- I asked him about any options at

13  work that would not put you in harm's way and he

14  said there weren't any.  I said the only way we

15  could tell the work was totally a problem that was

16  causing your breathing issues is if you went back

17  and started over.

18       Q.   You don't know whether if Mr. Jackson went

19  back to work his problem would return?

20       A.   I did not know.  That's how we determine

21  that the environment is part of the problem.

22       Q.   Elimination?

23       A.   Elimination, yeah, unless there was a

24  number of people who all are having the same kind of

Michael Wilons, M.D. 8/17/2017

```
 1   improved being away from work.
 2       Q.   But did he have an impairment on that
 3   date?
 4       A.   Breathing tests were normal.
 5       Q.   Did he have any impairment that affected
 6   his ability to care for himself?
 7       A.    Not from the respiratory standpoint.  But
 8   his complaints that he talked about were other than
 9   pulmonary which I have no expertise nor could I
10   describe how the limitations related to those.
11       Q.   So your area of expertise in reference to
12   Mr. Jackson is limited to the pulmonary function?
13       A.   Yes.
14       Q.   That's fine.  We can agree that that's
15   what we're discussing?
16       A.   Yeah, uh-huh.
17       Q.   Was his ability to perform manual tasks
18   limited with regard to his pulmonary function?
19       A.   That's what the whole point of going back
20   to work to see what happens.  The day I saw him not
21   in the environment his breathing was normal.
22       Q.   His ability to see?
23       A.   I don't evaluate his seeing.
24       Q.   And I understand that some of these are
```

Michael Wilons, M.D. 8/17/2017

1   totally not within your area.

2       A.   I can't really comment on those

3   limitations based on those things.  I know that he

4   had back problems.  He had some chronic pain

5   problems.  I know eight months later or so he had

6   corneal surgery.  So, apparently, he was having some

7   visual issues.  I don't know the details and could

8   not comment on his abilities related to that.

9       Q.   And that's fine.  I'm just going through

10  this checklist.  What about his ability to hear?

11      A.   I had no difficulty communicating with

12  him.

13      Q.   His ability to eat?

14      A.   There was no apparent problem with eating.

15      Q.   His ability to sleep?

16      A.   He had problems with sleep.  He had been

17  to a sleep doctor in the past and was still having

18  some symptoms.

19      Q.   Were those related to his lungs?

20      A.   They can be.  He may have had some

21  obstructive sleep apnea.

22      Q.   Do you have any knowledge regarding any

23  limitations beyond what he told you?

24      A.   No, because he had a sleep doctor.  And we

Michael Wilons, M.D. 8/17/2017

```
 1   did discuss going back and having reassessment.  He
 2   hadn't followed through completely.
 3        Q.   Do you know who that sleep doctor was?
 4        A.   Doctor was in Tupelo, I believe.  I don't
 5   know though.
 6        Q.   What about his ability to walk?
 7        A.   Not from the breathing standpoint.
 8        Q.   Stand?
 9        A.   Not from the respiratory standpoint.
10        Q.   Lift?
11        A.   Not from the respiratory standpoint.
12        Q.   Bend?
13        A.   Not really, no, not bending specifically.
14        Q.   Speak?
15        A.   Not from the respiratory standpoint.
16        Q.   Breathe?
17        A.   Not on that day.
18        Q.   Learn?
19        A.   No reason for impairment from my
20   standpoint.
21        Q.   Read?
22        A.   No.
23        Q.   Concentrate?
24        A.   No.  But I think he had other problems
```

Michael Wilons, M.D. 8/17/2017

```
 1   that may have had impact on that.

 2       Q.   I'm going to come back to that in just a

 3   moment.  What about his ability to think?

 4       A.   I think that's related to the other

 5   issues.  I can't really evaluate nor really comment

 6   on those.

 7       Q.   But those would not be linked to any lung

 8   problem?

 9       A.   Not to his breathing problems, no.

10       Q.   Communicate?

11       A.   No.

12       Q.   Work?

13       A.   No.

14       Q.   And then with regard to these major bodily

15   functions, did he have any impairment in July of

16   2015 that would affect his immune system?

17       A.   Some of the medications that he's taking

18   to control the breathing had a tendency to possibly

19   lower your immune response.

20       Q.   Do you know whether he, Mr. Jackson, had

21   any issues with his immune system?

22       A.   I wasn't aware of any.

23       Q.   Normal cell growth?

24       A.   Nothing from the breathing standpoint.
```

Michael Wilons, M.D. 8/17/2017

```
 1      Q.    His digestive system?

 2      A.    Not from the respiratory.

 3      Q.    His bowels?

 4      A.    No.

 5      Q.    Bladder?

 6      A.    No.

 7      Q.    Neurological functions?

 8      A.    Not from the respiratory standpoint.  But

 9   that's where the other issues that he mentioned

10   would be involved.

11      Q.    His brain?

12      A.    The other issues that he was dealing with.

13      Q.    His respiratory system?

14      A.    His respiratory system was under control

15   on medication.

16      Q.    And you testified that he had been weaning

17   off of the medication at that point, correct?

18      A.    I was trying to see if we could cut down

19   on some of the medication.

20      Q.    Was he off medication or he was just at a

21   reduced level?

22      A.    We were reducing the level.

23      Q.    Do you know what level of medication he

24   was on in July of 2015?
```

Michael Wilons, M.D. 8/17/2017

1    A.    We had been off steroids.  That was

2  completed.  He was still using the inhalers, long

3  acting inhaler and a rescue inhaler.

4    Q.    Do you have any opinion as to whether he

5  was substantially limited in his respiratory

6  function, because I believe you testified that his

7  PFT had returned to normal?

8    A.    Yes.

9    Q.    So at that point he was not limited?

10   A.    He was not limited from the pulmonary

11 standpoint.

12   Q.    What about his circulatory system?

13   A.    I didn't evaluate his circulatory system.

14   Q.    Endocrine?

15   A.    I didn't evaluate that.

16   Q.    Reproductive functions?

17   A.    I have no evaluation of that.

18   Q.    You mentioned his concentration and

19 thinking and neurological functions.  Does

20 Mr. Jackson have any problems with his memory?

21   A.    Mr. Jackson and I discussed this to the

22 extent that he played contact sports and had been in

23 an accident and there was some question of

24 concussive problems in the past.

Michael Wilons, M.D. 8/17/2017

```
1        Q.   Do you know whether he is seeing any

2   physician for the possibility of an Alzheimer's

3   diagnosis?

4        A.   I think he mentioned -- you know, that can

5   go along with early signs of dementia when you have

6   those kind of problems.  But the doctor who was

7   evaluating for that was talking to him about that.

8        Q.   As we discussed, your involvement in

9   Mr. Jackson's treatment is totally limited to --

10       A.   Totally limited to his pulmonary status.

11       Q.   Okay.  Do you know whether prior to

12  December 2014, whether Mr. Jackson had any pulmonary

13  issues?

14       A.   Historically, he had no history of any.

15  He was a non-smoker.  And he had never really had

16  but maybe some problems related to times he may have

17  had some allergy and leads to some minor problems.

18  But he was -- to me he was clear in describing the

19  problems that started end of 2014 were different

20  than anything he had before.

21       Q.   If you will give me one minute to flip

22  through these, we may be finished for me anyway.

23            Does Mr. Jackson continue to have any

24  problems or have they resolved?
```

Michael Wilons, M.D. 8/17/2017

```
 1      A.   Well, I saw Mr. Jackson several more times

 2   after that.  He came back in February of '16, tried

 3   to be off the medications and had a bronchitis and a

 4   flare-up which cleared.  The last time I saw him on

 5   4/19 of this year, he had completely normal

 6   pulmonary function status, the best he had been

 7   since the beginning.

 8           MS. CANNADY:  Ron, that's all I have for

 9   now, if you have any follow-up.

10           MR. WOODRUFF:  I have a few, Dr. Wilons.

11                   EXAMINATION

12   BY MR. WOODRUFF:

13      Q.   Dr. Wilons, we designated you as a

14   treating physician because in Federal Court you have

15   to designate someone who is going to give expert

16   testimony based upon their specialized knowledge,

17   which of course would be you.  Your testimony is as

18   a doctor.

19           What do you consider your specialty?

20   Would it be pulmonary or -- can you tell me what

21   your specialty is?

22      A.   Pulmonary medicine.

23      Q.   What we call pulmonary medicine?

24      A.   Yes.
```

BEFORE THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION

MWCC NO. 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B

JAMES BENNY JACKSON                                                    CLAIMANT

VS.

BLUE MOUNTAIN PRODUCTION CO.                                          EMPLOYER

AND

LIBERTY MUTUAL FIRE INSURANCE COMPANY                                 CARRIER

**RECEIVED**
**JAN 0 3 2017**
**DOCKET ROOM**
**M.W.C.C.**

### APPLICATION FOR APPROVAL
### OF COMPROMISE SETTLEMENT

COMES NOW James Benny Jackson, claimant in the above-styled and numbered cause, and files this his application with the Mississippi Workers' Compensation Commission, praying the approval by said Commission of a certain offer of compromise and settlement submitted to your claimant by Blue Mountain Production Co. and Liberty Mutual Fire Insurance Company, employer and carrier respectively, and in support thereof, would show the Commission as follows, to-wit:

Claimant alleges that he received accidental injuries and that his accidental injuries were received or became manifested on or about November 21, 2014, January 2, 2015, and April 28, 2015, in Tippah County, Mississippi, arising out of and in the course and scope of his employment with said employer; November 21, 2014, occurring when claimant slipped and fell injuring his lower right extremity; January 2, 2015, occurring when preparing clay caused respiratory exposure; April 28, 2015, occurring when as a result of cumulative trauma while preparing clay claimant injuring his right upper extremity. Employer and carrier have denied the occurrence of any and all accidents and/or injuries. Claimant never reported any injuries or conditions to the employer until claimant

D0683014.1



4

decided to retire. The average weekly wage at the time of the injuries was $641.60. Claimant has been paid no disability payments.

Claimant treated with Family Clinic of Falkner, Dr. Michael Wilons, Dr. Hanna Mitias.

Family Clinic of Falkner referred claimant to a pulmonologist in 2015 for breathing problems possibly related to work, but also noted his history of alcoholism and years of steroid use due to arthritis. Dr. Michael Wilons at Memphis Lung Physicians took claimant off work on April 27, 2015, to remove him from exposure to dust and chemicals, and his breathing improved. Claimant's breathing returned to baseline within 6 to 7 weeks of removal from exposure. Dr. Wilons confirmed in November 2015 it was related to work because claimant retired in the summer and had no problems since then. After tapering off medications, claimant had remarkable worsening of airflow obstruction at his next visit, but on his last visit in April 2016, Claimant's pulmonary function had returned to normal other than an acute infection. Dr. Wilons answered a questionnaire stating claimant's breathing problems were related to his work, he was unable to work from April 27, 2016, through June 30, 2016, and he had no permanent restrictions. Dr. Wilon's questionnaire is attached hereto as Exhibit "A" and incorporated herein by reference.

Claimant had treated with Dr. Mitias for multiple issues since the late 90's. He had ankle surgery, surgery to repair a torn meniscus in his left knee, left carpal tunnel release, and treatment for osteoarthritis in both knees and his shoulder. He was diagnosed with severe bilateral carpal tunnel syndrome in 2002.

On April 29, 2014, claimant complained of numbness and tingling in his right hand for several months, and the impression was right carpal tunnel syndrome. On October 7, 2014, Dr. Mitias noted that claimant desired to have a lap band procedure, and Dr. Mitias noted losing weight

would probably take care of his carpal tunnel syndrome as it could be due to obesity. He also noted it would help his knees.

Claimant returned December 9, 2014, with right knee pain describing a fall at work after slipping on wet cat litter and twisting his knee two to three weeks earlier. Dr. Mitias' impression was a lateral meniscus tear. The pain was a new type of pain different from claimant's prior and ongoing knee complaints, and Dr. Mitias thought this new pain was related to a work injury. Claimant continued to treat with Dr. Mitias, but none of the records mention the meniscus tear. His knee complaints consistently refer to osteoarthritis and injections to relieve the pre-existing arthritic pain. He also received injections for carpal tunnel syndrome. On September 8, 2016, Dr. Mitias recommended a right carpal tunnel release. A copy of Dr. Mitias' records are attached hereto as composite Exhibit "B" and incorporated herein by reference.

Your claimant would further show unto the Commission that he has contended, and now contends, that he is entitled to compensation whereas said employer and carrier have contended, and now contend, that your claimant is not entitled to any further compensation, and in no event, to the amount thereof demanded by the claimant. In order to compromise and finally settle the disagreement as to the extent of disability suffered by your claimant, the said employer and carrier have offered to pay your claimant the sum of $22,000.00, all inclusive, without discount, in addition to any compensation and medical benefits heretofore paid, in complete settlement of all claims of every kind and nature, arising out of or in any way related to this claim or those injuries or conditions alleged herein, with claimant responsible for payment of all outstanding and future medical expenses. The parties herein agree that the settlement amount includes any back temporary total disability benefits owed to claimant.

Employer and carrier would show that the purpose of this settlement is to compromise a doubtful and disputed claim, avoid litigation, and to buy peace, and that no payments made or other consideration given shall be construed as an admission of liability, all liability being expressly denied.

The claimant has filed for Social Security, but was denied and is not eligible for Medicare at this time. The total settlement is as follows: $22,000.00 less attorney fees of $5,000.00 and $5,000.00 for future medical. This leaves a balance of $12,000.00 for permanent partial disability benefits. Pursuant to the Mortality Table, the claimant is expected to live 999.44 more weeks. If the $12,000.00 was divided by this many weeks, the claimant would receive $12.01 per week in Workers' Compensation benefits as it relates to Social Security Disability benefits.[1]

Claimant affirmatively states on his oath that he is not a Medicare or Medicaid recipient and that he has been paid no benefits under either of those programs for these alleged injuries or otherwise. The employer and carrier rely on those sworn assertions of claimant regarding those issues as part of the agreement to settle this case, and claimant agrees to indemnify the employer and carrier for any adverse consequences they might experience should it be found that claimant has not been truthful regarding these assertions.

The Medicare Secondary Payer Act, 42 U.S.C. §1395y(b)(2), ("MSP") provides that any money received for settlement is a primary payment to Medicare. Further, the MSP also provides that Medicare does not pay for any item or service if there is a primary payment or payor. The regulations, 42 C.F.R. §411.46 provide that if any amount paid for settlement is intended to compensate the individual for all future medical expenses related to the claimed injuries, conditions

---

[1] Employer and carrier do not participate in this request.

4

or diseases, Medicare payments for such services are excluded until medical expenses related to the injuries, conditions or diseases equal the amount of these payments. Claimant is not expected to become a Medicare beneficiary within 30 months. The total settlement amount is under $250,000.00. As such, this case does not meet CMS' review thresholds. Further, employer and carrier have denied and continue to deny compensability of this claim, and therefore, dispute any liability for any medical treatment obtained by claimant.

Your claimant further shows that this request and application are made pursuant to the provisions of Section 71-3-29 of Mississippi Code Annotated (1972), and that this case comes within the purview of such section for the reason that it is impossible to determine the exact extent of the disability suffered by your claimant, and it would be to the best interest of your claimant for the Commission to allow said employer and carrier to settle and compromise said differences herein with your claimant, and to allow said payment to be made in full discharge of all responsibility of said employer and carrier under the terms of the Mississippi Workers' Compensation Act, or otherwise.

Your claimant would further show that he has employed the services of L. Shane Tompkins, attorney at law, of Columbus, Mississippi, that said attorney has rendered valuable services in bringing about the aforesaid offer of compromise and settlement, and that your claimant has agreed to pay said attorney, subject to approval by this Commission, $5,000.00. Your claimant now avers that this Commission should authorize him to pay to said attorney the sum of $5,000.00.

WHEREFORE, PREMISES CONSIDERED, your claimant prays that this application be considered at the next meeting of this Commission, and that upon due consideration, the Commission will enter an order approving said compromise and settlement as set forth above as a full and complete settlement, accord and satisfaction for all disability of every kind and nature

D0683045.1

5

sustained by your claimant as a result of the injuries or conditions which occurred or became manifested on or about November 21, 2014, January 2, 2015 and April 28, 2015, and that said payment, when made, shall fully acquit and discharge said employer and carrier from any further liability because of, arising out of, or in any way connected with said accidental injuries or conditions.

Your claimant prays that this Commission will authorize and empower him to execute any and all receipts, releases, acquittances, and every instrument required by said employer and carrier to effectuate the purposes hereof.

Claimant further prays that this Commission will authorize and empower him to pay to L. Shane Tompkins, attorney, the sum of $5,000.00.

Respectfully submitted,

JAMES BENNY JACKSON



RECEIVED
JAN 03 2017
DOCKET ROOM
M.W.C.C.

STATE OF MISSISSIPPI

COUNTY OF Lowndes

THIS DAY PERSONALLY CAME AND APPEARED BEFORE ME, the undersigned authority in and for the state and county aforesaid, the within named James Benny Jackson, who acknowledged that he did sign and execute the above and foregoing Application for Approval of Compromise Settlement on the day and year therein mentioned and for the intent and purposes therein expressed.

SWORN TO AND SUBSCRIBED BEFORE ME, this the 28th day of
_____, 2016.

_____
NOTARY PUBLIC

My commission expires:

APPROVED BY:

_____
L. SHANE TOMPKINS - MSB #100041
ATTORNEY FOR CLAIMANT
TOMPKINS LAW FIRM
POST OFFICE BOX 1804
COLUMBUS, MS 39703
TELEPHONE: (662)328-7557
FACSIMILE: (662)594-2535
EMAIL: shane@tompkinslawfirm.com

MWCC NO. 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B

RECEIVED
JAN 03 2017
DOCKET ROOM
M.W.C.C.

D0683045.1

7

## JOINDER OF EMPLOYER AND CARRIER

COME NOW Blue Mountain Production Co. and Liberty Mutual Fire Insurance Company, employer and carrier, respectively of the claimant, James Benny Jackson, by their attorneys, Daniel Coker Horton & Bell, P.A., and join with the claimant in his Application for Approval of Compromise Settlement, and hereby affirm all things therein set forth.

BLUE MOUNTAIN PRODUCTION CO. AND LIBERTY MUTUAL FIRE INSURANCE COMPANY, EMPLOYER AND CARRIER

BY:    DANIEL COKER HORTON & BELL, P.A., THEIR ATTORNEYS

BY:    _____
OF COUNSEL

GEORGE E. READ - MSB # 8757
DANIEL COKER HORTON & BELL, P.A.
265 NORTH LAMAR BOULEVARD, SUITE R
POST OFFICE BOX 1396
OXFORD, MS 38655-1396
TELEPHONE: (662)232-8979
FACSIMILE: (662)232-8940
EMAIL: gread@danielcoker.com

MWCC NO. 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B

4366-131689, 4366-131690, 4366-131691/kg



From:                                    04/26/2016 15:42    #386 P.002/003



# TOMPKINS LAW FIRM

L. SHANE TOMPKINS, ESQ
shane.tompkins@tompkinslawfirm.com

MARK JACKSON, ESQ
mark.jackson@tompkinslawfirm.com

DEBORAH R. MOORE, PARALEGAL
deborah.moore@tompkinslawfirm.com

ASHLEE P. BRYAN, PARALEGAL
ashlee.bryan@tompkinslawfirm.com

BRITANEE SPEAR, PARALEGAL
britanee.spear@tompkinslawfirm.com

PAM WYCKOFF, PARALEGAL
pam.wyckoff@tompkinslawfirm.com

April 20, 2016

_Via Fax:  901 767 6591_
Dr. Michael Wilons, MD
Memphis Lung Physicians Foundation
6025 Walnut Grove Road, #508
Memphis, TN 38120

Re: *James Benny Jackson v. Blue Mountain Production*
Dates of Injury/Illness:  April 28, 2015
MWCC No:  1603043 P 1437

Dear Dr. Wilons:

Our office has been retained to represent Mr. Jackson in the above captioned workers' compensation matter. A medical records authorization is attached for your convenience. We are alleging that Mr. Jackson developed a respiratory condition late in December 15, 2014, due to his exposure to dust and other chemicals while working for the Employer, Blue Mountain Production, which produces cat litter. I have enclosed your medical records from April 29, 2015 to November 10, 2015. However, it is my understanding that Mr. Jackson was also seen by you on April 19, 2016. After reviewing the enclosed records, I would appreciate your response to the following questions:

1) What is your diagnosis for the condition Mr. Jackson was suffering from as of April 27, 2015?

   _Bronchospastic airway disease_

2) Is it your opinion that Mr. Jackson's exposure to dust and other chemicals at work caused aggravated, exacerbated or accelerated the condition you diagnosed for the Claimant in response your response to question #1 of this letter?  __✓__ yes  _____ no

3) If yes, what period of time was Mr. Jackson unable to work due to the condition you diagnosed in your response to question #1 of this letter?

   _4-27-15 → 6-30-15_



RECEIVED
JAN 03 2017
DOCKET ROOM
M.W.C.C.

MAILING ADDRESS
P.O. BOX 1804
COLUMBUS, MISSISSIPPI 39703

PHONE: (662) 328-7557
FAX (866) 594 2535
WWW.TOMPKINSLAWFIRM.COM

PHYSICAL ADDRESS
301 5TH STREET SOUTH, SUITE B
COLUMBUS, MISSISSIPPI 39701

EXHIBIT
A

From:                                    04/26/2016 15:42     #386 P.003/003

Page 2
Dr. Michael Wilons
April 26, 2016

4)  What permanent restrictions if any, would you assign, secondary to the condition you diagnosed for
    Claimant in your response to question #1 of this letter? ____ No restrictions _____

I would like to thank you in advance for responding to this letter.

                                         Sincerely,

                                         Tompkins Law Firm

                                         /s/ Shane Tompkins, Esq.

LST/dm
Enclosures
c: B. Jackson
    Employer-Carrier

From:                                         05/12/2016 01:29    #140 P.015/021

# Mitias Orthopaedics & Sports Medicine

JACKSON, JAMES

DOB:

SSN:

Chart Number:
Hanna Mitias, MD
New Albany Clinic

12/09/2014 - MBP/HMM

**CHIEF COMPLAINT:** He comes to the clinic today with complaint of right knee pain.

**HISTORY OF PRESENT ILLNESS:** Mr. Jackson is a 61-year-old white male who reports that two to three weeks ago he was at work when he slipped, twisting his right knee. The patient reports that since that time he has had increased pain in his knee, particularly with knee flexion and weightbearing activity. The knee even feels as if it is going to catch and buckle with him. He denies any fever, chills, nausea, vomiting, bowel or bladder problems, nor has any complaints of numbness or tingling.

**PHYSICAL EXAMINATION:** He is a well-nourished, well-developed white male in no acute distress. He is alert and oriented x4. He appears the stated age of 61. He makes good eye contact in the clinic. There is no bruising, swelling, erythema, lacerations, lymphadenopathy, or palpable masses present. All compartments are soft. He is neurovascularly intact. Pulses are good. All dermatomal and myotomal patterns appear to be normal. The patient shows good respiratory effort and walks with an antalgic gait on the right. He is tender with palpation over the posterolateral joint line of the right knee. He has a negative varus stress test. With the valgus stress test, he has a good end feel. However, he has increased pain with this. He has pain with Apley and McMurray. Due to the girth of the patient's thighs, I am unable to get a good end feel with Lachman or posterior drawer.

**X-RAYS:** AP, lateral, and oblique views of the right knee shows that he has some calcification of the lateral meniscus.

**IMPRESSION:** Lateral meniscus tear of the right knee.

**PLAN:** Mr. Jackson was at work, and when it rains where they make cat litter it gets a little bit muddy and his foot slipped and twisted and he felt a sudden pain in his lateral joint line. I have treated Mr. Jackson for his knees in the past. It has always been medial joint line pain and this is completely new. He did ask me if this is something that would be related to his injury and I told him I thought it would. Right now I am going to try and inject it with 4 cc of lidocaine and 2 cc of Depo-Medrol under ultrasound. I will see him back in a week and just see if it has knocked out his pain. He cannot have his lap-band surgery because the final approval was not given by the insurance company.

_____

Hanna M. Mitias, MD

Job #: R133543
DD: 12/09/2014 15:26 / DU: 12/09/2014 17:08    DT: 12/10/2014 13:28
Author ID: 2261



## Mitias Orthopaedics & Sports Medicine

JACKSON, JAMES

DOB:
SSN:

Chart Number:
Samuel Keith Box, DO
New Albany Clinic

03/27/2015 - DBR/SB

I reviewed the past medical history, family history, drug allergies, medications, past surgical history, social history, and review of systems on the Mitias Orthopaedics intake form. They have been reviewed and uploaded into the medical record.

CHIEF COMPLAINT: Mr. Jackson comes in today with chief complaint of bilateral knee pain and right wrist pain.

HISTORY OF PRESENT ILLNESS: Mr. Jackson is here today with complaints of bilateral knee pain and right wrist pain. He had a knee scope about 15 years ago on his left knee. He has had injections of cortisone and hyaluronic acid injections in his right knee. The last injection in his right knee was back in December. His pain is worse with ambulation. He also complains of right wrist pain and numbness and tingling. He has had a carpal tunnel release already on the left. His hand pain is worse at night. He complains of numbness and tingling in the median nerve distribution. He denies any fever, chills, nausea or vomiting.

PHYSICAL EXAMINATION: He is a well-nourished, well-developed white male in no acute distress. He is alert and oriented x3. There are mild effusions in both knees. He has some diffuse wrist swelling. There is no bruising, erythema, lacerations, lymphadenopathy or palpable masses present. All compartments are soft. He has good pulses. He has decreased sensation in his right median nerve distribution. He shows good respiratory effort. He has an antalgic gait. He has full range of motion with extension in both knees. Flexion is about to 110 degrees in both knees. His strength is full. There is some slight crepitus with motion. He has good alignment in standing. He has negative varus and valgus stress tests. Lachman is negative. McMurray is tender, but not positive. With his right wrist, Tinel and Phalen are positive. He has decreased range of motion of the wrist. Finkelstein is negative, although he does have some palpable pain in the first dorsal compartment. He has decreased range of motion of his fingers.

X-RAYS: AP, lateral, and oblique views of the left wrist show arthritic changes in the wrist and a little bit of widening of the scapholunate area.

IMPRESSION:
1. Right carpal tunnel syndrome.
2. Bilateral knee osteoarthritis.

PLAN: Mr. Jackson is here today for a followup of his right carpal tunnel syndrome and his bilateral knee osteoarthritis. His carpal tunnel is waking him up at nighttime. He was last seen for his knees back in December so it has been about three months since that visit. Today, I am going to go ahead and inject both knees with 4 cc of lidocaine and 1 cc of Depo-Medrol. I am going to inject his right carpal tunnel space with 1 cc of lidocaine and 1 cc of Depo-Medrol. All of this will be done with ultrasound guidance. I will see him back on a p.r.n. basis.

Samuel Keith Box, DO

## Mitias Orthopaedics & Sports Medicine

JACKSON, JAMES

DOB:
SSN:

Chart Number:
Samuel Keith Box, DO
New Albany Clinic

Job #: R145857
DD: 03/27/2015 12:23 / DU: 03/30/2015 08:41    DT: 03/30/2015 10:04
Author ID: 2275

# Mitias Orthopaedics & Sports Medicine

JACKSON, JAMES
                   DOB:
                   SSN:

Chart Number:
Samuel Keith Box, DO
New Albany Clinic

03/27/2015 - DBR/SB

EXAMINATION PERFORMED:  Limited diagnostic ultrasound of the bilateral knees and right upper extremity.

CLINICAL INDICATION:
1.  Bilateral knee osteoarthritis and pain.
2.  Carpal tunnel syndrome, right wrist.

FINDINGS:  The patient was placed in the hook-lying position.  The small linear transducer was placed over the anterior aspect of the left knee.  Under ultrasound visualization, we see the quadriceps tendon and the suprapatellar pouch.  There is a mild joint effusion present.  There appear to be no masses, lesions, or defects present.  We then turned our attention over to the right knee.  Here, also, we see a mild joint effusion present.  There are no masses or defects.  We then turned our attention over to the right wrist.  Here, the small linear transducer was placed over the volar aspect of the right wrist.  Under ultrasound visualization, we see the carpal tunnel space, the flexor tendons, the transverse carpal ligament, and the median nerve.  The anatomical structures appear to be intact.  There is some hypoechoic feedback present in the carpal tunnel space.  The median nerve is compressed.  It does measure 0.82 cm in width.  It is compressed against the transverse carpal ligament.

IMPRESSION:
1.  Bilateral knee osteoarthritis.
2.  Bilateral knee mild joint effusion.
3.  Carpal tunnel syndrome, right wrist, with a measurement of 0.82 cm of the median nerve.

PROCEDURE:  With the patient in the hook-lying position, we sterilely prepped the lateral gutter of the left knee in the proper fashion.  We anesthetized the site with ethyl chloride.  We reapplied the small linear transducer to better visualize the anatomy.  With the suprapatellar pouch well identified and under ultrasound guidance of the needle, we injected 4 cc of lidocaine and 80 mg of Depo-Medrol into the suprapatellar pouch of the left knee.  We then turned our attention over to the right knee.  Here, also, we sterilely prepped the lateral gutter of the right knee in the proper fashion.  We anesthetized the site with ethyl chloride.  We reapplied the small linear transducer to better visualize the anatomy.  With the suprapatellar pouch well identified and under ultrasound guidance of the needle, we injected 4 cc of lidocaine and 80 mg of Depo-Medrol into the suprapatellar pouch of the right knee.  We then turned our attention over to the right wrist.  Here, we sterilely prepped the radial aspect of the right wrist in the proper fashion.  We anesthetized the site with ethyl chloride.  We reapplied the small linear transducer to better visualize the anatomy.  With the carpal tunnel space well identified and the median nerve also well identified, we injected 1 cc of lidocaine and 40 mg of Depo-Medrol above the median nerve, decompressing it from the transverse carpal ligament.  The patient tolerated all three injections well and noted relief.

The images obtained are attached to the patient's chart.

## Mitias Orthopaedics & Sports Medicine

JACKSON, JAMES

DOB:
SSN:

Chart Number:
Samuel Keith Box, DO
New Albany Clinic

Samuel Keith Box, DO

Job #: R145784
DD: 03/27/2015 13:09 / DU: 03/27/2015 14:08    DT: 03/27/2015 15:09
Author ID: 2275

MITIAS ORTHOPAEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

**JACKSON, JAMES B**

## Encounters and Procedures

Clinical Encounter Summaries
**Encounter Date: 05/03/2016**
Patient

| | | | |
|---|---|---|---|
| Name | JACKSON, JAMES | Appt. Date/Time | 05/03/2016 10:15AM |
| DOB | | Service Dept. | MITIAS ORTHOPAEDICS PLLC |
| Provider | HANNA M. MITIAS, MD | | |
| Insurance | Med Primary: BCBS – IL (PPO) | | |

      Insurance # : XOF843105224
      Policy/Group # : P16742
      Employer Name : BLUE MOUNTAIN PRODUCTION
      Prescription: SURESCRIPTS LLC – This member could not be found in the payer's files. Pleas
      coverage and all member demographic information. details

### Chief Complaint

Followup: Osteoarthritis of knee
Followup: Carpal tunnel syndrome

### Previous Assessment / Plan

Date of Service
11/12/2015
**1. Osteoarthritis of knee – Bilateral**
    M17.11: Unilateral primary osteoarthritis, right knee
    M17.12: Unilateral primary osteoarthritis, left knee
    · INJECTION/ASPIRATION, LARGE JOINT OR BURSA, WITH ULTRASOUND GUIDANCE (PROC)
    · INJECTION/ASPIRATION, LARGE JOINT OR BURSA, WITH ULTRASOUND GUIDANCE (PROC)
    · Kenalog 40 mg/mL suspension for injection - Take by injection route.   Administered   Route: Injectior
    Administer Qty: 40 mg
    · Kenalog 40 mg/mL suspension for injection - Take by injection route.   Administered   Route: Injectior
    Administer Qty: 40 mg

**2. Localized osteoarthrosis**
    M19.011: Primary osteoarthritis, right shoulder

**3. Carpal tunnel syndrome**
    G56.01: Carpal tunnel syndrome, right upper limb
    · Kenalog 40 mg/mL suspension for injection - Take by injection route.   Administered   Route: Injectior
    Administer Qty: 40 mg
    · INJECTION, CARPAL TUNNEL (PROC)

### Discussion
**Discussion Notes**
    we will go ahead and inject his right carpal tunnel and bilateral knees under ultrasound guidance. I will se
    a when necessary basis.

### Allergies

Allergies not reviewed (last reviewed 11/12/2015)
CODEINE
PENICILLIN G

### Medications

Medications not reviewed (last reviewed 11/12/2015)

| | | |
|---|---|---|
| Cardizem | 11/12/15 | entered |
| Celebrex | 11/12/15 | entered |

MITIAS ORTHOPAEDICS PLLC · 206 OXFORD RD, NEW ALBANY MS 38652-3115

**JACKSON, JAMES B**

| | |
|---|---|
| Kenalog 40 mg/mL suspension for injection<br>Take by injection route. | 05/03/16 |
| Lamisil | 11/12/15  entered |
| Nasacort | 11/12/15  entered |

### Problems
  · Carpal tunnel syndrome
  · Localized osteoarthrosis
  · Osteoarthritis of knee

### Vitals
  None recorded.

### Social History
  Social History not reviewed (last reviewed 11/12/2015)
  Smoking Status: Never smoker
  Are you currently employed?: N
  Employer: retired
  Able to Care for Self: Y
  Hand Dominance: Right

### Past Medical History
  Past Medical History not reviewed (last reviewed 11/12/2015)
  Heart Problems: Y – Irregularity
  Hypertension: Y

### QM
  Provider: jmitias
  Programs: MU Medicare - Year 1 - 2015 Stage 1, MU Medicare - Year 2 - 2016, PQRS 2015 (EHR and Registry), PQ
  (EHR and Registry)
  Last updated 05/03/2016

| Measure | Status |
|---|---|
| BMI Screening and Follow-Up (F/U on or prior to most recent BMI) | Needs Data |
| Colorectal Cancer Screening | Needs Data |
| Depression screening and follow-up | Needs Data |
| Hypertension screening and follow-up | Needs Data |
| Measures Group: Preventive care: Unhealthy alcohol use: Screening & brief counseling | Needs Data |
| Patients view or download their health info | Needs Data |
| Provide patient information | Needs Data |
| Documentation of current medications | No Episodes |
| Tobacco screening and cessation intervention | Satisfied |

### HPI
Patient is a 62-year-old white male who we have followed for a long time for bilateral knee osteoarthritis as we
carpal tunnel syndrome. We've done periodic injections in both knees and his right carpal tunnel. He has done
with the injections. He last received injections of Kenalog into the bilateral knees on 11/12/2015 as well as Ker
injection in the right carpal tunnel space. These helped well until approximately 1 month ago when all of his pa
recurring. He comes in the clinic today requesting more injections. He continues to have pain at night but it is
During the daytime he noted some decreased grip strength. He's had no new injuries or trauma. He also has ha
knee osteoarthritis. He states that he is getting by with activities of daily living. He is no longer working and is
do more at home because of that. He does not need or wish to have knee replacements at this point. Both his
worse with weather changes and with overuse. He does complain of numbness and tingling to the right mediar
distribution. He denies any fever, chills, nausea vomiting, bowel or bladder problems.

Print HTML Document                                                    Page 4 of 8

MITIAS ORTHOPAEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

**JACKSON, JAMES B**
ROS

ROS as noted in the HPI

**Physical Exam**

Patient is a 62-year-old male.

**Constitutional:** General Appearance: healthy-appearing, NAD, and normal body habitus.

**Psychiatric:** Orientation: oriented to time, place, and person. Mood and Affect: normal mood and affect and ac
alert.

**Cardiovascular System:** Arterial Pulses Right: popliteal normal, radial pulse normal, and ulnar pulse normal. Arte
Left: popliteal normal, radial pulse normal, and ulnar pulse normal. Edema Right: none and no edema. Edema Le
no edema. Varicosities Right: no varicosities and capillary refill test normal. Varicosities Left: no varicosities an
refill test normal.

**Lymph Nodes:** Inspection/Palpation Right: no popliteal LAD. Inspection/Palpation Left: no popliteal LAD.

**Knees:** Inspection Right: **swelling and genu varum deformity** and quad tone normal and normal axial alignmen
Left: **swelling and genu varum deformity** and quad tone normal and normal axial alignment. Bony Palpation Rig
**tenderness of the lateral joint line and the medial joint line.** Bony Palpation Left: **tenderness of the medial joir**
the lateral joint line. Soft Tissue Palpation Right: no gross tenderness. Soft Tissue Palpation Left: no gross tend
Active Range of Motion Right: **crepitus, flexion (100 deg.), and extension (-5 deg.).** Active Range of Motion Left
**flexion (100 deg.), and extension (-5 deg.)** and normal and no pain with motion. Passive Range of Motion Right
Passive Range of Motion Left: normal. Stability Right: no laxity or ligamentous instability and Lachman test neg
Stability Left: no laxity or ligamentous instability and Lachman test negative. Special Tests Right: McMurray's t
Special Tests Left: McMurray's test negative. Strength Right: flexion 5/5 and extension 5/5. Strength Left: flex
extension 5/5.

**Skin:** Right Lower Extremity: normal. Left Lower Extremity: normal. Right Upper Extremity: normal. Left Upper
normal.

**Neurologic:** Coordination: heel-to-shin normal and finger-to-nose movement normal. Sensation on the Right: n
nerve distribution, radial nerve distribution, median nerve distribution, at the dorsal 1st web space, and distal
and L2 normal, L3 normal, C6 normal, C7 normal, and C8 normal. Sensation on the Left: normal ulnar nerve dist
radial nerve distribution, median nerve distribution, at the dorsal 1st web space, and distal extremities and L2
normal, C6 normal, C7 normal, and C8 normal. Brachioradialis Reflex Right: normal (2). Brachioradialis Reflex Le
Special Tests on the Right: Tinel's sign at the median nerve positive and Phalen's test positive and Froment's s
carpal compression test negative, key pinch test negative, Finkelstein's test negative, quadriga absent, intrins
and extrinsics normal. Special Tests on the Left: Tinel's sign negative, Froment's sign negative, carpal compres
negative, key pinch test negative, Phalen's test negative, Finkelstein's test negative, quadriga absent, intrinsic
extrinsics normal.

**Gait and Station:** Appearance: normal gait.

**Hands and Digits:** Inspection Right: no deformities, atrophy, swelling, warmth, mass, or erythema and normal a
Inspection Left: no deformities, atrophy, swelling, warmth, mass, or erythema and normal attitude. Soft Tissue
Right: no tenderness of the soft tissue. Soft Tissue Palpation Left: no tenderness of the soft tissue. Thumb Rig
pulley, passive range of motion, and active range of motion; no tenderness of the first metacarpal or the thurr
subluxation of the CMC joint or pain with CMC grind test. Thumb Left: normal A1 pulley, passive range of motic
range of motion; no tenderness of the first metacarpal or the thumb; and no subluxation of the CMC joint or p
grind test. Index Finger Right: normal A1 pulley, active range of motion, and passive range of motion and no te
the second metacarpal or the index finger. Index Finger Left: normal A1 pulley, passive range of motion, and a
motion and no tenderness of the second metacarpal or the index finger. Middle Finger Right: normal A1 pulley
of motion, and passive range of motion and no tenderness at the third metacarpal or of the middle finger. Mic
Left: normal A1 pulley, active range of motion, and passive range of motion and no tenderness of the third me
the middle finger. Ring Finger Right: normal A1 pulley, active range of motion, and passive range of motion an
tenderness of the fourth metacarpal or the ring finger. Ring Finger Left: normal A1 pulley, active range of mot
passive range of motion and no tenderness of the fourth metacarpal or the ring finger. Little Finger Right: nor
pulley, active range of motion, and passive range of motion and no tenderness of the fifth metacarpal or the li
Little Finger Left: normal A1 pulley, active range of motion, and passive range of motion and no tenderness of

From:                                                    05/12/2016 01:28    #140 P.011/021

Print HTML Document                                              Page 5 of 8

MITIAS ORTHOPAEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

**JACKSON, JAMES B**
metacarpal or the little finger. Stability Right: no general instability. Stability Left: no general instability. Stren
thumb strength 5/5, grip 5/5, and interossei 5/5. Strength Left: thumb strength 5/5, grip 5/5, and interossei 5.

Results / Interpretations

X-RAY, KNEE
· Possibility of Pregnancy?: N, Side: BILATERAL
AP lateral and Houston views of both knees show calcification of both menisci and severe patellofemoral chon

Assessment / Plan

**1. Osteoarthritis of knee – Bilateral**
   M17.11: Unilateral primary osteoarthritis, right knee
   M17.12: Unilateral primary osteoarthritis, left knee
   · KNEE ARTHRITIS: CARE INSTRUCTIONS
   · X-RAY, KNEE
   Possibility of Pregnancy?: N Side: BILATERAL
   · Kenalog 40 mg/mL suspension for injection – Take by injection route.    Administer    Route: Injection
   Qty: 40 mg
   · Kenalog 40 mg/mL suspension for injection – Take by injection route.    Administer    Route: Injection
   Qty: 40 mg
   · INJECTION/ASPIRATION, LARGE JOINT OR BURSA, WITH ULTRASOUND GUIDANCE (PROC)
   · INJECTION/ASPIRATION, LARGE JOINT OR BURSA, WITH ULTRASOUND GUIDANCE (PROC)

**2. Carpal tunnel syndrome**
   G56.01: Carpal tunnel syndrome, right upper limb
   · Kenalog 40 mg/mL suspension for injection – Take by injection route.    Administer    Route: Injection
   Qty: 40 mg
   · INJECTION, CARPAL TUNNEL (PROC)


Discussion
**Discussion Notes**
   He wants both knees injected and his right carpal tunnel. We will do these under ultrasound today. He d
   me a letter from his attorney which asked multiple questions about his injury. I answered the letter and w
   into the record. This point I will see him back in when necessary basis when he is ready to have his knees i
   again.


Return to Office
   None recorded.

Procedure Documentation

**US Injxn Bilateral Knee Pain/OA:**

   EXAM PERFORMED: Limited diagnostic ultrasound of bilateral knees. CLINICAL INDICATION: Bilateral knee
   FINDINGS: The patient was placed in the seated The large linear probe was used to evaluate the left kne
   joint was with effusion. There was spurring seen on the femoral condyles. The medial and lateral menisc
   to be intact. There were no soft tissue masses or defects. Quad and patellar tendons were intact. Then i
   linear probe was used to evaluate the right knee joint. The joint was with effusion. There was spurring s
   femoral condyles. The medial and lateral meniscus appeared to be intact. There were no soft tissue mas
   defects. Quad and patellar tendons were intact. IMPRESSION: 1. Right Knee Osteoarthritis 2. Left Knee O
   PROCEDURE: With the patient in the current position, the skin was sterilized with chlorhexidine and alcc
   was then anesthetized with ethyl chloride. Using sterile technique the left knee was injected with 4 cc's
   Lidocaine and 40 mg of Kenalog under direct guidance from the ultrasound probe. the skin was sterilize
   chlorhexidine and alcohol. Attention was turned to the right knee. The skin was then anesthetized with
   chloride. Using sterile technique the left knee was injected with 4 cc's of 2% Lidocaine and 40 mg of Ke
   direct guidance from the ultrasound probe. Ultrasound was necessary due to precise placement of the i
   the knee joint. The patient tolerated the procedure well and images were saved to the patient's chart.
**US Injxn Carpal Tunnel:**

   EXAM PERFORMED: Limited diagnostic ultrasound of right wrist. CLINICAL INDICATION: Right wrist carpal

MITIAS ORTHOPAEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

**JACKSON, JAMES B**

symptoms. FINDINGS: The patient was placed in the seated position with the forearm supinated. The lin
was used to evaluate the wrist. The median nerve was compressed. The flexor tendons were intact. Rad
arteries were patent. IMPRESSION: Right Carpal Tunnel Syndrome PROCEDURE: With the patient in the c
position, the skin was sterilized with alcohol. The skin was then anesthetized with Ethyl Chloride. Using s
technique the carpal tunnel space was injected with 0.5 cc of 2% Lidocaine and 20 mg of Kenalog under
guidance from the ultrasound probe. Ultrasound was necessary due to precise placement of the injectic
carpal tunnel space and to avoid the arteries. The patient tolerated the procedure well and images were
the patient's chart.

**Encounter Sign-Off**
Encounter signed-off by Hanna M. Mitias, MD, 05/03/2016.

Encounter performed and documented by Hanna M. Mitias, MD
Encounter reviewed & signed by Hanna M. Mitias, MD on 05/03/2016 at 11:19am

**Encounter Date: 11/12/2015**
**Patient**

| | | | |
|---|---|---|---|
| Name | JACKSON, JAMES | Appt. Date/Time | 11/12/2015 10:15AM |
| DOB | | Service Dept. | MITIAS ORTHOPAEDICS PLLC |
| Provider | HANNA M. MITIAS, MD | | |
| Insurance | Med Primary: BCBS - IL (PPO) | | |

Insurance # : XOF843105224
Policy/Group # : P16742
Employer Name : BLUE MOUNTAIN PRODUCTION
Prescription: SURESCRIPTS LLC - This member could not be found in the payer's files. Pleas
coverage and all member demographic information. details

**Chief Complaint**
None recorded.

**Allergies**
Reviewed Allergies
CODEINE
PENICILLIN G

**Medications**
Reviewed Medications

| | | |
|---|---|---|
| Cardizem | 11/12/15 | entered |
| Celebrex | 11/12/15 | entered |
| Kenalog 40 mg/mL suspension for injection Take by injection route. | 11/12/15 | administered |
| Lamisil | 11/12/15 | entered |
| Nasacort | 11/12/15 | entered |

**Problems**
· Carpal tunnel syndrome
· Localized osteoarthrosis
· Osteoarthritis of knee

**Vitals**
None recorded.

**Social History**

MITIAS ORTHOPAEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

**JACKSON, JAMES B**

Reviewed Social History
Smoking Status: Never smoker
Are you currently employed?: N
Employer: retired
Able to Care for Self: Y
Hand Dominance: Right

## Past Medical History

Reviewed Past Medical History
Heart Problems: Y - Irregularity
Hypertension: Y

## QM

Provider: jmitias
Programs: MU Medicare - Year 1 - 2015 Stage 1, PQRS 2015 (EHR and Registry)
Last updated 11/12/2015

| Measure | Status |
| --- | --- |
| BMI Screening and Follow-Up | Needs Data |
| Colorectal Cancer Screening | Needs Data |
| Hypertension screening and follow-up | Needs Data |
| Provide patient information | Needs Data |
| Tobacco screening and cessation intervention | Satisfied |

## HPI

this is a 62-year-old white male who I have followed for a long time. He is here for right carpal tunnel syndrom
knee arthritis, and right shoulder osteoarthritis. We've done periodic injections in both knees and his right carp
has done fairly well with the injections in his carpal tunnel. He continues to have pain at night but it is periodic
daytime he noted some decreased grip strength. He's had no new injuries or trauma. He also has had long-term
osteoarthritis which we've injected. He states that he is getting by with activities of daily living. He is no longe
and is now able to do more at home because of that. He does not need or wish to have knee replacements at t
shoulder has been bothering him with overhead activities and when he lays on that side. He is also lost motion
complains of crepitus. Both his knees and his shoulder and is worse with weather changes and with overuse. He
nausea or vomiting or other constitutional symptoms.

## ROS

ROS as noted in the HPI

## Physical Exam

Patient is a 62-year-old male.

Examination of his right hand shows he has decreased range of motion of his wrist. He has positive Tinel and Ph
His thenar eminence is still flush. Prescription strength is adequate. Sensation is decreased in his median distri
Examination of both knees shows he has a 10° flexion contracture in both knees with 95° flexion. There is crep
motion. He has a varus alignment. He has good pulses throughout his bilateral upper and lower extremities. His
compartments are soft in his bilateral upper and lower extremities. Flexor and extensor tendons are functioni
well. His shoulder has 100° of flexion and abduction. He has 30° of external rotation and crepitus with motion.
cuff strength is good.

## Assessment / Plan

1. **Osteoarthritis of knee - Bilateral**
   M17.11: Unilateral primary osteoarthritis, right knee
   M17.12: Unilateral primary osteoarthritis, left knee
   · INJECTION/ASPIRATION, LARGE JOINT OR BURSA, WITH ULTRASOUND GUIDANCE (PROC)
   · INJECTION/ASPIRATION, LARGE JOINT OR BURSA, WITH ULTRASOUND GUIDANCE (PROC)
   · Kenalog 40 mg/mL suspension for injection - Take by injection route.    Administered    Route: Injectior
   Administer Qty: 40 mg
   · Kenalog 40 mg/mL suspension for injection - Take by injection route.    Administered    Route: Injectior
   Administer Qty: 40 mg

MITIAS ORTHOPAEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

## JACKSON, JAMES B

**2. Localized osteoarthrosis**
M19.011: Primary osteoarthritis, right shoulder

**3. Carpal tunnel syndrome**
G56.01: Carpal tunnel syndrome, right upper limb
· Kenalog 40 mg/mL suspension for injection - Take by injection route.   Administer   Route: injection
Qty: 40 mg
· INJECTION, CARPAL TUNNEL (PROC)

### Discussion
**Discussion Notes**
we will go ahead and inject his right carpal tunnel and bilateral knees under ultrasound guidance. I will se
a when necessary basis.

### Return to Office
· as needed

### Procedure Documentation

**US Injxn Bilateral Knee Pain/OA:**

EXAM PERFORMED: Limited diagnostic ultrasound of bilateral knees. CLINICAL INDICATION: Bilateral knee
FINDINGS: The patient was placed in the seated position The large linear probe was used to evaluate the
joint. The joint was with effusion. There was spurring seen on the femoral condyles. The medial and late
appeared to be intact. There were no soft tissue masses or defects. Quad and patellar tendons were int
large linear probe was used to evaluate the right knee joint. The joint was with effusion. There was spur
the femoral condyles. The medial and lateral meniscus appeared to be intact. There were no soft tissue
defects. Quad and patellar tendons were intact. IMPRESSION: 1. Right Knee Osteoarthritis 2. Left Knee C
PROCEDURE: With the patient in the current position, the skin was sterilized with chlorhexidine and alco
was then anesthetized with ethyl chloride. Using sterile technique the left knee was injected with 4 cc's
Lidocaine and 40 mg of Kenalog under direct guidance from the ultrasound probe, the skin was sterilize
chlorhexidine and alcohol. Attention was turned to the right knee. The skin was then anesthetized with
chloride. Using sterile technique the left knee was injected with 4 cc's of 2% Lidocaine and 40 mg of Ke
direct guidance from the ultrasound probe. Ultrasound was necessary due to precise placement of the i
the knee joint. The patient tolerated the procedure well and images were saved to the patient's chart.

**US Injxn Carpal Tunnel:**

EXAM PERFORMED: Limited diagnostic ultrasound of right wrist. CLINICAL INDICATION: Right wrist carpal
symptoms. FINDINGS: The patient was placed in the seated position with the forearm supinated. The lin
was used to evaluate the wrist. The median nerve was compressed, it measured .88 cm. The flexor tend
intact. Radial and ulnar arteries were patent. IMPRESSION: Right Carpal Tunnel Syndrome PROCEDURE: V
patient in the current position, the skin was sterilized with alcohol. The skin was then anesthetized with
Chloride. Using sterile technique the carpal tunnel space was injected with 0.5 cc of 2% Lidocaine and 2
Kenalog under direct guidance from the ultrasound probe. Ultrasound was necessary due to precise pla
the injection into the carpal tunnel space and to avoid the arteries. The patient tolerated the procedure
images were saved to the patient's chart.

### Encounter Sign-Off
Encounter signed-off by Hanna M. Mitias, MD, 11/12/2015.

Encounter performed and documented by Hanna M. Mitias, MD
Encounter reviewed & signed by Hanna M. Mitias, MD on 11/12/2015 at 12:06pm

MITIAS ORTHOPAEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

JACKSON, JAMES B

## Encounters and Procedures

Clinical Encounter Summaries
Encounter Date: 09/08/2016

### Patient

| | | | |
|---|---|---|---|
| Name | JACKSON, JAMES | Appt. Date/Time | 09/08/2016 09:30AM |
| DOB | | Service Dept. | MITIAS ORTHOPAEDICS PLLC |
| Provider | HANNA M. MITIAS, MD | | |
| Insurance | Med Worker's Comp: LIBERTY MUTUAL | | |

    Employer Name : OIL DRI
    Case # : wc949c97899
    Case Injury Date : 04/28/2015
    Prescription: SURESCRIPTS LLC - This member could not be found in the payer's files. Please
    verify coverage and all member demographic information. details

### Chief Complaint

Followup: Carpal tunnel syndrome

### Patient's Care Team

Insurance Adjuster (Worker's Comp): NICHOLETTE BOYD: Ph (469) 242-8966, Fax (603) 334-9563

### Patient's Pharmacies

WAL-MART PHARMACY 176 (ERX): 822 CITY AVENUE SOUTH, RIPLEY MS 38663, Ph (662) 837-4100, Fax (662) 837-2888

### Vitals

None recorded.

### Allergies

Allergies not reviewed (last reviewed 11/12/2015)
CODEINE
PENICILLIN G

### Medications

Medications not reviewed (last reviewed 11/12/2015)

| | |
|---|---|
| Cardizem | 11/12/15  entered |
| CeleBREX | 11/12/15  entered |
| Kenalog 40 mg/mL suspension for injection<br>Take by injection route. | 05/03/16 |
| LamISIL | 11/12/15  entered |
| Nasacort | 11/12/15  entered |

### Problems

Reviewed Problems
• Carpal tunnel syndrome
• Localized osteoarthrosis
• Osteoarthritis of knee

### Social History

Social History not reviewed (last reviewed 11/12/2015)
Smoking Status: Never smoker
Are you currently employed?: N
Employer: retired
Able to Care for Self: Y
Hand Dominance: Right

### Past Medical History

Past Medical History not reviewed (last reviewed 11/12/2015)
Heart Problems: Y - Irregularity
Hypertension: Y

athena     9/8/2016 12:45:32 PM    PAGE    3/005

MITIAS ORTHOPAEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

JACKSON, JAMES B

## Screening

None recorded.

## HPI

Patient is a 62-year-old white male returns for his right carpal tunnel syndrome. We last injected his right carpal tunnel space on 5/3/2016. He did receive good relief from this injection. His symptoms returned approximately 2 months ago. He is already had a left carpal tunnel release approximately 12 years ago and states he is ready to have the right release but he needs a current NCV. He continues to have pain at night but it is periodic. During the daytime he noted some decreased grip strength. He's had no new injuries or trauma. He does complain of numbness and tingling to the right median nerve distribution. This is made worse with gripping/grasping activities such as holding a steering wheel or when using a lawn mower. The patient also states that he has recently had a blood clot in his left thigh which he is being treated by Dr. Elliot with Eliquis. He states he cannot take any nonsteroidal anti-inflammatories. He denies any fever, chills, nausea vomiting, bowel or bladder problems.

## ROS

ROS as noted in the HPI

## Physical Exam

Patient is a 63-year-old male.

**Constitutional:** General Appearance: healthy-appearing, NAD, and normal body habitus.

**Cardiovascular System:** Arterial Pulses Right: radial pulse normal and ulnar pulse normal. Arterial Pulses Left: radial pulse normal and ulnar pulse normal. Edema Right: none. Edema Left: none. Varicosities Right: no varicosities and capillary refill test normal. Varicosities Left: no varicosities and capillary refill test normal.

**Psychiatric:** Orientation: oriented to person, place, and time. Mood and Affect: normal affect and mood and active and alert.

**Hands and Digits:** Inspection Right: no deformities, atrophy, swelling, warmth, mass, or erythema and normal attitude. Inspection Left: no deformities, atrophy, swelling, warmth, mass, or erythema and normal attitude. Soft Tissue Palpation Right: no tenderness of the soft tissue. Soft Tissue Palpation Left: no tenderness of the soft tissue. Thumb Right: normal A1 pulley, passive range of motion, and active range of motion; no tenderness of the first metacarpal or the thumb; and no subluxation of the CMC joint or pain with CMC grind test. Thumb Left: normal A1 pulley, passive range of motion, and active range of motion; no tenderness of the first metacarpal or the thumb; and no subluxation of the CMC joint or pain with CMC grind test. Index Finger Right: normal A1 pulley, active range of motion, and passive range of motion and no tenderness of the second metacarpal or the index finger. Index Finger Left: normal A1 pulley, passive range of motion, and active range of motion and no tenderness of the second metacarpal or the index finger. Middle Finger Right: normal A1 pulley, active range of motion, and passive range of motion and no tenderness at the third metacarpal or the middle finger. Middle Finger Left: normal A1 pulley, active range of motion, and passive range of motion and no tenderness of the third metacarpal or the middle finger. Ring Finger Right: normal A1 pulley, active range of motion, and passive range of motion and no tenderness of the fourth metacarpal or the ring finger. Ring Finger Left: normal A1 pulley, active range of motion, and passive range of motion and no tenderness of the fourth metacarpal or the ring finger. Little Finger Right: normal A1 pulley, active range of motion, and passive range of motion and no tenderness of the fifth metacarpal or the little finger. Little Finger Left: normal A1 pulley, active range of motion, and passive range of motion and no tenderness of the fifth metacarpal or the little finger. Stability Right: no general instability. Stability Left: no general instability. Strength Right: thumb strength 5/5, grip 5/5, and interossei 5/5. Strength Left: thumb strength 5/5, grip 5/5, and interossei 5/5.

**Neurological System:** Coordination: finger-to-nose movement normal. Brachioradialis Reflex Right: normal (2). Brachioradialis Reflex Left: normal (2). Sensation on the Right: normal ulnar nerve distribution, radial nerve distribution, median nerve distribution, at the dorsal 1st web space, and distal extremities and C6 normal, C7 normal, and C8 normal. Sensation on the Left: normal ulnar nerve distribution, radial nerve distribution, median nerve distribution, at the dorsal 1st web space, and distal extremities and C6 normal, C7 normal, and C8 normal. Special Tests on the Right: **Tinel's sign at the median nerve positive and Phalen's test positive** and Froment's sign negative, carpal compression test negative, key pinch test negative, Finkelstein's test negative, quadrigia absent, intrinsics normal, and extrinsics normal. Special Tests on the Left: Tinel's sign negative, Froment's sign negative, carpal compression test negative, key pinch test negative, Phalen's test negative, Finkelstein's test negative, quadrigia absent, intrinsics normal, and extrinsics normal.

**Skin:** Right Upper Extremity: normal. Left Upper Extremity: normal.

## Assessment / Plan

1. **Carpal tunnel syndrome - Right**
   G56.01: Carpal tunnel syndrome, right upper limb
   - CARPAL TUNNEL RELEASE
     Side: RIGHT
   - NOTE TO RETURN TO WORK/SCHOOL
     Restrictions: no use injured extremity Return to Work Status: Light Duty
   - Kenalog 40 mg/mL suspension for injection - Take 1 mL by injection route.    Administer    Route: Injection
     Administer Qty: 40 mg
   - THERAPEUTIC ULTRASOUND (PROC)

athena          9/8/2016 12:45:32 PM   PAGE    4/005
MITIAS ORTHOPEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

JACKSON, JAMES B

**Discussion Notes**
   The ultrasound of his right hand showed that his median nerve had a with 0.88 cm and a height of 0.24 cm indicating that he does have carpal tunnel syndrome. Anything over 1 cm² is diagnosed with carpal tunnel syndrome according to the latest studies and are more accurate than nerve conduction studies. At this point his symptoms also point to carpal tunnel syndrome so we will proceed with a right carpal tunnel release. Risks benefits and alternatives have been discussed and he wishes to proceed. we will give him an intramuscular injection of Kenalog to help him with his pain.

**Surgery Counseling**

   We discussed various methods of treatment for this diagnosis, including both non-surgical and surgical treatment options. The procedure was discussed in detail, including rationale for proceeding with the procedure, specifics of the technical aspects of the procedure, and the expected postoperative course including the possible need for activity modification, therapy, and duration of expected recovery.

   Risks to surgery include: pain, numbing, scar, infection, loss of motion, nerve or vascular injury, stiffness, blood loss, reoccurrence, re-operation, non-union or mal-union, fracture, dislocation, unequal leg lengths, allergic reaction to medicine, heart attack, stroke or death. Risks of allograft and blood transfusions include; infection, allergic reaction, disease transmission including hepatits or AIDS virus. Complications, including blood loss and potential need for transfusion, nerve injury, infection, success rates (expected outcomes) of the procedure, and risk of death from anesthesia were discussed. Patient fully understands that there are no guarantees with surgical intervention.

   The patient voiced understanding of the procedure and risks, and the decision for surgery was made today.

**Return to Office**
   None recorded.

Encounter Sign-Off
   Encounter signed-off by Hanna M. Mitias, MD, 09/08/2016.

Encounter performed and documented by Hanna M. Mitias, MD
Encounter reviewed & signed by Hanna M. Mitias, MD on 09/08/2016 at 11:04am

## Other Orders

This fax may contain legally privileged health information and is intended for the sole use of the intended recipient. You are hereby notified that the disclosure, or other unlawful use of this health information is prohibited.

If you received this fax in error visit www.athenahealth.com/NotMyFax to notify the sender and confirm that the information will be destroyed. If you do not have internet access, please call 1-888-482-8436 to notify the sender and confirm that the information will be destroyed. [ID:328808-H-11099]

09/08/2016

| From Provider | To Provider |
|---|---|
| HANNA M. MITIAS, MD<br>MITIAS ORTHOPAEDICS PLLC<br>206 OXFORD RD<br>NEW ALBANY, MS 38652-3115<br>Phone: (662) 534-2227<br>Fax: (662) 534-2330 | |

### Order Information

| Order |
|---|
| Orders included: 1 |
| Carpal tunnel syndrome - Right<br>ICD-10: G56.01: Carpal tunnel syndrome, right upper limb<br>• NOTE TO RETURN TO WORK/SCHOOL |
| Restrictions: no use injured extremity<br>Return to Work Status: Light Duty |

### Patient Information

MITIAS ORTHOPAEDICS PLLC • 206 OXFORD RD, NEW ALBANY MS 38652-3115

JACKSON, JAMES B

| | |
|---|---|
| Patient Name | JACKSON, JAMES B |
| DOB | |
| Primary Insurance | LIBERTY MUTUAL<br>Policy Holder: OIL DRI |
| Secondary Insurance | None recorded. |

Electronically Signed by: HANNA M. MITIAS, MD

BEFORE THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION

MWCC NO. 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B

JAMES BENNY JACKSON                                    CLAIMANT

VS.

BLUE MOUNTAIN PRODUCTION CO.                           EMPLOYER

AND

LIBERTY MUTUAL FIRE INSURANCE COMPANY                  CARRIER

## ORDER GRANTING APPLICATION
## FOR COMPROMISE SETTLEMENT

THIS CAUSE having come on this day for hearing before the Mississippi Workers'
Compensation Commission, at its offices in Jackson, Mississippi, on the petition of the claimant,
James Benny Jackson, and the Commission having sufficiently examined said proposal, and being
fully advised in the premises, is of the opinion that the same is proper and that the prayer thereof
should be granted. The Commission finds that the claimant, on the one hand, and the employer and
carrier, on the other hand, have a disagreement as to the extent of disability sustained by the
claimant, and that the case is a proper one for disposition under the provisions of Section 71-3-29
of Mississippi Code Annotated (1972).

It is, therefore, ordered that said compromise settlement should be, and the same is hereby
approved and that Blue Mountain Production Co. and Liberty Mutual Fire Insurance Company shall
pay to James Benny Jackson, claimant, the sum of $22,000.00, all inclusive, without discount, in
addition to any compensation and medical benefits heretofore paid, in complete settlement of all
claims of every kind and nature, arising out of or in any way related to this claim or those injuries
or conditions alleged herein, and that claimant shall be responsible for payment of all outstanding

D0683045.1

and future medical expenses. The settlement amount includes any back temporary total disability benefits owed to claimant.

Employer and carrier have shown that the purpose of this settlement is to compromise a doubtful and disputed claim, avoid litigation, and to buy peace, and that no payments made or other consideration given should be construed as an admission of liability, all liability having been expressly denied.

The claimant has filed for Social Security, but was denied and is not eligible for Medicare at this time. The total settlement is as follows: $22,000.00 less attorney fees of $5,000.00 and $5,000.00 for future medical. This leaves a balance of $12,000.00 for permanent partial disability benefits. Pursuant to the Mortality Table, the claimant is expected to live 999.44 more weeks. If the $12,000.00 was divided by this many weeks, the claimant would receive $12.01 per week in Workers' Compensation benefits as it relates to Social Security Disability benefits.[1]

Claimant has affirmatively stated on his oath that he is not a Medicare or Medicaid recipient and that he has been paid no benefits under either of those programs for these alleged injuries, conditions or otherwise. The employer and carrier have relied on those sworn assertions of claimant regarding those issues as part of the agreement to settle this case, and claimant agreed to indemnify the employer and carrier for any adverse consequences they might experience should it be found that claimant has not been truthful regarding these assertions.

The Medicare Secondary Payer Act, 42 U.S.C. §1395y(b)(2), ("MSP") provides that any money received for settlement is a primary payment to Medicare. Further, the MSP also provides that Medicare does not pay for any item or service if there is a primary payment or payor. The regulations, 42 C.F.R. §411.46 provide that if any amount paid for settlement is intended to compensate the individual for all future medical expenses related to the claimed injuries, conditions or disease, Medicare payments for such services are excluded until medical expenses related to the

---

[1] Employer and carrier did not participate in this request.

injuries, conditions or disease equal the amount of these payments. Claimant is not expected to become a Medicare beneficiary within 30 months. The total settlement amount is under $250,000.00. As such, this case does not meet CMS' review thresholds. Further, employer and carrier have denied and continue to deny compensability of this claim, and therefore, dispute any liability for any medical treatment obtained by claimant.

It is further ordered that upon payment of said sum to claimant, said employer and carrier, and any entity in privity with them, shall stand fully and completely discharged of any other or further liability to the claimant, or otherwise, for, arising out of, or connected with the injuries or conditions sustained by James Benny Jackson on or about November 21, 2014, January 2, 2015, and April 28, 2015, or of the effects thereof, and that this matter be, and it is hereby, dismissed with prejudice. Further, the claimant is hereby authorized and empowered to execute any receipt, release, or other instrument required by said employer and carrier to evidence their full and final release, acquittal, and discharge herein.

The Commission further finds that L. Shane Tompkins, attorney for claimant, has rendered valuable legal services to the claimant; therefore, claimant is authorized and empowered to pay unto said attorney the sum of $5,000.00.

JAN 11 2017

SO ORDERED on _____.

Mississippi Workers' Compensation Commission

By: _____

_____

Commissioners

MWCC No. 1603042-P-1436-B, 1603041-P-1435-B
and 1603043-P-1437

ATTEST:

_____

Commission Secretary

D0683045.1                                    4

PRESENTED BY:

L. SHANE TOMPKINS - MSB #100047
ATTORNEY FOR CLAIMANT
TOMPKINS LAW FIRM
POST OFFICE BOX 1804
COLUMBUS, MS 39703
TELEPHONE: (662)328-7557
FACSIMILE: (662)594-2535
EMAIL: shane@tompkinslawfirm.com

GEORGE E. READ - MSB # 8757
ATTORNEY FOR EMPLOYER & CARRIER
DANIEL COKER HORTON & BELL, P.A.
265 NORTH LAMAR BOULEVARD, SUITE R
POST OFFICE BOX 1396
OXFORD, MS 38655-1396
TELEPHONE: (662)232-8979
FACSIMILE: (662)232-8940
EMAIL: gread@danielcoker.com

MWCC NO. 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B

4366-131689, 4366-131690, 4366-131691/kg

D0683045.1

## RECEIPT AND RELEASE

FOR AND IN CONSIDERATION of the sum of Twenty Two Thousand Dollars ($22,000.00), cash in hand paid, receipt of which is hereby acknowledged, I, James Benny Jackson, do hereby fully, completely and finally release, discharge, and acquit Blue Mountain Production Co. and Liberty Mutual Fire Insurance Company from any and all claims which I may now or hereafter have under the terms of the Mississippi Workers' Compensation Law, or otherwise, on account of, arising out of, or connected with my sustaining personal injuries or conditions on or about November 21, 2014, January 2, 2015, and April 28, 2015.

Claimant agrees to indemnify and hold harmless Blue Mountain Production Co. And Liberty Mutual Fire Insurance Company for any loss of Medicare benefits and for any injuries, conditions or damages related to or arising out of that loss of benefits; for any recovery Medicare and/or the Centers for Medicare and Medicaid Services might pursue against the parties; and for any and all other losses or damages that result from claimant's representations about his Medicare status or creation, administration, or dissolution of the account.

As claimant is not a current Medicare beneficiary, no conditional payment search was undertaken.

It is further understood that this payment has heretofore been approved by the Mississippi Workers' Compensation Commission in docket number 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B, and is accepted by me in full and complete settlement, compromise, accord and satisfaction of all claims that I may now or hereafter have because of, arising out of, or connected with said accidental injuries or conditions, against said employer and carrier, and their agents, servants and employees, and any other party in privity with any of them. Further, claimant has not waived his pending employment labor claim filed separately by Jim Waide against Blue Mountain Production Co.

D0083045.1

2

Provided, however, this release is not intended to affect and in no way releases any third parties who might otherwise be liable for said injuries, conditions or damages nor does it in any way affect the subrogation rights of said employer and carrier.

WITNESS MY SIGNATURE, this the _16th_ day of _January_, 2017.

_____
JAMES BENNY JACKSON

STATE OF MISSISSIPPI

COUNTY OF _Lowndes_

THIS DAY PERSONALLY CAME AND APPEARED BEFORE ME, the undersigned authority in and for the state and county aforesaid, the within named, James Benny Jackson, who acknowledged that he did sign and execute the above and foregoing Receipt and Release on the day and year therein mentioned and for the intent and purposes therein expressed.

GIVEN UNDER MY HAND AND OFFICIAL SEAL, this the _16th_ day of _January_, 2017.

_____
NOTARY PUBLIC

My commission expires:

STATE OF MISSISSIPPI
DEBORAH R. MOORE
NOTARY PUBLIC
ID No. 14243
Commission Expires
May 19, 2020
LOWNDES COUNTY

APPROVED AND AGREED TO:

_____
L. SHANE TOMPKINS,
ATTORNEY FOR JAMES BENNY JACKSON

MWCC NO. 1603042-P-1436-B, 1603041-P-1435-B and 1603043-P-1437-B

4366-131689, 4366-131690, 4366-131691/kg

D0683045.1

3

If you are using Adobe Acrobat, navigate using the Tab key.

**Mississippi Workers' Compensation Commission**

## NOTICE OF FINAL PAYMENT
PRINT OR TYPE

| MWCC # | | CARRIER FILE # |
|---|---|---|
| (2) SOCIAL SECURITY #  xxx-xx-0166 | | (3) DATE OF INJURY OR DEATH |

| | | |
|---|---|---|
| (1) EMPLOYEE NAME AND ADDRESS - (INCLUDE CITY, STATE and ZIP)  James Benny Jackson | (4) DATE DISABILITY BEGAN | (5) DATE MAXIMUM MEDICAL IMPROVEMENT |
| | (6) DATE RETURNED TO WORK | (7) DATE OF FINAL PAYMENT |

| (8) EMPLOYER NAME AND ADDRESS - (INCLUDE CITY, STATE and ZIP)  Blue Mountain Production  31 County Road 827  Blue Mountain, MS 38610 | (9) INSURANCE CARRIER NAME & SERVICING CO. (if applicable)  Liberty Mutual Fire Insurance Company  c/o Liberty Mutual Insurance Company  P.O. Box 168208  Irving, TX 75016 |
|---|---|

Compensation payments were made as follows:

(10) Average Weekly Wage:  $ 641.60      (11) Rate of Weekly Compensation $

**A. DISABILITY PAYMENTS**

| (12) ____ Weeks ____ Days Temporary Total | $ |
| (13) ____ Weeks ____ Days Temporary Partial | $ |
| (14) ____ Weeks ____ Days Permanent Partial | $ |
| ____ % loss to _____ | |
| (15) ____ Weeks ____ Days Permanent Total | $ |
| **Total Disability Payments** | $ |

**B. DEATH PAYMENTS**

| (16) ____ Weeks ____ Days (itemize at 26 below) | $ |
| (17) Payment to Spouse (Section 71-3-25(a)) | $ |
| (18) Funeral Expenses | $ |
| (19) Second Injury Fund | $ |
| **Total Death Payments** | $ |

**C. SETTLEMENT PAYMENTS**

| (20) Lump Sum | $ |
| (21) Compromise | $ 22,000.00 |
| (22) Third Party: (Attach order if not approved by MWCC) | |
| a. Amt. reimbursed for comp. previously paid  *(Subtract reimbursements)* | $ (          ) |
| b. Amt. credited against future liability | $ |
| **Total Settlement Payments** | $ 22,000.00 |

**D. OTHER PAYMENTS**

| (23) Total Medical Expenses | $ 159.00 |
| (24) Rehabilitation Expenses | $ |
| (25) Other (Specify) | $ |
| | |
| **TOTAL PAYMENTS**  (A + B + _C_* + D)  *If C is a negative amount, subtract from total* | $ 22,159.00 |

(26) Dependents and Spouse Payments (Item at 16 below when applicable, i.e. when payments made)

| Name and Relationship | Rate | Weeks | Days | Total |
|---|---|---|---|---|
| a. | | | | $ |
| b. | | | | $ |
| c. | | | | $ |
| d. | | | | $ |

RECEIVED
JAN 23 2017
SECRETARY
M.W.C.C.

(27) If full compensation was not paid, explain:  (attach separate page if necessary)

### NOTICE TO EMPLOYEE OR BENEFICIARY

This is NOT a release of the employer's or the insurance carrier's workers' compensation liability. It is a statement of workers' compensation benefits already paid. If no further workers' compensation benefits are provided within one (1) year from the date this form is properly filed with the Commission, the right to any further such benefits may be barred by the applicable statute of limitations and this claim finally closed. Exceptions may apply for incompetents or minors. If you incur additional loss of time from work, additional medical expense, or other additional expense, due to this injury, you should immediately contact your employer, the insurance carrier, or the Mississippi Workers' Compensation Commission for further guidance.

PHONE #: 601-969-7607

Prepared by: Daniel Coker Horton & Bell  Date  12/20/16

Employee's Signature _____  Date  1/16/17
(or representative or beneficiary)

MWCC Form B31 (1/2014)