**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**JAMES BENNY JACKSON**                                                    **PLAINTIFF**

**VERSUS**                                                    **NO.: 3:16cv189-DMB-LDP**

**OIL-DRI CORPORATION OF AMERICA and
BLUE MOUNTAIN PRODUCTION COMPANY[1]**                    **DEFENDANTS**

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

COMES NOW Plaintiff James Benny Jackson ("Jackson" or "Plaintiff"), by and through counsel, and submits his Brief in Opposition to Motion for Summary Judgment filed by Defendant Blue Mountain Production Company ("BMPC" or "Defendant") [Docket 75], and would show unto the Court the following:

**FACTS**

Stating the facts in the light most favorable to the non-movant, Plaintiff, and with all reasonable inferences drawn in his favor as required by *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), *Moore v. Willis Independent School Dist.,* 233 F.3d 871, 874 (5th Cir. 2000), and *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005), the relevant facts are as follows:

---

[1]As stated by Defendants, on November 1, 2017, the parties filed a stipulation of dismissal of Oil-Dri Corporation of America.

### A. Plaintiff's Background

James Benny Jackson was born in Ripley, Mississippi, in June 1953, and grew up in Tippah County, Mississippi. [Exhibit "1", p. 13] In 1971, Jackson graduated from Falkner High School in Tippah County. [Exhibit "1", p. 20; Exhibit "2"] From 1971 to 1974, Jackson attended Northeast Mississippi Community College, but he did not receive a degree. [Exhibit "1", pp. 20-21; Exhibit "2"] In 2002, Jackson returned to college at the University of Mississippi, studying sociology, but because of time and financial restraints, did not graduate. [Exhibit "1", pp. 20-21; Exhibit "2"] Jackson is married with two adult daughters, both of whom are disabled. [Exhibit "1", pp. 12-14]

### B. BMPC

In September 2014, Tracy Smithey became the plant manager at Oil-Dri's Blue Mountain facility, BMPC, and is still in that position today. [Exhibit "3", p. 5]

Amanda Hill is the Regional Human Resources Manager over Defendant's two facilities in Mississippi, one in Blue Mountain and one in Ripley, Mississippi. [Exhibit "4", p. 4] Hill reported to Ron Parks, who was Vice President of Human Resources at the corporate office in Chicago, Illinois, at the time relevant to this lawsuit. [Exhibit "4", p. 6] All job postings go through the Human Resources ("HR") department. [Exhibit "4", p. 7]

Rhonda Barnes has been the HR coordinator for both facilities in North Mississippi, for the past 4 years. [Exhibit "5", p. 4] As HR coordinator, Barnes was responsible for new hires, termination paperwork, and benefits. [Exhibit "5", p. 4] Barnes was responsible for FMLA leave and would have been the person in HR to approve that leave. [Exhibit "4", p. 10] Barnes sent everything she processed to Amanda Hill for review. [Exhibit "5", p. 6]

### C.     Hired at BMPC

In February 2000, Jackson was hired at BMPC as a chemical operator, also known as a clay prep operator.  [Exhibit "1", pp. 23, 25-26] In that position, Jackson was responsible for ensuring the machine operators had the correct materials to make their product, absorbent clay.  [Exhibit "1", pp. 23-24] Jackson remained in the same job during his entire employment with BMPC, even though over time, the job evolved into also working in the dye room and the slurry room.  [Exhibit "1", pp. 25-26]   In the last three years of his employment, Jackson also took over some duties of the lab technicians.  [Exhibit "1", p. 26]

Jackson had a small room in the packaging area where he worked about ten-percent (10 %) of the time; the room also contained the control panels and his computer.  [Exhibit "1", pp. 32-33] The remainder of Jackson's time was spent on the chemical platform, in the slurry room, or in the packaging area.  [Exhibit "1", p. 33]

Brian Bates worked for BMPC for approximately eleven (11) years as a maintenance electrician. [Exhibit "6", pp. 5, 7-8]  According to Bates, Jackson was a good employee who did a good job, and no one had any problems with him. [Exhibit "6", p. 14]

### D.     Jackson Complained About Working Environment

Over the years, Jackson continually complained to management and his supervisors about the working conditions at his work site, trying to get the air quality improved.  [Exhibit "1", pp. 35-36, 40] Specifically, Jackson complained about the dusty conditions caused by the chemical additives he had to put into the products, and he noted that these conditions were causing him health problems. [Exhibit "1", p. 36]   These additives included a clumping agent, called S-20, and anhydrous citric

3

acid. [Exhibit "1", p. 37] Usually, management would agree with Jackson that improvements needed to be made. [Exhibit "1", p. 40]

When Tracy Smithey took over as the plant manager, he made a promise to Jackson that he would try to resolve some of the dust problems where Jackson worked. [Exhibit "1", p. 98] Smithey had some equipment installed, but the equipment was never connected and the conditions did not improve. [Exhibit "1", pp. 98-99] Jackson was exposed to chemicals and dust at his work site more than the other employees at the plant. [Exhibit "1", p. 99] As Jackson explained:

> Because I had direct contact with the chemical agents, the compounds that we used that no one in the plant had. No one else in the plant had the exposure I had in that job.

[Exhibit "1", p. 99]

Even though the person on the second shift had the same exposure, the person on the second shift stayed only approximately one year and then transferred to another job. [Exhibit "1", p. 100] Jackson, however, worked the same job for fifteen (15) years. [Exhibit "1", p. 100]

### E. Chemical Platform and Slurry Room

#### a. Brian Bates

Brian Bates testified that the chemical platform and the slurry room were the two worst places to work in the plant in regards to dust and chemicals. [Exhibit "6", p. 16] Bates testified that he would not have been interested in working there full-time "because of the exposure to the chemicals daily." [Exhibit "6", p. 17] Bates was aware that the company tried various exhaust fans and filters to alleviate the problem, but recognized those measures did not solve the problem with the dust and chemicals. [Exhibit "6", p. 18] When asked whether he had any breathing or other issues when working on the chemical platform, Bates responded, ". . . it's a dusty environment and

4

the chemicals [are] rough.  You know, it's rough." [Exhibit "6", p. 8]  However, Bates testified that

if an employee worked as a forklift driver, then that employee would breathe far less dust and

chemicals.  [Exhibit "6", p. 17]

        *b.*   *Doug Miller*

     Doug Miller worked in maintenance at the Blue Mountain facility for almost twenty (20)

years. [Exhibit "7", p. 6] Miller did not like to go into the chemical platform and the slurry room

because of the dust and chemicals.  [Exhibit "7", p. 8]   Miller did not want to work in the area full

time, as he testified:

> Breathing it, it would irritate your sinuses and your throat and your eyes and if you
> got in it a little bit, it would irritate your skin - - or it did mine.

[Exhibit "7", pp. 9-10]

     Miller testfied that the air quality, dust, and chemicals would be worse when working on the

chemical platform and in the slurry room, than when driving a forklift through the plant.  [Exhibit

"7", p. 11]

        *c.*   *Danny Strickland*

     Danny Strickland worked in maintenance at the Blue Mountain facility until 2016. [Exhibit

"8", pp. 5-6] As a member of maintenance, Strickland would occasionally work on equipment in

Jackson's work area. [Exhibit "8", p. 6] Strickland testified that Jackson complained about how the

dust and chemicals were affecting his lungs.  [Exhibit "8", pp. 6-7]  Strickland testified that when

he worked in the area, he found breathing difficult, and even when he wore a dust mask, "that didn't

help with a lot of the dyes and stuff."   [Exhibit "8", p. 7] When Strickland was asked whether

Jackson's work area was the hardest area in which to work because of the dust and chemicals, he

responded, "Absolutely."   [Exhibit "8", p. 7]

### F.     Jackson Suffered Health Related Problems Because of His Work Environment

On two occasions Jackson developed pneumonia while working at BMPC.  [Exhibit "1", p. 42] On one of those occasions Jackson had to be hospitalized for over a week.  [Exhibit "1", p. 42]

In December 2014, Jackson began having a great deal of trouble breathing, with asthma-like symptoms.  [Exhibit "1", p. 44] Jackson saw Nurse Practitioner Melinda Quinn at the Family Clinic in Falkner.  [Exhibit "1", p. 44] Quinn treated Jackson for an upper respiratory infection.  [Exhibit "1", p. 45] The problems proved to be chronic, and Jackson was not improving, even with the treatments.  [Exhibit "1", pp. 45-46] Jackson began running a high fever and had to leave work. [Exhibit "1", p. 46] Quinn sent Jackson to the hospital for a lung x-ray, and the radiologist told Jackson that he had COPD.  [Exhibit "1", p. 46]  Quinn also referred Jackson to a lung specialist, Dr. Michael D. Wilons, in Memphis, Tennessee.  [Exhibit "1", pp. 46-47]

### G.     Jackson's April 2015 Conversation with Rhonda Barnes

In early April 2015, a few weeks prior to seeing Dr. Wilons, Jackson met with Rhonda Barnes in the HR department for Defendant.  [Exhibit "1", p. 52] Jackson was very sick at this time, and he and Barnes discussed his going on FMLA leave, his possible retirement, and positions in the plant that were open.  [Exhibit "5", p. 8; Exhibit "1", p. 53] Jackson also asked Barnes whether he could work in a different area of the plant. [Exhibit "1", p. 53] Jackson requested a reasonable accommodation, moving to a forklift driver[2] or shipping clerk position, because he knew these two positions were open. [Exhibit "5", p. 9; Exhibit "1", p. 78; Exhibit "9"]  Jackson could not bid for

---

[2]Jackson was previously certified to drive a forklift.  [Exhibit "1", p. 62] Further, part of his job as a chemical operator (lab technician) was driving a forklift.  [Exhibit "1", p. 62; Exhibit "4", pp. 17-18; Exhibit "10"]

6

the positions of forklift driver or shipping clerk because they were not promotions.[3]  [Exhibit "1", p. 100-01]

In fact, BMPC admits it posted job openings for two shipping/receiving clerks on April 16, 2015.  [Exhibit "5", p. 9; Exhibit "11"]  Jackson was told about the shipping clerk positions, and Jackson told Barnes that he would take a position as a shipping clerk.  [Exhibit "1", p. 115]  Barnes told Jackson that she did not know how he could take the job with that big of a pay cut.  [Exhibit "1", p. 115] BMPC refused this reasonable accommodation and suggested, instead, that Jackson retire because he qualified for immediate retirement benefits. [Exhibit "9"] The two positions in the shipping department were filled on April 27, 2015, and June 15, 2015. [Exhibit "12"]

### H.    Dr. Wilons - FMLA/Short Term Disability

In April 2015, Jackson saw Dr. Michael D. Wilons, who diagnosed him with mild COPD, sarcoidosis, and asthma.  [Exhibit "1", p. 47] Dr. Wilons proscribed Jackson different inhalers, various medicines, and removed him from the work environment that was causing his health issues. [Exhibit "1", p. 48]

In April 2015, Jackson requested FMLA leave, which was granted. [Exhibit "1", pp. 50-51; Exhibit "13"] Dr. Wilons stated that Jackson had a chronic breathing condition which required him to be out of his dusty work environment in order to get control of the condition. [Exhibit "13"] According to Jackson, the chemicals in the dust to which he was exposed were causing his health problems.  [Exhibit "1", p. 113]

---

[3]An employee was allowed to bid on only a job with a higher pay grade, not one that was a demotion or a lateral move.  [Exhibit "1", p. 101] Brian Bates confirmed that BMPC had that rule in effect, but was not sure whether it was still in effect when he left. [Exhibit "6", pp. 11-12] Doug Miller testified that this rule was in effect the last fifteen (15) years that he worked there.  [Exhibit "7", p. 13]

On May 5, 2015, Jackson filed for short-term disability. [Exhibit "14"] In the application, Jackson's doctor stated that being put back in the same environment could cause Jackson to miss more work. [Exhibit "4", p. 24; Exhibit "14"]

**I.    Released to Return to Work**

On July 15, 2015, Jackson was released to return to work by Dr. Wilons, with one restriction, that he was not to be exposed to the same environment and do the same job. [Exhibit "1", p. 56] Even though Jackson still suffered from sarcoidosis and asthma, he could return to work if BMPC did not make him work in the same environment which caused his lung condition.[4] [Exhibit "1", p. 9] As Dr. Wilons wrote on July 15, 2015, when releasing Jackson to return to work:

> Persistent respiratory tract infection with complete clearance and resolution after removal from the work environment where he has exposure to dust and chemicals, has resolved his issues. His breathing is completely back to baseline and he feels much better.
> . . .
> We will begin weaning off pulmonary medications because it looks like staying out of the work environment will keep him from requiring chronic pulmonary medications to control his breathing.[5]

[Exhibit "15"]

Dr. Wilons testified that he discussed with Jackson how returning to the same job where he was exposed to a great deal of dust and chemicals could re-trigger his breathing issues. [Exhibit "16", p. 17] However, Jackson's "respiratory system was under control **on medication**." [Exhibit

---

[4]To this day, Jackson has never fully recovered from his lung issues, and the same restrictions of not returning to the same job apply. [Exhibit "1", pp. 45, 56]

[5]Amanda Hill admitted that she was aware that Jackson's doctor stated that Jackson needed to work in a different environment than the slurry room/chemical platform. [Exhibit "4", p. 16]

"16", p. 28; emphasis added] Jackson told Dr. Wilons that he was trying to transfer to another part of the plant. [Exhibit "16", p. 33]

### J.    Jackson Attempts to Return to Work

Once released to return to work, with restrictions, Jackson asked Barnes whether anything had changed concerning job openings that he could perform, and Barnes replied, "No." [Exhibit "1", p. 57] Barnes told Jackson that the company had no other work available for him other than the job that made him sick. [Exhibit "17", pp. 12] Because BMPC would not accommodate his disability, Jackson told her that he would retire. [Exhibit "1", pp. 57, 78] Jackson was physically able and available to work; however, as he testified in his unemployment hearing, ". . . my options were . . . . either retire or quit or go back to the job that was making me sick." [Exhibit "17", pp. 8-9]

Jackson knew that BMPC had forklift and shipping openings that he could perform at the time. [Exhibit "1", p. 57] Jackson also knew that job openings were not always posted. [Exhibit "1", p. 58]

No one with BMPC ever notified Jackson when there were forklift driver positions open, of which he would not be aware because he was on FMLA leave beginning in April 2015, and never returned to work. [Exhibit "1", p. 115] BMPC posted a position for a forklift driver on June 17, 2017, and a person was hired for the position on July 7, 2015. [Exhibit "18"] Another forklift position was posted on July 30, 2015, and filled on August 18, 2015. [Exhibit "19"] Further, BMPC hired forklift drivers from postings on October 1, 2016, October 10, 2015, and December 15, 2015. [Exhibit "4", p. 19; Exhibit "20"]

Jackson would not have retired in July 2015, if BMPC had offered him a job as either a forklift driver or in the shipping department. [Exhibit "1", p. 116] In all, BMPC hired/transferred

two shipping clerks and five forklift drivers in 2015, and Jackson was not offered any of the positions.[6]  [Exhibit "4", pp. 20-21]

### K.    September 2015

In September 2015, Jackson called Barnes to see when he would be receiving his retirement check.  [Exhibit "1", p. 70]   Amanda Hill returned the call and asked Jackson to meet with her and Ron Parks.  [Exhibit "1", pp. 70-71] At the meeting, Jackson was told that he would not be receiving retirement benefits because for two years of his employment he did not meet the required minimum number of hours worked.  [Exhibit "1", p. 72]

BMPC gave Jackson the option of returning to work to obtain the requisite hours to qualify for retirement.  [Exhibit "1", p. 73] Jackson asked  what job would he be performing if he returned to work.  [Exhibit "1", p. 73] Jackson was told he would be doing the same job he was doing when he went out on medical leave because the company was shorthanded at the position.  [Exhibit "1", p. 74] Jackson responded:

> . . . that's the reason I'm off now is because that job is what made me sick and my doctor would not release me to go back to that job, so, . . . I just don't think I could do it.

[Exhibit "1", p. 74]

Still, Jackson explained that he would think about his options for a few days and get back to BMPC.  [Exhibit "1", p. 74] A few days later, because BMPC would not afford Jackson reasonable accommodation by letting him work at a job that would not make him sick, Jackson called Hill and

---

[6]Even though BMPC would not return Jackson to work when he came off FMLA leave, he still won a cost-saving idea contest and went to Chicago for the annual awards banquet.  [Exhibit "1", p. 68]  Jackson had caught a flaw in production process of the slurry.  [Exhibit "1", pp. 68-69]

told her that he could not come back if he would have to work the same job that made him sick. [Exhibit "1", p,. 74, 78]

### L. No Attempt at Accommodation

Under the ADAA, an employer is required to engage in an interactive process to see whether it can accommodate an employee with a disability. On three different occasions, in April 2015, July 2015, and September 2015, Jackson asked for the reasonable accommodation to be moved to a job that would not make him sick. Not only did BMPC fail to engage in an interactive process to see if Jackson could perform some job with his disability, it also made no effort whatsoever to try to accommodate Jackson's disability.

When HR Director Hill was asked what efforts BMPC made to accommodate Jackson's disability, she responded, "We didn't have any request to accommodate . . . a disability for Mr. Jackson. [Exhibit "4", p. 15] When asked whether a request to transfer to another position would be an accommodation, Hill testified, "I really don't know to be honest with you. . . . I'm not sure." [Exhibit "4", pp. 15-16]

When Plant Manager Tacy Smithey was asked what efforts he had made to accommodate Jackson's disability, he responded, "I don't know." [Exhibit "3", pp. 10-11] When asked what efforts BMPC made to engage in the interactive process to see if they could accommodate Jackson's disability, Smithey responded, "I don't know. I had no knowledge or conversation about it." [Exhibit "3", p. 11]

Similarly, when HR coordinator Rhonda Barnes was asked what attempts she made to accommodate Jackson's disability, she responded, "I gave him FMLA paperwork and his short-term disability paperwork." [Exhibit "5", pp. 9-10] Barnes further claims that Jackson never asked for

11

a transfer. [Exhibit "5", p. 10] While Barnes recalls Jackson's asking about the shipping department, she does not recall Jackson's asking about a forklift driver position. [Exhibit "5", p. 13] However, Barnes admitted that she reviewed the documentation Jackson presented from his doctor and knew that Dr. Wilons wanted Jackson removed from his work environment to avoid exposure to dust. [Exhibit "5", pp. 18-19] When asked what she did to engage in the interactive process of trying to find Jackson a job in the facility, other than testifying that Jackson did not ask for another job and that he asked to retire, Barnes testified, "I can't recall." [Exhibit "5", pp. 25-26]

Ron Parks was the corporate Vice President of HR during the relevant time period. [Exhibit "21", p. 5-6] When asked what efforts Oil-Dri made to engage in the interactive process to accommodate Jackson's disability, he could not identify any specific efforts made. [Exhibit "21", pp. 12-14]

### M. Mississippi Department of Employment Security

Defendant claims that Jackson admitted he is not disabled because he checked a certain box on the Initial Claim for Benefits form with the Mississippi Department of Employment Security ("MDES"). [Exhibit "22"] Jackson did, in fact, check "no" in response to the question, "Do you have a disability?" [Exhibit "22"] However, as Jackson testified, he asked an MDES employee about that question, and that employee told him the question meant whether he had ever filed for benefits such as social security disability, which he had not. [Exhibit "1", p. 81] Jackson checked the "no" box at the instruction of an employee of MDES. The standard of what constitutes a disability is different for: 1) a social security disability claim; 2) a disqualification of unemployment benefits; and 3) for purposes of an ADA lawsuit; checking the box has no legal effect on Jackson's lawsuit.

Jackson applied for and was initially denied unemployment benefits; however, after a hearing, he was awarded benefits. [Exhibit "23"]  The judge found:

> The claimant was advised by his doctor to remain off work due to his medial condition.  By advising the claimant to remain off work, the doctor advised him to leave his employment due to his health.  Any individual who had been advised by a doctor to leave his employment due to their health has shown good cause under the leave for leaving their employment.

[Exhibit "23"]

## STANDARD OF REVIEW

FEDERAL RULE OF CIVIL PROCEDURE 56(a) requires that a court grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-moving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986).* In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) *(en banc)*.  When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Rather, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"Although summary judgment is a useful device, it must be used cautiously or it may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980).

## ARGUMENTS AND AUTHORITIES

### I. ADA - ACCOMMODATION

Congress amended the ADA in 2008, to provide that it "shall be construed in favor of broad coverage of individuals... to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). The amendments provide that an impairment which "substantially limits one major life activity need not limit other major life activities in order to be considered a disability." ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. § 12102(4)(c).

> For purposes of paragraph (1), major life activities **include, but are not limited to**, caring for oneself,, seeing, hearing, eating, sleeping, walking, standing, **lifting**, bending, speaking, **breathing**, learning, reading, concentrating, thinking, communicating, and **working**.

42 U.S.C.A. § 12102(2)(A) (emphasis added).

> Under the Americans with Disabilities Amendments Act of 2008 (ADAAA):

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C.A. § 12112(a).

> The ADAAA states that "it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations. ..." *Id*. at 3554. Therefore, the "question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* This Court is bound by the clear language of the ADAAA.

*Hoffman v. Carefirst of Fort Wayne, Inc*., 737 F.Supp. 2d 976, 985 (N.D. Ind. 2010).

14

42 U.S.C.A. § 12102(E)(I) states, "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures ...." "The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, **without regard to mitigating measures such as medicines**, or assistive or prosthetic devices." *Foreman v. Babcock & Wilcox Co*., 117 F.3d 800, 805 (5th Cir. 1997)(citing 29 C.F.R. § 1630.2(j))(emphasis added). Thus, "**[t]he question of whether an individual is substantially limited in a major life activity is a question of fact.**" *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 763 (3rd Cir. 2004)(emphasis added).

The ADAAA prohibits employers from "discriminating against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination includes the failure to make "reasonable accommodations to the known physical ... limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Under the ADAAA, a qualified employee is entitled to reasonable accommodation. *Griffin v. UPS, Inc*., 661 F.3d 216, 224 (5th Cir. 2011); 42 U.S.C. § 12111(9)(B)(2009).

> "[A] reasonable accommodation is 'a method of accommodation that is reasonable in the run of cases, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular [employer's] operations.' " *Riel*, 99 F.3d at 683 (quoting *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C.Cir.1993), cert. denied, 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994) (interpreting "reasonable accommodation" under the Rehabilitation Act)); see also *U.S. Airways, Inc*., 535 U.S. at 401, 122 S.Ct. 1516 (noting that many lower courts have held that an accommodation must be reasonable "on its face, i.e., ordinarily or in the run of cases"). **The burden of production is not a heavy one and merely entails demonstrating the existence of a plausible accommodation, "the costs of which, facially, do not clearly exceed its benefits."** *Borkowski v. Valley Cent. Sch. Dist*., 63 F.3d 131, 138 (2d Cir.1995); see *Bruff*, 244 F.3d at 500.

15

*Bennett v. Calabrian Chemicals Corp*., 324 F. Supp. 2d 815, 836 (E.D. Tex. 2004) aff'd, 126 Fed. Appx. 171 (5th Cir. 2005) (unpublished)(emphasis added).

> *Prewitt v. U.S. Postal Service*, 662 F.2d 292, 308 (5th Cir. 1981) held:

> Thus, under subsection (a) of this provision, the burden of proving inability to accommodate is upon the employer. The administrative reasons for so placing the burden likewise justify a similar burden of proof in a private action based upon the Rehabilitation Act. The employer has greater knowledge of the essentials of the job than does the handicapped applicant. The employer can look to its own experience, or, if that is not helpful, to that of other employers who have provided jobs to individuals with handicaps similar to those of the applicant in question. Furthermore, the employer may be able to obtain advice concerning possible accommodations from private and government sources. See *Note, Accommodating the Handicapped: Rehabilitating Section 504 After Southeastern*, 80 Colum.L.Rev. 171, 187-88 (1980).

> *Moss v. Harris County Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017), states:

> To prevail on a failure-to-accommodate claim, the plaintiff must show "(1) [he] is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Feist*, 730 F.3d at 452.

### A.   *Prima Facie*

#### 1.   *Qualified Person with a Disability*

The ADAAA defines a disability as either: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."

*Miller v. McHugh*, 814 F. Supp. 2d 299, 312 (S.D. N.Y. 2011)*.*

In order to be a qualified person with a disability, a plaintiff could either (1) perform the essential functions of the job; or (2) that a reasonable accommodation of his disability would have enabled him to perform the essential functions of his job. *Burch v. City of Nacogdoches*, 174 F.3d 615, 619 (5th Cir. 1999).

16

Defendant claims that Jackson is not a qualified person with a disability. Defendant claims that the evidence does not support a finding that Plaintiff's breathing issues constituted a disability. In order to prove this point, contrary to the mandates of a summary judgment motion, Defendant has selectively identified evidence that might tend to support its position, while ignoring evidence that does not. When the evidence is viewed as a whole, at the least, Jackson has demonstrated that a jury could find that he is a qualified person with a disability, for all of the following reasons:

1. Jackson complained about the dusty conditions caused by the chemical additives he was required to put in the products that were causing him health problems. [Exhibit "1", p. 36]

2. On two occasions, Jackson developed pneumonia while working at Oil-Dri. [Exhibit "1", p. 42] On one of those occasions, Jackson had to be hospitalized for over a week. [Exhibit "1", p. 42]

3. In December 2014, Jackson began having a lot of trouble breathing with asthma-like symptoms. [Exhibit "1", p. 44] Jackson saw Nurse Practitioner Melinda Quinn at the Family Clinic in Falkner. [Exhibit "1", p. 44] Quinn treated Jackson for an upper respiratory infection. [Exhibit "1", p. 45] The problems proved to be chronic, and Jackson was not improving even with the treatments. [Exhibit "1", pp. 45-46] Jackson began running a high fever and had to leave work. [Exhibit "1", p. 46]

4. Quinn sent Jackson to the hospital for a lung x-ray, and the radiologist told Jackson that he had COPD. [Exhibit "1", p. 46] Quinn also referred Jackson to a lung specialist in Memphis, Tennessee, Dr. Michael Wilons. [Exhibit "1", pp. 46-47]

5. In April 2015, Jackson saw Dr. Wilons, who diagnosed him with mild COPD, sarcoidosis, and asthma. [Exhibit "1", p. 47] Dr. Wilons prescribed Jackson different inhalers,

17

various medicines, and removed him from the work environment that was causing his health issues. [Exhibit "1", p. 48]

6. Dr. Wilons stated that Jackson had a chronic breathing condition which required him to be out of his dusty work environment in order to get control of the condition. [Exhibit "13"] According to Jackson, the chemicals in the dust to which he was exposed to that were causing his health problems. [Exhibit "1", p. 113]

7. On May 5, 2015, Jackson filed for short-term disability. [Exhibit "14"] In the application, Jackson's doctor stated that being put back in the same environment could cause Jackson to miss more work. [Exhibit "4", p. 24; Exhibit "14"]

8. On July 15, 2015, Jackson was released to return to work by Dr. Wilons, with one restriction, not to be exposed to the same environment and do the same job. [Exhibit "1", p. 56] Even though Jackson still suffered from sarcoidosis and asthma, he could return to work if BMPC did not force him to work in the same environment which caused his lung condition. [Exhibit "1", p. 9]

9. Amanda Hill admitted that she was aware that Jackson's doctor stated that Jackson needed to work in a different environment than the slurry room/chemical platform. [Exhibit "4", p. 16]

10. Dr. Wilons wrote on July 15, 2015, when releasing Jackson to return to work:

Persistent respiratory tract infection with complete clearance and resolution after removal from the work environment where he has exposure to dust and chemicals, has resolved his issues. His breathing is completely back to baseline and he feels much better.
. . .

18

> We will begin weaning off pulmonary medications because it looks like staying out of the work environment will keep him from requiring chronic pulmonary medications to control his breathing.

[Exhibit "15"]

11.  Dr. Wilons testified that he discussed with Jackson that returning to the same job where he was exposed to a great deal of dust and chemicals could re-trigger his breathing issues. [Exhibit "16", p. 17]   Dr. Wilons testified that Jackson's "respiratory system was under control **on medication**." [Exhibit "16", p. 28, emphasis added] Jackson continued to take medicine to control his breathing issues long after he was released to work. [Exhibit "16", p. 29]

12.  When Defendant offered to let Jackson return to work to qualify for retirement, Jackson was told he would be doing the same job he was doing when he went out on medical leave because the company was shorthanded at the position.  [Exhibit "1", p. 74] Jackson responded: "That's the reason I'm off now is because that job is what made me sick and my doctor would not release me to go back to that job, so, . . . I just don't think I could do it." [Exhibit "1", p. 74]

13.  The ALJ Judge found: "By advising the claimant to remain off work, the doctor advised him to leave his employment due to his health." [Exhibit "17", pp. 8-9]

14.  Jackson was physically able and available to work; however, as he testified in his unemployment hearing, ". . . my options were . . . either retire or quit or go back to the job that was making me sick."

15.  As will be shown below, with a reasonable accommodation, Jackson could have performed his job.

## 2. *Disability Known by Employer*

As discussed above, there was significant evidence the employer knew that Jackson had a disability with this one restriction, not to be put back working as a chemical operator, in July 2015. The following pieces of evidence demonstrate that Defendant also knew of the disability and the restriction in April 2015 and September 2015:

1. In early April 2015, a few weeks prior to his seeing Dr. Wilons, Jackson met with Rhonda Barnes in the HR department for Defendant. [Exhibit "1", p. 52] Jackson was very sick at this time, and he and Barnes discussed his going on FMLA leave, his possible retirement, and positions in the plant that were open. [Exhibit "5", p. 8; Exhibit "1", p. 53]

2. Jackson asked Barnes whether he could work in a different area of the plant. [Exhibit "1", p. 53] Jackson requested a reasonable accommodation, moving to a forklift driver or shipping clerk position because he knew these two positions were open. [Exhibit "5", p. 9; Exhibit "1", p. 78; Exhibit "9"] Jackson could not bid for the positions of forklift driver or shipping clerk because they were not promotions. [Exhibit "1", p. 100-01]

3. BMPC posted job openings for two shipping/receiving clerks on April 16, 2015. [Exhibit "5", p. 9; Exhibit "11"] Jackson told Barnes that he would take a position as a shipping clerk. [Exhibit "1", p. 115] Barnes told Jackson that she did not know how he could take the job with that big of a pay cut. [Exhibit "1", p. 115]

4. BMPC refused this reasonable accommodation and suggested that Jackson retire because he qualified for immediate retirement benefits. [Exhibit "9"] The two positions in the shipping department were filled on April 27, 2015, and June 15, 2015. [Exhibit "12"]

5.   In April 2015, Jackson requested FMLA leave, because he was not offered reasonable accommodation by becoming a shipping clerk. [Exhibit "1", pp. 50-51; Exhibit "13"]

6.   On July 15, 2015, Jackson was released to return to work by Dr. Wilons, with one restriction, that he not be exposed to the same environment and not do the same job.  [Exhibit "1", p. 56]

7.   Once released to return to work, with restrictions, Jackson asked Barnes whether anything had changed concerning job openings that he could perform, and Barnes replied, "No." [Exhibit "1", p. 57]   Barnes told Jackson that they had no other work available for him other than the job that made him sick. [Exhibit "17", pp. 12]

8.   Because Oil-Dri would not accommodate his disability, Jackson told her that he would retire.  [Exhibit "1", pp. 57, 78]   Jackson was physically able and available to work; however, his only options were either to retire, to quit or to go back to the job that was making him sick. [Exhibit "17", pp. 8-9]

9.   Jackson knew that BMPC had forklift and shipping openings that he could perform at the time.  [Exhibit "1", p. 57] Jackson also knew that job openings were not always posted.  [Exhibit "1", p. 58]

10.   No one with BMPC ever notified Jackson when there were forklift driver positions open. [Exhibit "1", p. 115]   BMPC posted a position for a forklift drivers on June 17, 2017, and a person was hired for the position on July 7, 2015. [Exhibit "18"]   Another forklift position was posted on July 30, 2015, and filled on August 18, 2015. [Exhibit "19"]   Further, BMPC hired forklift drivers from postings on  October 1, 2016, October 10, 2015, and December 15, 2015.  [Exhibit "4", p. 19; Exhibit "20"]

11.  Jackson would not have retired in July 2015 if BMPC had offered him a job as either a forklift driver or in the shipping department. [Exhibit "1", p. 116] In all, BMPC hired/transferred two shipping clerks and five forklift drivers in 2015, and Jackson was not offered any of the positions. [Exhibit "4", pp. 20-21]

12.  In September 2015, BMPC gave Jackson the option of returning to work to obtain the requisite hours to qualify for the retirement. [Exhibit "1", p. 73] Jackson asked what job would he be performing if he returned. [Exhibit "1", p. 73] Jackson was told he would be doing the same job he was doing when he went out on medical leave because the company was shorthanded at the position. [Exhibit "1", p. 74] Jackson responded, "That's the reason I'm off now is because that job is what made me sick and my doctor would not release me to go back to that job, so, . . . I just don't think I could do it."

13.  A few days later, because BMPC would not afford Jackson reasonable accommodation by letting him work at a different job, Jackson called Hill and told her that he could not come back if he would have to work the same job that made him sick.

As explained above, Defendant was aware of Plaintiff's disability and his limitation in April 2015, July 2015, and September 2015. [Exhibit "1", p. 74]

### 3.  *Employer Failed to Make Reasonable Accommodation*

Defendant argues that an employee has the right to reasonable accommodation, not preferred accommodation. Defendant has failed to argue that accommodating Jackson's disability would have been an undue hardship. Defendant's defense is that it did not have a forklift position open on July 15, 2015, and that Jackson was not entitled to his "preferred" accommodation.

22

In this case, what Jackson asked for was not only reasonable, it was medically necessary. It was not his "preferred" position, as he would work any position. All Jackson was asking for was to be put in a position that would not make him sick. Jackson asked for reasonable accommodation in April 2015, July 2105, and September 2015.

> Once an employee has made a request for an accommodation, the ADA's regulations state that "it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation" in order to craft a reasonable accommodation. 29 C.F.R. § 1630.2(o)(3). The EEOC's interpretive guidelines reinforce this directive, but also stress that the interactive process requires the input of the employee as well as the employer. See 29 C.F.R. Pt. 1630, App. § 1630.9 at 359 ("flexible, interactive process that involves both the employer and the qualified individual with a disability"). See also *Taylor v. Principal Financial Group, Inc*., 93 F.3d 155, 165 (5th Cir.), cert. denied, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996) (duty to launch interactive process is triggered by request for an accommodation). The need for bilateral discussion arises because "each party holds information the other does not have or cannot easily obtain." See *Taylor v. Phoenixville School Dist*., 174 F.3d 142, 162 (3rd Cir.1999) (noting that employers will not always understand what the disabled employee is capable of and the employee will not always understand what accommodations are reasonably available). **Courts interpreting the interactive process requirement have held that when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA**. See *Taylor v. Phoenixville School Dist*., 174 F.3d 142, 165; *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir.1996).

*Loulseged v. Akzo Nobel Inc*., 178 F.3d 731, 735–36 (5th Cir. 1999).

Not only did Defendant fail to provide accommodation for Jackson, it also totally failed to engage in the required interactive process to see whether it could accommodate Jackson. The following pieces of evidence demonstrate that failure:

1. In early April 2015, Jackson asked Barnes whether he could work in a different area of the plant. [Exhibit "1", p. 53] Jackson requested a reasonable accommodation, moving to a forklift driver or shipping clerk position, because he knew these two positions were open. [Exhibit "5", p. 9; Exhibit "1", p. 78; Exhibit "9"]

23

2. Jackson told Barnes that he would take a position as a shipping clerk. [Exhibit "1", p. 115] Barnes told Jackson that she did not know how he could take the job with that big of a pay cut. [Exhibit "1", p. 115] BMPC refused this reasonable accommodation, and suggested that Jackson retire because he qualified for immediate retirement benefits. [Exhibit "9"] The two positions in the shipping department were filled on April 27, 2015, and June 15, 2015. [Exhibit "12"]

3. On July 15, 2015, Jackson was released to return to work by Dr. Wilons, with one restriction, that he not be exposed to the same environment and not do the same job. [Exhibit "1", p. 56] Jackson asked Barnes whether anything had changed concerning job openings that he could do, and Barnes replied, "No." [Exhibit "1", p. 57] Barnes told Jackson that they had no other work available for him other than the job that made him sick. [Exhibit "17", p. 12]

4. Because Oil-Dri would not accommodate his disability, Jackson told Barnes that he would retire. [Exhibit "1", pp. 57, 78] Jackson was physically able and available to work; however, as he testified in his unemployment hearing, ". . . my options were . . . either retire or quit or go back to the job that was making me sick." [Exhibit "17", pp. 8-9]

5. Jackson knew that BMPC had forklift and shipping openings that he could perform at the time. [Exhibit "1", p. 57] No one with BMPC ever notified Jackson that there was a forklift driver position open. [Exhibit "1", p. 115] BMPC posted a position for a forklift drivers on June 17, 2017. [Exhibit "18"], on July 30, 2015, [Exhibit "19"] and on October 1, 2016, October 10, 2015, and December 15, 2015. [Exhibit "4", p. 19; Exhibit "20"]

6. Jackson would not have retired in July 2015 if BMPC had offered him a job as either a forklift driver position or a position in the shipping department. [Exhibit "1", p. 116] In all, BMPC

24

hired/transferred two shipping clerks and five forklift drivers in 2015, and Jackson was not offered any of the positions.  [Exhibit "4", pp. 20-21]

     7.  Around September 2015, BMPC gave Jackson the option of returning to work to obtain the requisite hours to qualify for  retirement.  [Exhibit "1", p. 73] Jackson asked  what job would he be doing if he returned to work.  [Exhibit "1", p. 73] Jackson was told he would be doing the same job he was doing when he went out on medical leave because the company was shorthanded at the position.  [Exhibit "1", p. 74] Jackson responded: "That's the reason I'm off now is because that job is what made me sick and my doctor would not release me to go back to that job, so, . . . I just don't think I could do it."  [Exhibit "1", p. 74]

     8.  Jackson called Hill and told her that he could not come back if he would have to work the same job that made him sick.  [Exhibit "1", pp. 74, 78]

     9.  When HR Director Hill was asked what efforts BMPC made to accommodate Jackson's disability, she responded, "We didn't have any request to accommodate . . . a disability for Mr. Jackson." [Exhibit "4", p. 15]  When asked whether a request to transfer to another position was an accommodation, Hill testified, "I really don't know to be honest with you. . . . I'm not sure." [Exhibit "4", pp. 15-16]

     10.  When Plant Manager Tracy Smithey was asked what efforts he had made to accommodate Jackson's disability, he responded, "I don't know." [Exhibit "3", pp. 10-11] When asked what efforts BMPC did to engage in the interactive process to see if they could accommodate his disability, Smithey responded, "I don't know.  I had no knowledge or conversation about it." [Exhibit "3", p. 11]

11.   When HR coordinator Rhonda Barnes was asked what attempts she made to accommodate Jackson's disability, she responded, "I gave him FMLA paperwork and his short-term disability paperwork." [Exhibit "5", pp. 9-10]  Barnes further claims that Jackson never asked for a transfer.  [Exhibit "5", p. 10] However, Barnes admits that Jackson asked about the shipping department.  [Exhibit "5", p. 13]  When asked what she did to engage in the interactive process of trying to find Jackson a job in the facility, other that testifying that Jackson did not ask for another job and that he asked to retire, Barnes testified, "I can't recall."  [Exhibit "5", pp. 25-26]

12.   Ron Parks was the corporate Vice President of HR during the relevant time period. [Exhibit "21", pp. 5-6]  When asked what efforts BMPC made to engage in the interactive process to accommodate Jackson's disability, he could not identify any specific efforts made.  [Exhibit "21", pp. 12-14]

A reasonable jury, hearing all the evidence, could conclude that Plaintiff was a qualified person with a disability; Defendant knew about Plaintiff's disability and limitation; and not only did Defendant fail to reasonably accommodate Jackson, but also it refused to participate in the interactive process even though Jackson repeatedly requested reasonable accommodation.  Therefore, summary judgment should be denied as to Jackson's ADA failure to accommodate a claim.

## II.    ADA - DISABILITY DISCRIMINATION [7]

Jackson claims Defendant forced him to retire because he had a disability, because Defendant

regarded him as having a disability, and/or because he had a history of a disability.

> In order to make a *prima facie* case of discrimination under the ADA, a plaintiff must
> establish that he is a qualified individual with a disability and that the negative
> employment action occurred because of the disability." *Sherrod v. Am. Airlines, Inc.,*
> 132 F.3d 1112, 1119 (5th Cir.1998).

*Dooley v. Parks and Recreation for the Parish of East Baton Rouge,* 433 Fed. Appx. 321, 325-326,

(5th Cir. 2011).

---

[7]Under binding law, Plaintiff is not required to plead legal theories, but is obligated to plead only the facts that support the theory. In *Johnson v. City of Shelby, Miss*., 135 S. Ct. 346, 347 (2014), the Supreme Court reversed and remanded a case that was dismissed for failure to state § 1983 in the Complaint, holding:

> Petitioners stated simply, concisely, and directly events that, they alleged, entitled them to damages from the city. Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim. See Fed. Rules Civ. Proc. 8(a)(2) and (3), (d)(1), (e). For clarification and to ward off further insistence on a punctiliously stated "theory of the pleadings," petitioners, on remand, should be accorded an opportunity to add to their complaint a citation to § 1983. See 5 Wright & Miller, supra, § 1219, at 277–278 ("The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." (footnotes omitted)); Fed. Rules Civ. Proc. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires.").

In *Quadir v. New York State Dep't of Labor*, 39 F. Supp. 3d 528 (S.D.N.Y. 2014), the plaintiff filed a claim of disability under the ADA. *Quadir*, 39 F. Supp. 3d at 534. The Court dismissed the ADA claim under the 11th Amendment because the ADA does not abrogate a state's sovereign immunity. *Quadir*, 39 F. Supp. 3d at 537. However, the Court analyzed the plaintiff's claim under the Rehabilitation Act, even though the plaintiff did not specifically name the Act in the Complaint:

> If the complaint is read with special solicitude so as to raise the strongest possible legal arguments on the facts as alleged, however, it may state a claim under the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794.

*Quadir*, 39 F. Supp. 3d at 537.

### A. *Prima Facie*

Jackson must introduce evidence that:

(1)     he suffers from a disability;
(2)     he was qualified for the job; and
(3)     he suffered an adverse employment action because of his disability.

*EEOC v. LHC Group, Inc.,* 773 F.3d 688, 695 (5th Cir. 20140); *Vanderford v. Parker Hannifin Corp.*, 971 F.Supp. 1079, 1080-81 (N.D. Miss. 1997).

"To establish a *prima facie* case, [the plaintiff] need only make a very minimal showing."

*Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).

### 1. *Suffers From a Disability*; *Regarded as Having an Impairment; and/or History of a Disability*.

As discussed above:

1. Over the years, Jackson continually complained to management and his supervisors about the working conditions at his work site, trying to get the air quality improved.  [Exhibit "1", pp. 35-36, 40] Specifically, Jackson complained about the dusty conditions caused by the chemical additives he had to put in the products, and he noted that those conditions were causing him health problems. [Exhibit "1", p. 36]

2. On two occasions, Jackson developed pneumonia while working at Oil-Dri.  [Exhibit "1", p. 42] On one of those occasions, he had to be hospitalized for over a week.  [Exhibit "1", p. 42]

3. In December 2014, Jackson began having a great deal of trouble breathing with asthma-like symptoms.  [Exhibit "1", p. 44] Jackson saw Melinda Quinn, a nurse practitioner, at the Family Clinic in Falkner.  [Exhibit "1", p. 44] Quinn treated Jackson for an upper respiratory infection. [Exhibit "1", p. 45] The problems proved to be chronic, and Jackson was not improving even with

28

the treatments. [Exhibit "1", pp. 45-46] Jackson began running a high fever and had to leave work. [Exhibit "1", p. 46]

    4.  Quinn sent Jackson to the hospital for a lung x-ray, and the radiologist told Jackson that he had COPD. [Exhibit "1", p. 46] NP Quin also referred Jackson to a lung specialist in Memphis, Tennessee, Dr. Michael D. Wilons. [Exhibit "1", pp. 46-47]

    5.  In April 2015, Jackson saw Dr. Wilons, who diagnosed him with mild COPD, sarcoidosis, and asthma. [Exhibit "1", p. 47] Dr. Wilons prescribed Jackson different inhalers, various medicines, and removed him from the work environment that was causing his health issues. [Exhibit "1", p. 48]

    6.  Dr. Wilons stated that Jackson had a chronic breathing condition which required him to be out of his dusty work environment in order to get control of the condition. [Exhibit "13"] According to Jackson, the chemicals in the dust to which he was exposed were causing his health problems. [Exhibit "1", p. 113]

    7.  On May 5, 2015, Jackson filed for short term disability. [Exhibit "14"] In the application, Jackson's doctor stated that being put back in the same environment could cause Jackson to miss more work. [Exhibit "4", p. 24; Exhibit "14"]

    8.  On July 15, 2015, Jackson was released to return to work by Dr. Wilons, with one restriction, not to be exposed to the same environment and do the same job. [Exhibit "1", p. 56] Even though Jackson still suffered from sarcoidosis and asthma, he could return to work if BMPC did not require him to work in the same environment which caused his lung condition. [Exhibit "1", p. 9]

9.   Amanda Hill admitted that she was aware that Jackson's doctor stated that Jackson needed to work in a different environment than the slurry room/chemical platform.  [Exhibit "4", p. 16]

10.   Dr. Wilons wrote on July 15, 2015, when releasing Jackson to return to work:

Persistent respiratory tract infection with complete clearance and resolution after removal from the work environment where he has exposure to dust and chemicals, has resolved his issues.  His breathing is completely back to baseline and he feels much better.
. . .
We will begin weaning off pulmonary medications because it looks like staying out of the work environment will keep him from requiring chronic pulmonary medications to control his breathing.

[Exhibit "15"]

11.   Dr. Wilons testified that he discussed with Jackson that returning to the same job where he was exposed to a great deal of dust and chemicals could re-trigger his breathing issues. [Exhibit "16", p. 17]   However, his "respiratory system was under control **on medication**."  [Exhibit "16", p.  28, emphasis added] Jackson took medicine to control his breathing issues long after he was released to work. [Exhibit "16", p. 29]

12.   When Defendant offered to let Jackson return to work to qualify for retirement, Jackson was told he would be doing the same job he was doing when he went out on medical leave because the company was shorthanded at the position.  [Exhibit "1", p. 74] Jackson responded: "That's the reason I'm off now is because that job is what made me sick and my doctor would not release me to go back to that job, so, . . . I just don't think I could do it."   [Exhibit "1", p. 74]

13.   The ALJ Judge found: "By advising the claimant to remain off work, the doctor advised him to leave his employment due to his health." [Exhibit "17", pp. 8-9]

30

14.  Jackson was physically able and available to work; however, as he testified in his unemployment hearing, ". . . my options were . . . either retire or quit or go back to the job that was making me sick."

As with the accommodation claim above, Jackson suffered from a disability as that term is defined by the ADAAA.

### 2.      Qualified Individual

Jackson has worked for Defendant for fifteen (15) years and by all indications, he was a good employee without attendance or disciplinary issues.  Jackson was a qualified individual.

### 3.      Adverse Employment Action Because of the Disability

On July 15, 2015, Jackson was released to return to work by Dr. Wilons, with one restriction, not to be exposed to the same environment and not to perform the same job.  [Exhibit "1", p. 56] Even though Jackson still suffers from sarcoidosis and asthma, he could return to work if Oil-Dri did not force him to work in the same environment which caused his lung condition.  [Exhibit "1", p. 9] As Dr. Wilons wrote on July 15, 2015, when releasing Jackson to return to work:

> Persistent respiratory tract infection with complete clearance and resolution after removal from the work environment where he has exposure to dust and chemicals, has resolved his issues.  His breathing is completely back to baseline and he feels much better.
> . . .
> We will begin weaning off pulmonary medications because it looks like staying out of the work environment will keep him from requiring chronic pulmonary medications to control his breathing.

[Exhibit "15"]

Dr. Wilons testified that he discussed with Jackson that returning to his same job where he was exposed to a great deal of dust and chemicals could re-trigger his breathing issues. [Exhibit

"16", p. 17] Jackson told Dr. Wilons that he was trying to transfer to another part of the plant. [Exhibit "16", p. 33]

Once released to return to work, with restrictions, Jackson asked Barnes whether anything had changed concerning job openings that he could perform, and Barnes replied, "No." [Exhibit "1", p. 57]   Barnes told Jackson that they had no other work available for him other than the job that made him sick. [Exhibit "17", p. 12]   Because Oil-Dri would not accommodate his disability, Jackson told Barnes that he would retire.  [Exhibit "1", pp. 57, 78] Jackson was physically able and available to work; however, as he testified in his unemployment hearing, ". . . my options were . . . either retire or quit or go back to the job that was making me sick." [Exhibit "17", pp. 8-9]

Jackson would not have retired in July 2015, if BMPC had offered him a job as either a forklift driver or in the shipping department.  [Exhibit "1", p. 116] In effect, Jackson was constructively discharged.

Jackson did not voluntarily retire, but retired only because the only other option was working in a job that would make him sick, and which his doctor told him not to perform.  The ALJ Judge held:

> Any individual who had been advised by a doctor to leave his employment due to their health has shown good cause under the leave for leaving their employment.

[Exhibit "23"]

That is the definition of a constructive discharge, which is an adverse employment action.

**B.    Legitimate Non-Discriminatory Reason for Termination**

Defendant claims Jackson voluntarily resigned from his position.

### C.    Pretext Alternative/Mixed Motive Alternative[8]

The plaintiff must then identify or offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Culwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir.2005) (analyzing a Title VII claim under the modified approach).

*Meinelt v. P.F. Chang's China Bistro, Inc.*, 787 F. Supp. 2d 643, 650-51 (S.D. Tex. 2011).

### 1.    *Pretext Alternative*

Jackson has presented substantial evidence from which a reasonable jury could conclude Defendant's claim that Jackson voluntarily retired is not true:

1.    On July 15, 2015, Jackson was released to return to work by Dr. Wilons, with one restriction, not to be exposed to the same environment and not to perform the same job.  [Exhibit "1", p. 56]  Even though Jackson still suffers from sarcoidosis and asthma, he could return to work if Oil-Dri did not force him to work in the same environment which caused his lung condition.  [Exhibit "1", p. 9]

2.  As Dr. Wilons wrote on July 15, 2015, when releasing Jackson to return to work:

Persistent respiratory tract infection with complete clearance and resolution after removal from the work environment where he has exposure to dust and chemicals, has resolved his issues.  His breathing is completely back to baseline and he feels much better.
. . .

---

[8]The law may be unsettled in the Fifth Circuit as to whether the "motivating factor" standard still applies for an ADA case after the decisions of *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009) and *Univ. of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517 (2013).  However, Plaintiff is not aware that the Fifth Circuit has not ruled on whether a motivating factor analysis is permitted for an ADA claim.

> We will begin weaning off pulmonary medications because it looks like staying out of the work environment will keep him from requiring chronic pulmonary medications to control his breathing.

[Exhibit "15"]

3. Dr. Wilons testified that he discussed with Jackson that returning to the same job where he was exposed to a great deal of dust and chemicals could re-trigger his breathing issues. [Exhibit "16", p. 17] Jackson told Dr. Wilons that he was trying to transfer to another part of the plant. [Exhibit "16", p. 33]

4. Once released to return to work, with restrictions, Jackson asked Barnes whether anything had changed concerning job openings that he could perform, and Barnes replied, "No." [Exhibit "1", p. 57] Barnes told Jackson that they had no other work available for him other than the job that made him sick. [Exhibit "17", p. 12] Because Oil-Dri would not accommodate his disability, Jackson told Barnes that he would retire. [Exhibit "1", pp. 57, 78] Jackson was physically able and available to work; however, as he testified in his unemployment hearing, ". . . my options were . . . either retire or quit or go back to the job that was making me sick." [Exhibit "17", pp. 8-9]

5. Jackson would not have retired in July 2015, if BMPC had offered him a job as either a forklift driver or in the shipping department. [Exhibit "1", p. 116]

6. A reasonable jury, considering all the evidence, could conclude that Jackson did not voluntarily retire, but retired only because the only other option was working in a job that would make him sick, and which his doctor told him not to perform. Jackson did not voluntarily resign, but instead, was constructively discharged.

34

### *2. Mixed Motive Alternative*

Even if there were any indicia of reliability as to the reason Defendant claims that Jackson left his employment, namely, "voluntary retirement," a reasonable jury could conclude that his disability was a motivating factor in that decision, for all the reasons stated in the preceding sections.

### CONCLUSION

For all the reasons stated herein, Plaintiff James Benny Jackson asks this Court to deny Defendant's motion for summary judgment.

DATED, this the 14th day of November, 2017.

Respectfully submitted,

WAIDE & ASSOCIATES, P.A.


BY: */s/ Ron L. Woodruff*
      RON L. WOODRUFF
      MS BAR NO: 100391

WAIDE & ASSOCIATES, P.A.
ATTORNEYS AT LAW
POST OFFICE BOX 1357
TUPELO, MISSISSIPPI 38802
TELEPHONE: 662-842-7324
FACSIMILE: 662-842-8056
EMAIL: waide@waidelaw.com

Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

This will certify that undersigned counsel for Plaintiff has this day filed the above and foregoing with the Clerk of the Court, utilizing this court's electronic case data filing system (CM/ECF), which sent notification of such filing to the following:

> **Ashley Eley Cannady, Esq.**
> **Armin J. Moeller, Jr., Esq.**
> **Balch & Bingham LLP**
> **188 East Capitol Street, Suite 1400**
> **Jackson, MS  39201**
> **acannady@balch.com**
> **amoeller@balch.com**
> **pfairchild@balch.com**
> **kbrock@balch.com**

DATED, this the 14th day of November, 2017.

> _/s/ Ron L. Woodruff_____
> Ron L. Woodruff