Deposition of Benny Jackson, taken May 10, 2017

1

### Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2              OXFORD DIVISION
3

JAMES BENNY JACKSON          PLAINTIFF
4
   VS.           NO. 3:16CV189-DMB-RP
5

OIL-DRI CORPORATION OF AMERICA AND
6  BLUE MOUNTAIN PRODUCTION COMPANY     DEFENDANTS
7
8
9  ********************************************
10
         DEPOSITION OF BENNY JACKSON
11
12 ********************************************
13
14
     TAKEN AT THE INSTANCE OF THE DEFENDANTS
15   IN THE LAW OFFICES OF WAIDE & ASSOCIATES
     332 NORTH SPRING STREET, TUPELO, MISSISSIPPI
16   ON MAY 10, 2017, BEGINNING AT 10:40 A.M.
17
18
19     APPEARANCES NOTED HEREIN
20
21
22 Reported by:  KATHRYN H. BOYER, CSR #1349
23
         ADVANCED COURT REPORTING
24           P.O. BOX 761
           TUPELO, MS 38802-0761
25           (662) 690-1500

### Page 2

1  APPEARANCES:
2  For the Plaintiff:   RON L. WOODRUFF, Esquire
               Waide & Associates
3              P.O. Box 1357
               Tupelo, MS 38802-1357
4              (662) 842-7324
5
   For the Defendants:   ARMIN MOELLER, JR., Esquire
6              Balch & Bingham
               P.O. Box 22587
7              Jackson, MS 39225-2587
               (601) 965-8156
8
9  Also Present:    Amanda Hill
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### Page 3

TABLE OF CONTENTS

WITNESS                    PAGE
BENNY JACKSON
  Examination by Armin Moeller      4
  Examination by Ron Woodruff      111
  Examination by Armin Moeller     116
  Examination by Ron Woodruff      117

EXHIBITS
  1  FMLA paperwork         49

  2  Job posting           59

  3  Job bid form          65

  4  IU-501 Initial Claim for Benefits 79

  5  Notice of Nonmonetary Decision
     1-9-16            82
  6  Notice of Nonmonetary Decision
     7-13-16            84

  7  Doctor's certificate       85

  8  Workers' Compensation settlement 109

  9  7-15-15 medical record      118

### Page 4

1       BENNY JACKSON, after being duly sworn,
2  testified as follows:
3
4            EXAMINATION
5  BY MR. MOELLER:
6    Q.  Mr. Jackson, my name is Armin Moeller and I'm
7  the attorney for Oil-Dri Corporation and as I
8  understand it, you previously were employed by Oil-Dri
9  Corporation.
10   A.  That's correct.
11   Q.  And you filed a lawsuit which you are
12  represented by Mr. Woodruff and Mr. Waide.
13   A.  That's correct.
14   Q.  And you filed this lawsuit against Oil-Dri; is
15  that correct?
16   A.  That's correct.
17   Q.  And I'll be asking you a number of questions
18  today.  Is there any reason why you cannot give full
19  and complete answers?
20   A.  No.
21   Q.  Mr. Jackson, has your attorney explained to
22  you the process of a deposition?
23   A.  He has.
24   Q.  And so, you understand that I will be asking
25  questions and you are to provide the answers.

**EXHIBIT**

**A**
tabbies

ADVANCED COURT REPORTING
662-690-1500



Deposition of Benny Jackson, taken May 10, 2017

2

## Page 5

1  A. Yes, sir.
2  Q. And is there any reason today why you cannot
3  provide full and complete answers?
4  A. No.
5  Q. Are you suffering today under any physical or
6  mental impairments?
7  A. No.
8  Q. Since your employment ended at Oil-Dri --
9  which, I believe, was on or about July 15, 2016; is
10  that correct?
11  A. No, sir. I believe it was 2015.
12  Q. 2015. Excuse me. So since your employment
13  ended on or about July 15, 2015, have you suffered any
14  physical or mental impairments?
15  MR. WOODRUFF: You're asking new or
16  continuations or -- I'm not sure what you're --
17  Q. (Mr. Moeller) Since.
18  MR. WOODRUFF: You understand his
19  question?
20  A. New?
21  Q. (Mr. Moeller) Correct.
22  A. Any new impairments.
23  Q. Yeah. Well, any impairments. Have you since
24  July 15, 2015, suffered or been -- suffered any
25  physical or mental impairments?

## Page 6

1  A. Blood clot in my leg.
2  Q. Okay. When was that?
3  A. I think it was July of last year.
4  Q. July 2016?
5  A. Yes, sir. I think that's right.
6  Q. And did that impair you for some period of
7  time?
8  A. I'm not sure exactly what you mean by
9  "impaired". You mean that it would --
10  Q. Disabled.
11  A. Disabled?
12  Q. Yes.
13  A. For about a week, I had to be off my leg, have
14  my leg elevated.
15  Q. Okay.
16  A. But other than that, no, sir.
17  Q. Okay. So other than that, you've had no
18  physical or mental impairments since July 2015?
19  A. Yes, sir. I have had mini strokes, but not
20  sure -- can't pinpoint exactly when I had one of those.
21  Q. Okay. Did any -- did you go to a doctor?
22  A. Yes, sir.
23  Q. About a mini stroke?
24  A. Yes, sir.
25  Q. When did you see a doctor about a mini stroke?

## Page 7

1  A. In 2016. I don't remember the exact date.
2  Q. Who did you see?
3  A. Dr. Assaf.
4  Q. And is he with a clinic or a hospital?
5  A. He has a clinic in Memphis.
6  Q. And did you see him on more than one occasion?
7  A. Yes.
8  Q. How many occasions?
9  A. Approximately eight or 10 times. Not sure the
10  exact number.
11  Q. When was the first time you saw Dr. Assaf?
12  A. I don't remember. Don't recall the exact
13  date.
14  Q. Do you know how his name is spelled?
15  A. I think I have his card in my pocket.
16  Q. Oh. Very good. Thank you.
17  A. Maybe.
18  Q. I believe this card shows that his name is --
19  first name is M-O-H-A-M-M-A-D; last name, Assaf,
20  A-S-S-A-F, M.D.; 200 Highway 30 West, 5th floor, New
21  Albany, Mississippi 38652. Now were you seeing him in
22  New Albany or were you seeing him in Memphis?
23  A. In New Albany. Yes, sir.
24  Q. Okay. Now when was the last time you saw
25  Dr. Assaf?

## Page 8

1  A. About two months ago.
2  Q. Okay. Have you been released by Dr. Assaf?
3  A. No, sir.
4  Q. What is Dr. Assaf's diagnosis for you?
5  A. He's treating me for anxiety and depression
6  and he -- as far as what his diagnosis is, I
7  couldn't --
8  Q. Okay.
9  A. -- couldn't be specific about that.
10  Q. Well, I believe you just stated that he's
11  treating you for anxiety and depression. Did he
12  diagnose you as having anxiety and depression?
13  A. Yes, sir.
14  Q. Okay. Now with regard to the treatment plan
15  for the anxiety and depression, are you taking any
16  medications?
17  A. Paxil.
18  Q. Paxil?
19  A. Actually, it's a -- the generic form of Paxil.
20  I don't remember the exact -- Paroxetine maybe, but
21  it's --
22  Q. Okay.
23  A. -- generic Paxil.
24  Q. Okay. And how long have you been taking that?
25  A. About two months.

**Deposition of Benny Jackson, taken May 10, 2017**

## Page 9

1  Q. Okay. And did he first prescribe it about two
2  months ago?
3  A. Yes, sir.
4  Q. Was that the onset of your anxiety and
5  depression?
6  A. No, sir.
7  Q. When was the onset of your anxiety and
8  depression?
9  A. I couldn't put a specific date on it, but
10  since I've been off work, I've had -- I've had
11  depression and anxiety because of my -- not being a
12  breadwinner anymore.
13  Q. Okay. Are you under any physical or mental
14  impairments that prevent you from working?
15  A. No, sir. Other than the lung impairments I
16  have from -- I have sarcoidosis. I have asthma.
17  Q. Okay. Has the doctors treating you for asthma
18  released you to work?
19  A. With -- with conditions, he has. He released
20  me to work if I would not work in the same environment
21  that I was working in, which he believes, as I do,
22  caused my condition.
23  Q. Okay. So when you say released to return to
24  work, are you referring to the doctor's release for you
25  to return to work for Oil-Dri on or about July 15,

## Page 10

1  2015?
2  A. Yes, sir.
3  Q. Okay. And has any doctor modified that
4  release since then?
5  A. Modified as in -- I'm not sure --
6  Q. As in changed in the sense that -- that you no
7  longer are released to return to work.
8  A. No, sir. Not that I'm aware of.
9  Q. Okay.
10  A. Not that I recall.
11  Q. Okay. Are you under -- other than the Paxil,
12  which you've stated --
13  A. Yes, sir.
14  Q. -- today, are you taking any other medications
15  for any other conditions?
16  A. Yes, sir. I'm taking several medications. I
17  take Eliquis, which is a blood thinner. I take
18  Singulair, which is for the asthma and allergy. I take
19  Neurontin for the -- I guess it would be for the nerve
20  endings. I've lost some feeling in some of my nerves,
21  hands and legs. I take Aricept for memory loss.
22  Q. And how long have you been taking these
23  medications?
24  A. The Aricept and Neurontin since I've been
25  seeing Dr. Assaf. The Eliquis since about last July.

## Page 11

1  The Paxil and the Singulair for about two months.
2  Q. Have you suffered from alcoholism?
3  A. Yes, sir.
4  Q. During what period of time?
5  A. Well, alcoholism is something that you never
6  fully recover from. If you're an alcoholic, you're
7  either a recovering alcoholic or you are a drinking
8  alcoholic and I've been a recovering alcoholic for
9  almost 23 years.
10  Q. Okay. When was the last time you had a drink?
11  A. This coming January will be 23 years.
12  Q. Okay. Do you currently have any other health
13  issues, impairments that you have not disclosed to me?
14  A. Not that I can think of.
15  Q. Now have you reviewed any documents in
16  preparation for your deposition today?
17  A. Yes, sir.
18  Q. Okay. I noticed that you were clutching a
19  document when you came in.
20  A. Yes, sir.
21  Q. What is that?
22  A. I would have to ask --
23  MR. WOODRUFF: He don't understand
24  what -- it's our discovery responses.
25  Q. (Mr. Moeller) Okay. And had you read the

## Page 12

1  discovery responses?
2  A. Yes, sir.
3  Q. Okay. Anything else that you reviewed in
4  preparation for your deposition today?
5  A. No, sir.
6  Q. Did you speak with your lawyer in preparation
7  for your deposition today?
8  A. Yes, sir.
9  Q. How many times did you speak with him?
10  A. I don't recall how many meetings we've had.
11  Three or four.
12  MR. WOODRUFF: In preparation for your
13  deposition today.
14  Q. (Mr. Moeller) Correct.
15  A. (Witness nods head up and down).
16  Q. Okay. Where were you born?
17  A. In Ripley. In Tippah County, Mississippi.
18  Q. What is your birthday?
19  A. June 4, 1953.
20  Q. Is my understanding correct that you are
21  married?
22  A. That's correct.
23  Q. To whom are you married?
24  A. Wanda Garrison Jackson.
25  Q. Okay. Have you ever been married to anyone

Deposition of Benny Jackson, taken May 10, 2017

4

---

**Page 13**

1    else?
2       A. No, sir.
3       Q. Do you have any children?
4       A. I have two girls.
5       Q. How old are they?
6       A. 31 and 27.
7       Q. What are their names?
8       A. Natalie Diane Jackson.
9       Q. And --
10      A. Hannah -- pardon?
11      Q. Go ahead.
12      A. Hannah Marie Jackson.
13      Q. Hannah?
14      A. Yes, sir.
15      Q. H-A-N-N-A-H?
16      A. Yes, sir.
17      Q. Marie Jackson?
18      A. Yes, sir.
19      Q. Where do they live?
20      A. They reside with me.
21      Q. Are they employed?
22      A. No, sir.
23      Q. Since they're 31 and 27, is there any
24    particular reason why they are not employed?
25      A. Yes, sir. My youngest girl was born with

---

**Page 14**

1    several disabilities. She has mental incapacities as
2    well as physical. She's disabled. My oldest daughter
3    had a car wreck about 10 years ago that's just been a
4    life-changing event for all of us.
5       Q. She has disabilities as a result of the car
6    wreck?
7       A. Yes, sir.
8       Q. Are either of your daughters receiving Social
9    Security benefits?
10      A. They are. Both.
11      Q. Okay. Are they receiving any other benefits
12    as a result of their disabilities?
13      A. No, sir.
14      Q. Now in terms of address, where do you live?
15      A.         , Ripley, Mississippi
16    38663.
17      Q. How long have you lived there?
18      A. I've lived there since 1963.
19      Q. Other than your daughters and your wife, does
20    anyone else live in that residence?
21      A. No, sir.
22      Q. Now I'm going to ask you a question as to
23    whether or not you have any other family members -- and
24    when I mean family members, I'm talking about whether
25    it's ascendents in the sense of your parents or

---

**Page 15**

1    descendents in the since of children or collateral
2    relatives such as cousins, nephews, anyone who is
3    related to you by blood or marriage is really the scope
4    of my question and I'm asking you: Is there anyone in
5    terms of part of your family related to you by blood or
6    marriage that live in the County of Benton?
7       A. Not that I'm aware of.
8       Q. Okay. Calhoun County.
9       A. No, sir.
10      Q. DeSoto County.
11      A. No, sir.
12      Q. Lafayette County.
13      A. No, sir.
14      Q. Marshall County.
15      A. No, sir.
16      Q. Panola County.
17      A. No, sir.
18      Q. Pontotoc County.
19      A. No, sir.
20      Q. Quitman County.
21      A. No, sir.
22      Q. Tallahatchie County.
23      A. No, sir.
24      Q. Tate, T-A-T-E, County.
25      A. No, sir.

---

**Page 16**

1       Q. Tippah.
2       A. Yes, sir.
3       Q. Okay. What other family members do you have
4    that live in Tippah County?
5       A. My mother had a big family and my father had a
6    big family, so I have a lot. I have a lot of cousins.
7       Q. Okay. Please name for the record all the
8    cousins about which you are aware and all people that
9    you're aware of that are related to you by blood or
10    marriage in Tippah County.
11      A. I'm not sure that I can give you an exact
12    list.
13        MR. WOODRUFF: Name all the ones that you
14    can remember.
15      A. Maternal -- Greg Smith; my uncle, Jimmy
16    Gaillard, G-A-I-L-L-A-R-D; Stephanie McAllister.
17      Q. (Mr. Moeller) And who is she? I mean, how is
18    she related to you?
19      A. She's a cousin on my mother's -- maternal.
20    Paternal cousins -- my aunt, Jamie Sue Hopper; Johnny
21    Hopper; David Hopper; my aunt, Thera Jackson; Donny
22    Jackson; Joel Jackson; Pat Flake; Neal Jackson; Carol
23    Jackson. That's all I can recall. I'm sure there's
24    more, but --
25      Q. Okay. Because, as you say, there are more, if

---

Deposition of Benny Jackson, taken May 10, 2017

5

### Page 17

1 you would, please, confer with your Counsel. I would
2 like you to prepare, if possible, a list of the others
3 that you have not named and if you could provide it to
4 your Counsel --
5     MR. WOODRUFF: Send us a discovery
6 request so I don't forget.
7     MR. MOELLER: That'll be fine. I'll send
8 a discovery request for that.
9     A. Can I ask a question?
10     MR. WOODRUFF: No.
11     A. Can't.
12     MR. WOODRUFF: Unless it's about his
13 question.
14     A. It is about --
15     Q. (Mr. Moeller) Yes.
16     MR. WOODRUFF: Go ahead.
17     A. When you say cousins --
18     MR. WOODRUFF: First cousins or --
19     A. First cousins, second cousin, third cousin,
20 how --
21     Q. (Mr. Moeller) Anyone that identifies through
22 blood or marriage as a cousin. So if it's first,
23 second or third, give it to me.
24     A. Okay.
25     Q. If you know them as a relative, then give it

### Page 18

1 to me.
2     A. Okay.
3     Q. Even if they're a distant relative.
4     MR. WOODRUFF: And start getting that
5 list together for when he sends the discovery request.
6     A. Okay.
7     Q. (Mr. Moeller) Now -- of course, the same
8 question with regard to Tunica County. Do you know of
9 any relatives that you have in Tunica County?
10     A. No, sir.
11     Q. Same question with regard to Union County.
12     A. Not that I'm aware of.
13     Q. Okay. And finally, the last county that's in
14 this court district, Yalobusha County.
15     A. No, sir.
16     Q. Okay. Thank you. Are you member of any
17 social or community organizations?
18     A. I work -- I volunteer at the Good Samaritan
19 Center.
20     Q. Okay. Where is that located?
21     A. That's in Ripley.
22     Q. When you say you volunteer, during what period
23 of time?
24     A. On Mondays of every week I work there.
25     Q. Okay. And is my understanding that you're a

### Page 19

1 volunteer?
2     A. That's correct. I volunteer on Mondays and if
3 they need someone at other times, I also come in.
4     Q. I see. And what do you do at the Good
5 Samaritan Center?
6     A. We prepare food parcels for the needy. They
7 register there and we have organizations that provide
8 our groceries and we prepare boxes of food for them,
9 for the needy people of Tippah County.
10     Q. Do they come there to receive them or is part
11 of your job to go out and deliver these boxes of food?
12     A. They come there to receive them.
13     Q. I see. So is it -- all of your work with
14 regard to the Good Samaritan Center is at the center?
15     A. It is.
16     Q. I see. And how long have you been working at
17 the Good Samaritan Center?
18     A. Approximately a year. I'm not quite sure the
19 exact time.
20     Q. Okay. Are you a member of any other social or
21 community organizations?
22     A. Could you give me an example as to what you're
23 talking about. Civic organizations or --
24     Q. Yes. Like, I mean, whether you're in any kind
25 of men's lunch club whether it be like, Kiwanis Club

### Page 20

1 or whatever. As you say, Good -- you volunteer for the
2 Good Samaritan Center. Do you volunteer for any other
3 social agencies in the community or community agencies?
4     A. No, sir.
5     Q. And have you ever filed for bankruptcy?
6     A. No, sir.
7     Q. Has any member of your immediate family ever
8 filed for bankruptcy?
9     A. No, sir.
10     Q. Have you ever been a Plaintiff or a Defendant
11 in any other lawsuit?
12     A. No, sir.
13     Q. Have you ever been arrested?
14     A. No, sir.
15     Q. Have you ever been convicted of a misdemeanor
16 or a felony?
17     A. No, sir.
18     Q. Have you ever served in the military?
19     A. No, sir.
20     Q. Where did you graduate from high school?
21     A. Falkner High School, Tippah County.
22     Q. And did you receive any post high school
23 education?
24     A. I went to Northeast Mississippi Community
25 College and University of Mississippi.

**Deposition of Benny Jackson, taken May 10, 2017**

6

### Page 21

1  Q. Do you have a degree from Northeast
2  Mississippi Community College?
3  A. No, sir.
4  Q. What was the highest level attained? Or if
5  you attained any particular license or certificate,
6  what was that that you obtained from Northeast
7  Mississippi Community College?
8  A. I did not retain any type of certificate from
9  them.
10  Q. Okay. You indicated that you went to the
11  University of Mississippi.
12  A. That's correct.
13  Q. During what period of time?
14  A. I believe 1977 and then 2001 and two.
15  Q. What was the purpose of going to the
16  University of Mississippi?
17  A. I was trying to complete my degree in
18  sociology.
19  Q. Did you complete it?
20  A. No, I did not.
21  Q. Why did you not complete it?
22  A. Time constraints and money. It was quite
23  expensive and I was working a lot of hours.
24  Q. Okay.
25  A. Was trying to go to school at night and work

### Page 22

1  at the same time.
2  Q. At that time, 2001/2002 -- let's just
3  start with 2001/2002. Where were you working?
4  A. I was working at Blue Mountain Production.
5  Q. Okay. 1977, where were you working?
6  A. I was not working in 1977. I was a full-time
7  student.
8  Q. I see. Okay. Now what was the job that you
9  held immediately prior to working for Blue Mountain
10  Production Company?
11  A. Immediately before that, I was -- for a short
12  period of time, I was self-employed.
13  Q. Okay. What were you doing while you were
14  self-employed prior to working for Blue Mountain
15  Production Company?
16  A. Pressure washing.
17  Q. How long were you self-employed in the
18  pressure washing business?
19  A. Less than a year. I don't remember the exact
20  time.
21  Q. And what led you to apply for employment at
22  Blue Mountain Production Company?
23  A. One of the employees that worked there told me
24  that there was an opening there and I talked to Howell
25  Duncan, who at that time was the personnel manager. I

### Page 23

1  don't remember -- I don't remember the person's name
2  that told me, but --
3  Q. Okay. So then you went to talk to the human
4  resources manager at the time, Howell Duncan?
5  A. That's correct.
6  Q. Okay. Were you interviewed by Howell Duncan?
7  A. I was.
8  Q. Were you hired?
9  A. I was.
10  Q. Okay. With regard to the work at Blue
11  Mountain Production Company, was there any employment
12  prior to Blue Mountain that you had that related in any
13  way to the job you were going to be doing at Blue
14  Mountain?
15  A. Could you be more specific as to --
16  Q. Let's start with -- the job you hired into at
17  Blue Mountain, what was that?
18  A. It was -- at the time, the job was called
19  chemical operator.
20  Q. Okay. And what were your duties as a chemical
21  operator?
22  A. I was responsible for the material that the
23  operators had to package. I had to make sure that the
24  correct material went to the correct packing line and
25  also had to make sure that any additives that were

### Page 24

1  needed in the product that was put on there, I was
2  responsible for the quality of the product.
3  Q. Okay. Do we agree that the product -- the end
4  product to be packaged was absorbent clay?
5  A. I would agree.
6  Q. Okay. Now with regard to the fact that you
7  were hired into that job by Howell Duncan, prior to
8  that, did you have any experience that related to the
9  job of chemical operator that you, of course, were
10  going to be doing for Blue Mountain?
11  A. I had previous experience in quality control
12  at BenchCraft.
13  Q. What experience did you have at BenchCraft in
14  quality control?
15  A. Well, I was responsible for the quality of the
16  leather furniture that we produced at BenchCraft.
17  Q. And in terms of being responsible for the
18  quality of the leather furniture, what were your duties
19  to assure that the leather furniture did have the
20  quality required by BenchCraft?
21  A. Part of my job was to inspect the leather when
22  we received it, make sure that it was a quality product
23  and that we could use it in our furniture.
24  Q. Okay. Is my understanding correct that
25  BenchCraft made leather furniture?

Deposition of Benny Jackson, taken May 10, 2017

7

## Page 25

1    A. That's correct.

2    Q. With regard to your Blue Mountain employment,
3 do you recall when you were hired?

4    A. I believe it was February of 2000.

5    Q. Okay. I believe you testified just a minute
6 ago that you were hired into the job of chemical
7 operator.

8    A. That's correct.

9    Q. Okay. Do you recall your pay rate?

10    A. No, sir, I do not.

11    Q. Okay. Do you recall who your supervisor or
12 supervisors were?

13    A. Kevin Jones.

14    Q. Anyone else?

15    A. Mike Johnson and, of course, Danny Yancy was
16 the plant manager.

17    Q. Okay. As a chemical operator, did you have
18 any other duties than what you've already described in
19 your testimony this morning?

20    A. Well, those duties could change. I had to --
21 at times, I had to work in the dye room or slurry room,
22 as it was called, mix dye.

23    Q. Uh-huh (indicating yes).

24    A. At times, that was part of that job. The
25 duties and responsibilities changed and evolved as I

## Page 26

1 worked there.

2    Q. Okay. Did you -- at some point, were you
3 promoted or reassigned to any other job?

4    A. No, sir.

5    Q. You remained a chemical operator?

6    A. Yes, sir.

7    Q. How long did you remain a chemical operator?

8    A. For the entire length of my work, little over
9 15 years.

10    Q. Okay. Is -- did you have the same job
11 classification for all 15 years?

12    A. Yes, sir.

13    Q. And was it called chemical operator?

14    A. I think clay prep operator is what the job
15 title was.

16    Q. Were you ever employed in a job -- in the job
17 classification of lab technician?

18    A. I did work in the lab some, but I was never
19 classified as a lab technician.

20    Q. Okay. When did you work in the lab?

21    A. We had to -- I would say approximately the
22 last three years I worked, the quality department was
23 reorganized and we had full-time lab technicians and
24 they were assigned to other areas in the plant and I
25 had to do some of the lab technician duties in my job

## Page 27

1 on a daily basis.

2    Q. As you say during the last three years there
3 was some reassignment of duties, with regard to the lab
4 technicians that worked in -- at Oil-Dri with you in
5 the last three years, who were they?

6    A. Well, there was no one that was designated as
7 a lab technician.

8    Q. Okay. So the best of your knowledge, no one
9 was designated or classified as a lab technician?

10    A. No, sir.

11    Q. With regard to your hours of work, when you
12 started as a chemical operator, what were they?

13    A. What were my hours?

14    Q. Correct.

15    A. I worked on the third shift from 11:00 p.m. to
16 7:00 a.m.

17    Q. At some point, did that change, your hours of
18 work?

19    A. Yes, sir. I moved to the day shift. I don't
20 remember exactly what year it was.

21    Q. Okay. Was it a number of years ago?

22    A. Yes, sir.

23    Q. Okay. And when you moved to the day shift,
24 what were your hours of work?

25    A. 7:00 -- well, 5:00 a.m. to 1:00 p.m. or

## Page 28

1 5:00 a.m. to 3:00 p.m.

2    Q. Okay. What was the difference in terms of
3 your shift from 5:00 a.m. to 1:00 p.m. or 5:00 a.m. to
4 3:00 p.m.? Was there a time in which that changed or
5 what?

6    A. I'm not sure I understand the question.

7    Q. Okay. In other words, when were you assigned
8 to work 5:00 p.m. to 1:00 p.m. and when were you
9 assigned to work 5:00 a.m. to 3:00 p.m.?

10    A. I don't recall as far as dates, but that --
11 depending on the amount of work that we had. You know,
12 if we -- if we had a lot of orders, sometimes you would
13 work overtime.

14    Q. Okay. Was a -- on your shift, anytime after
15 1:00 p.m., was that considered overtime?

16    A. Yes, it was.

17    Q. Okay. And were you paid overtime?

18    A. Yes, sir.

19    Q. Now focussing on your employment in the last,
20 say, two years of your employment, say, July 2013 to
21 July 2015, during that last two-year period, what days
22 of the work week were you assigned to work?

23    A. I would have to look back at my work record to
24 be sure, but I know in 2013 we were working seven days
25 a week a lot of the time.

**Deposition of Benny Jackson, taken May 10, 2017**

8

## Page 29

1   Q. Was that because the plant was busy?
2   A. Yes, sir.
3   Q. Okay. And then moving forward, 2014 into
4   2015, what days of the work week were you working
5   typically?
6   A. I don't recall. I know we -- we had a lot of
7   orders. We were working a lot of hours. I don't
8   recall having many days off, but to be specific, I
9   don't remember.
10  Q. Okay. Take me through -- before you took your
11  FMLA leave in 2015, take me through a typical workday
12  in terms of a day in your life at work. When did it
13  start? What did you do sequentially through the day
14  and how did it end?
15  A. I'll try to recall the best I can. My typical
16  workday would start at 4:45 a.m. I would arrive early
17  to try to prepare the product so when the packaging
18  team came in at 5:00, that they would be ready to start
19  work.
20  Q. What did you have to do to prepare the product
21  for the packaging team?
22  A. First -- first thing you would do is you would
23  make a short tour of the area that you worked in to
24  make sure that there was not any problems as far as a
25  dye leak, there was not any problems in the dye room,

## Page 30

1   make sure your pumps were running so whenever you
2   started the production line up, that everything was
3   going to work correctly. Make sure that the clay
4   elevators outside were on.
5       I would go to my control room, go in the
6   control room and it was all touch screens and you would
7   look on your touch screen and see what lines that you
8   needed to engage. We had a recipe number for each
9   product that we ran. You would check with the line
10  supervisors to make sure that you had the right product
11  that they were going to run so when you selected that
12  product on your touch screen, that you knew that you
13  were putting the correct product to the correct packing
14  line.
15      You would turn on the touch screen. Once you
16  made your selection, that would engage the correct
17  equipment and the correct additives that you were
18  putting on that particular product and this was on four
19  separate lines. So I was responsible for four
20  different packaging lines simultaneously.
21      So I would get -- try to have that to the
22  operator by 5:00 a.m. so they could start up their
23  line. Some of the products that we ran had powdered
24  additives, some did not. Some had liquid spray
25  additives, some did not. It varied from product to

## Page 31

1   product. Some had more than one additive. Some was
2   all natural. Some had no additives at all. You had to
3   know that. You had to maintain that. You had to add
4   -- that powdered additive came in bags, 40 and 50-pound
5   bags.
6   Q. Who would add the powdered additive?
7   A. I would.
8   Q. And where would you -- where would you do that
9   in terms of the location?
10  A. That was on a platform above the packaging
11  lines.
12  Q. I see.
13  A. I would put that additive that we had -- it
14  was called a hopper. You would dump the additives in
15  the hopper. It was augered into a feeder that went
16  directly on the belt on the product that you were
17  packaging. And I had to maintain that throughout the
18  day.
19      You had to also physically walk down to the
20  packaging line and inspect what was in the particular
21  package, whether it was a jug or a pail or a bag, and
22  make sure that -- that what you were sending the
23  customer was what it was supposed to be. What you were
24  claiming it was on the bag, that's what you wanted in
25  there and that's what I would do. Some days were more

## Page 32

1   hectic than others. Some days you had maybe three
2   lines running at the same time that you were adding the
3   -- what we call S-20. It was a clumping agent. We had
4   other powders and granular additives that we put in the
5   product.
6       The operators some days -- very seldom, but
7   some days they could run the same product for a
8   complete shift. On the -- what we call the jug line,
9   some days we would run the same product for a complete
10  shift. It wasn't -- normally, we would have
11  changeovers. On the paper bag packing line,
12  changeovers were frequent throughout the day on those
13  lines. So you had to be in your area because you
14  wanted to do the changeover as quick and efficient as
15  you could, make sure that they could stay in continuous
16  operation as best they could. Of course, we had --
17  we'd have one morning break. I believe it was 10
18  minutes. We have a 20-minute lunch break. And other
19  than that, it was pretty much in your area of work
20  operations for the duration of the shift.
21  Q. Did you have a particular work area or desk or
22  area that you used?
23  A. As far as -- I had a little small room that
24  the control panels were in and my computer was at.
25  Q. Okay. And you say you had a small room. Was

Deposition of Benny Jackson, taken May 10, 2017

9

## Page 33

1  that in a bigger room?
2     A.  That was in the packaging area.  It was just a
3  little, small room on the platform.  What everyone
4  referred to as the chemical platform.
5     Q.  Okay.  Anyone else in that room with you?
6     A.  No, sir.
7     Q.  Or use it?
8     A.  Not normally, no, sir.
9     Q.  Okay.  So you were the only person in that
10  room?
11     A.  Yes, sir.
12     Q.  Okay.  In terms of your total time in a given
13  shift, on average typically, what amount of time would
14  you spend in that room?  What amount of time would you
15  spend out on the packaging floor?  What amount of time
16  would you spend in other areas?
17     A.  It would be a guess.  I couldn't quantify
18  those numbers.  I would say maybe 10 percent of the
19  time in your office area.  The rest of the time would
20  be in the -- on the chemical platform itself or in the
21  packaging area.  Like I said, you know, you were
22  responsible for not only the quality of the product
23  that was going in, the containers -- you were also
24  responsible for quality of the container itself.
25     Q.  Did anyone work with you with regard to the

## Page 34

1  process as you've just testified about?
2     A.  Well, it was everyone's responsibility.  As
3  far as anyone else in my department working with me,
4  no, sir.
5     Q.  Okay.  Was it --
6     A.  I worked with the operators and with the
7  supervisors to try to insure that we had a quality
8  product.
9     Q.  Did anyone else work on the chemical platform?
10     A.  Not on my shift, no, sir.
11     Q.  Were there people on other shifts that did
12  your exact same job?
13     A.  There was.
14     Q.  Who -- who were the people that did your job
15  on the other shifts?
16     A.  At that particular time, George.  I can't
17  recall his last name.  I can't recall his last name.
18     Q.  But his first name was George?
19     A.  Yes.
20     Q.  Okay.  Anyone else do your job on other
21  shifts?
22     A.  No, sir.
23     Q.  So you and George were the only two people who
24  did this particular job?
25     A.  Yes, sir.

## Page 35

1     Q.  Okay.  Were you ever disciplined or counseled
2  during your employment?
3     A.  I was.
4     Q.  What were the circumstances and when?
5     A.  I don't recall when, but we had a point
6  system.  I had -- I was late for work a couple of
7  mornings and I had taken off to go to a funeral, so --
8     Q.  When you say point system, you're referring to
9  attendance?
10     A.  Yes, sir.
11     Q.  Okay.  And so, the -- with regard to, as you
12  say, taking off to go to a funeral, in the point
13  system, how were you counseled or disciplined?
14     A.  Well, my supervisor informed me that I had
15  acquired -- I don't remember the number of points, but
16  I had 30 days or -- I don't remember the number of days
17  that I could not be late again or I got a -- I think
18  it's called career day.
19     Q.  Okay.  Did you ever get a career day?
20     A.  No, sir.
21     Q.  Or decision-making leave day, D-M-L?
22     A.  No, sir.
23     Q.  Okay.  Now did you ever complain to anyone at
24  Oil-Dri about your working conditions?
25     A.  Yes, sir.

## Page 36

1     Q.  Who did you complain to?
2     A.  Almost anyone that would listen.
3     Q.  Who did you complain to that was a member of
4  management or a representative of Oil-Dri?
5     A.  Danny Yancy.
6     Q.  Anyone else?
7     A.  Just the -- Mike Johnson, Donald Yancy, Tyler
8  Cohea.
9     Q.  Did you complain about the same thing or
10  different things to these different supervisors?
11     A.  I think it was the same thing.  Yes.
12     Q.  Okay.  What did you complain to them about?
13     A.  About the dusty conditions that was from the
14  additives that we were putting in the scoopable
15  products.
16     Q.  With regard to the dusty conditions, do you
17  agree that Blue Mountain Production Company processes
18  absorbent clay?
19     A.  I would.  Yes, sir.
20     Q.  And by the nature of the processing and
21  packaging, it creates dust --
22     A.  Yes, sir.
23     Q.  -- from the absorbent clay?
24     A.  I would agree.
25     Q.  Okay.  When you say you complained about the

Deposition of Benny Jackson, taken May 10, 2017

## Page 37

1  dusty conditions and you complained about the
2  additives, were there any specific additives that you
3  complained about?
4     A.  The -- I'm not sure what the proper name for
5  it would be called, but it was a clumping agent we
6  called -- in the plant, we call it S-20, would be one
7  of the agents. Another one would be anhydrous citric
8  acid. In previous years -- in the early years that I
9  worked there, all of our fragrances were in a powder
10 form. We had several fragrances that were in powdered
11 form that we had to add to the product.
12    Q.  You indicated years ago you had fragrances in
13 powder form. How are fragrances added now? Is it
14 different?
15    A.  Well, I'm not sure about how they do it now,
16 but --
17    Q.  Well, in --
18    A.  We transitioned to the fragrance being in the
19 spray or the slurry that we sprayed on the product.
20    Q.  Did you complain to anyone at Oil-Dri in terms
21 of a member of management regarding any reaction you
22 had to the clumping agent, S-20?
23    A.  Yes.
24    Q.  Okay. Who did you complain to and what did
25 you complain about?

## Page 38

1     A.  Well, again, I complained to the plant
2  manager, the supervisors, the production manager. You
3  know, not only was it effecting me -- it was directly
4  effecting me because I was right over it, but also, it
5  was effecting the people on the packaging line too as
6  far as their nose running, their eyes watering,
7  sneezing, but they were not as directly exposed to it
8  as I was.
9     Q.  Okay. Were you furnished at Oil-Dri what are
10 known as masks?
11    A.  Yes, sir.
12    Q.  Did you wear a mask?
13    A.  Yes, sir.
14    Q.  Did you wear it every day?
15    A.  I did wear it every day. You know, I have to
16 explain how I wore it. I put it on in the morning and
17 I put it on my hard hat and when I would go outside, I
18 would pull it down over my face.
19    Q.  When you say, when you would go outside --
20    A.  Outside of my office.
21    Q.  Okay. So as long as you were in your office,
22 you didn't wear your mask?
23    A.  No, sir.
24    Q.  Okay. But when you went outside of your
25 office, you wore your mask?

## Page 39

1     A.  I'm sure there were times I did not, but I
2  made a conscious effort to wear it.
3     Q.  Okay. With regard to those times that you say
4  you were sure there were times that you did not, why
5  was it that you did not wear a mask at those times?
6     A.  It's just because I did not think to pull it
7  down over my face.
8     Q.  Okay.
9     A.  Now there were -- there were times that if you
10 were directly exposed to the clumping agent -- you
11 know, I had it on because if I didn't, you know, it --
12 it really bothered me, but as far as walking around in
13 the building with it on all the time, I would say there
14 was times that I did not have it on.
15    Q.  Okay. Now as you pointed out, you did not
16 have the mask on in your office. Was that because the
17 air quality in your office was better?
18    A.  It was somewhat better, yes, sir.
19    Q.  Okay. Was your office air conditioned?
20    A.  It was.
21    Q.  Heated?
22    A.  It was.
23    Q.  Now did you put any of your complaints about
24 either the dusty conditions or the additives in writing
25 to any Oil-Dri representative?

## Page 40

1     A.  Not that I recall.
2     Q.  Okay. And over what period of time were these
3  complaints made? That is, when did they start and when
4  did they end?
5     A.  I couldn't be specific about when they
6  started, but it was -- pretty much the whole time I
7  worked, I was, you know, trying to get working
8  conditions improved.
9     Q.  Did you seek the help of any coworkers or
10 anyone else to get working conditions improved?
11    A.  Well, I did. Yes, sir.
12    Q.  Whose help did you seek?
13    A.  Management. My supervisors.
14    Q.  Okay. What was their response? In other
15 words, you've named Danny Yancy, Mike Johnson, Tyler
16 Cohea and Ron Yancy as individuals that you
17 specifically mentioned these complaints too. What was
18 the responses of these individuals to you?
19    A.  Usually they would agree that, you know,
20 improvements needed to be made. Sometimes it was --
21 and also, Mr. Smithey, the plant manager -- I guess
22 he's still plant manager now. He took over from Danny
23 Yancy. We talked about improving the air quality by
24 having the suction from the bag house pull some of this
25 dust out. We had the capability of doing that, but it

Deposition of Benny Jackson, taken May 10, 2017

11

**Page 41**

1  never came to fruition. Never was -- we never had any
2  suction from the bag house to the chemical platform
3  that was operable as far as pulling out the dust
4  particles and the chemical particles.
5  Q. Other than your complaints to these
6  individuals -- that is, Danny Yancy, Ron Yancy, Mike
7  Johnson, Tyler Cohea -- did you take any other action
8  with regard to your complaints about the dusty
9  conditions and the additives?
10  A. If I understand you correctly, I tried to keep
11  my work area as clean as I possibly could, you know, to
12  eliminate some of the dust problems, but they're -- I'm
13  not really sure -- is that --
14  Q. Well, yeah, I mean, that was my question.
15  Other than your complaints to these individuals that
16  you named, did you do anything else in furtherance of
17  the conditions or your complaints?
18  A. Well, the people that worked in maintenance,
19  you know, I had several conversations with some of the
20  maintenance people about solutions that we could come
21  up with that would improve, you know.
22  Q. What did they tell you?
23  A. Well, the best solution that the maintenance
24  or anyone could come up with would be to try to exhaust
25  some of that to the bag house. And when I say bag

**Page 42**

1  house, it's kind of like a giant vacuum cleaner. So
2  that's -- when I refer to a bag house, that's what I'm
3  talking about. It's a vacuum that's pulling the dust
4  out. That's -- at the time I was there, that was only
5  pulling the -- from the actual packaging area. It was
6  pulling the dust from the packaging lines.
7  Q. Okay. Did the dusty conditions or the
8  additives cause you at any point to develop any medical
9  conditions?
10  A. I had pneumonia twice while I was working
11  there, had to be hospitalized one time with it.
12  Q. Do you or any doctor that treated you
13  associate either bout of pneumonia with dusty
14  conditions or anything to do with the plant?
15  A. I do. I don't know that the doctors would.
16  Actually, the doctor that treated me then is deceased.
17  Q. Who is that?
18  A. Dr. Horton Taylor was his name.
19  Q. Where did he practice?
20  A. In Ripley.
21  Q. During what periods of time did these two
22  bouts of pneumonia occur?
23  A. I don't recall exact dates. I know the first
24  time I had to be off work for two weeks. I was in the
25  hospital for about eight days.

**Page 43**

1  Q. When you say you were in the hospital for
2  eight days, what hospital was that?
3  A. Tippah County Hospital.
4  Q. Okay. With respect to the second bout, do you
5  recall when that was?
6  A. I don't recall the exact years, no, sir.
7  Q. Was this more than five years ago?
8  A. Yes, sir.
9  Q. More than 10?
10  A. No, sir.
11  Q. Okay. Between five and 10?
12  A. Yes, sir. I would say.
13  Q. With regard to the second bout of pneumonia,
14  how long did that last?
15  A. I don't recall the exact amount of time.
16  Q. Did it require hospitalization?
17  A. No, sir.
18  Q. With regard to your treating physician at the
19  time, was this also Dr. Horton Taylor?
20  A. It was.
21  Q. What did he prescribe in terms of treatment?
22  A. I don't remember the exact drugs. I had -- I
23  took breathing treatments. He prescribed some inhalers
24  and I don't -- I don't recall, you know, the medicines
25  that he prescribed.

**Page 44**

1  Q. Is my understanding correct that he prescribed
2  breathing treatments and he prescribed one or more
3  inhalers, but he also prescribed, in other words, pills
4  or some sort of medication?
5  A. Yes. Yes, sir.
6  Q. Okay. And did you receive any shots in his
7  office while you had pneumonia?
8  A. I don't recall.
9  Q. With regard to breathing difficulties
10  associated -- that you associate with work, when did
11  they begin?
12  A. You know, I don't recall a specific date. I
13  just know that in December of 2014, I believe, I began
14  to have a good bit of trouble as far as asthma-like
15  conditions. I wasn't aware that I had asthma, but I
16  did -- I did have. That was in -- I would have to say
17  December 2014 is when I became aware of it.
18  Q. Okay. Did you see a doctor about the
19  situation?
20  A. I did, yes, sir.
21  Q. Who did you see?
22  A. I believe Melinda Quinn at Family Clinic at
23  Falkner.
24  Q. Did she refer you to anyone?
25  A. Not at that particular time, no, sir.

Deposition of Benny Jackson, taken May 10, 2017

12

**Page 45**

1  Q. Okay. Did she prescribe any treatment for
2  you?
3  A. Yes, sir. She was treating me for an upper
4  respiratory infection at the time.
5  Q. With regard to the upper respiratory
6  infection, what treatment did she prescribe for you?
7  A. An antibiotic and a shot -- injection of
8  antibiotic and I, believe, Decadron.
9  Q. Did you overcome the upper respiratory
10 infection?
11 A. No, sir.
12 Q. You never got well?
13 A. No, sir.
14 Q. Okay. Do you still have the upper respiratory
15 infection?
16 A. I still have problems with it, yes, sir. I'm
17 suffering from it today.
18 Q. Okay. Now you indicated that you commenced
19 going to Dr. Melinda Quinn for this in December 2014.
20 By the way, of course, I called her a doctor, but is
21 she a doctor or --
22 A. She's a nurse practitioner.
23 Q. Nurse practitioner. Okay. Did, at some
24 point, you seek other medical assistance?
25 A. I can't remember the specific date, but I kept

**Page 46**

1  -- this was a recurring and ongoing and a chronic
2  problem from December on through the first of the year
3  and I kept going, getting the same treatment and I was
4  not improving and I started to run a high temperature.
5  I had chills and fever. I talked to Tyler Cohea at
6  work that day. I told him that I was sick and I needed
7  to go home and I had called Melinda Quinn and told her
8  the problems I was having and she called the Tippah
9  County Hospital and had me go by there and get a lung
10 X-ray.
11 Q. Okay. With regard to your comment to Tyler
12 Cohea that you were sick and needed to go home, did he
13 grant your request?
14 A. Yes, sir.
15 Q. Okay. And as you say, you were sent by Nurse
16 Practitioner Melinda Quinn to Tippah County Hospital to
17 have a chest X-ray.
18 A. That's correct.
19 Q. And did you have that performed?
20 A. I did.
21 Q. And what did it show?
22 A. The radiologist -- the diagnosis from the
23 radiologist was COPD.
24 Q. Did you see any doctor other than the
25 radiologist?

**Page 47**

1  A. Yes, sir. Ms. Quinn referred me to a lung
2  physician in Memphis, Dr. Michael Wilons.
3  Q. When did you first see him?
4  A. I believe it was April of 2015. I think that
5  was --
6  Q. And it's your understanding Dr. Michael Wilons
7  is a lung specialist?
8  A. He is. Yes, sir.
9  Q. Okay.
10 A. Memphis Lung Physicians.
11 Q. Did Dr. Wilons, in April of 2015, provide you
12 with any diagnosis?
13 A. He did.
14 Q. What did he say you had or what was your
15 condition?
16 A. He said my COPD was mild; that I had
17 sarcoidosis and asthma.
18 Q. When you say sarcoidosis, is your
19 understanding that sarcoidosis is a form of asthma?
20 A. I don't know that I've heard that it is a form
21 of asthma.
22 Q. Not trying to put words in your mouth. I just
23 want for you to tell me what was -- when the doctor
24 said you had sarcoidosis, what did the doctor explain
25 to you sarcoidosis was?

**Page 48**

1  A. My understanding of sarcoidosis was that if
2  you had a particulate that you inhaled in your lungs --
3  and I'm not sure that this would be every person, but
4  this is just in my case. That you had a foreign
5  particulate in your lungs. That your lungs, in trying
6  to fight off that invasion, encapsulated the
7  particulates and that caused an infection in my lung.
8  That's my layman's understanding of what that was.
9  Q. Did Dr. Wilons -- based upon his diagnosis as
10 you just stated, did he prescribe treatment?
11 A. He -- I can't remember. I think it was three
12 different inhalers that I used. The -- one form of the
13 treatment was to remove myself from the environment
14 that I'd been exposed to.
15 Q. So he prescribed removing you from the
16 environment temporarily or permanently?
17 A. Well, at that time, it was temporary.
18 Q. And he also prescribed inhalers?
19 A. Yes, sir.
20 Q. Anything else that he prescribed?
21 A. Prednisone. I don't recall. I remember
22 Prednisone. Qnasl, Symbicort. I can't remember what
23 this is. ProAir.
24 Q. Did you follow Dr. Wilons' advice?
25 A. Yes, sir.

**Deposition of Benny Jackson, taken May 10, 2017**

13

## Page 49

1  Q. And did you request leave from your job?
2  A. I did.
3  Q. I show you what I'll have the court reporter
4  mark as Exhibit 1.
5      (Thereupon, the document referred to was
6  marked as Exhibit No. 1)
7  Q. I ask you to look at Exhibit 1, which consists
8  of two documents. Have you seen these documents
9  before?
10  A. (Witness reviewing documents). No, sir. I
11  don't -- I don't recall seeing these documents before.
12  Q. You have not seen any of these documents?
13  A. Not to my -- I don't recall seeing them
14  before, no, sir.
15  Q. Okay. Well, the first document was, of
16  course, completed, as pointed out on page two, by your
17  provider, that is, Dr. Mike Wilons. Do you see where
18  it says provider's name and business address on page
19  two? It's shown as page one, but page two of this
20  document, see under section three at the bottom where
21  it says, completion by the healthcare provider?
22  A. Here (indicating)?
23  Q. Yes, sir. See section three?
24  A. Yes, sir.
25  Q. And if you go on -- turn onto the next page,

## Page 50

1  in section four, Dr. Wilons states -- referring to you:
2  He needed to be removed from his work environment to
3  avoid exposure to dust and then says: His persistent
4  bronchospasm -- a word that he repeats in several
5  different places. Did Dr. Wilons explain to you what
6  is a bronchospasm?
7  A. No, sir. Not to my knowledge.
8  Q. Okay. Do you have any familiarity with that
9  term?
10  A. No, sir.
11  Q. Do you see under number six, which is the
12  following page: Will the employee need to attend
13  follow-up treatment appointments, and Dr. Wilons says,
14  yes. Did you have follow-up treatment and appointments
15  with Dr. Wilons?
16  A. I did. I just went to him about six weeks
17  ago.
18  Q. Okay. With regard to your leave, do you
19  recall requesting leave from Oil-Dri Corporation, that
20  is, to be off during this period of time and to be away
21  from the dusty conditions?
22  A. Do I recall it?
23  Q. Yes.
24  A. I do.
25  Q. Okay. Do you recall that you requested this

## Page 51

1  leave toward the end of April 2015?
2  A. That's correct.
3  Q. Okay. Do you recall, as you previously just
4  testified, that your doctor prescribed this as part of
5  your treatment?
6  A. That's correct.
7  Q. Do you recall making the request to Oil-Dri to
8  be off consistent with your doctor's request that you
9  be off?
10  A. I do.
11  Q. Okay. And do you recall the -- that your
12  request was granted?
13  A. I do.
14  Q. Do you recall any communications at this time
15  about that request with Oil-Dri representatives and who
16  you spoke with?
17  A. I spoke with Rhonda Barnes on the phone.
18  Q. Okay. And what did you tell Rhonda Barnes?
19  A. I don't really recall the exact conversation.
20  I just told her that the doctor had told me that I
21  needed to be off work and I need to be on family
22  medical leave. Specific wise, I don't recall exactly
23  our conversation.
24  Q. Okay. Do you recall any conversation from
25  Rhonda Barnes or anyone else at Oil-Dri which they told

## Page 52

1  you, your request for leave has been granted?
2  A. That -- she told me that day on the phone that
3  it had been granted.
4  Q. I see. So you had one conversation with
5  Rhonda Barnes in which you both requested leave and she
6  told you that it had been granted?
7  A. Well, we had had a previous conversation about
8  -- about this because I was thinking that maybe I would
9  have to go on family medical leave and we had -- we had
10  had a previous conversation about it before this date.
11  Q. Okay. Do you recall that previous
12  conversation?
13  A. Some of it. Yes, sir.
14  Q. Okay. When did that occur?
15  A. I would say approximately two weeks before
16  this date.
17  Q. Okay. Before the approval?
18  A. Yes, sir.
19  Q. Okay. In that first conversation, was this in
20  person or by phone?
21  A. It was in person.
22  Q. Okay. And what did you tell Rhonda in that
23  initial conversation and what did she tell you?
24  A. As best I recall, I was sick. I was very
25  sick. I was sick when we had our conversation. I was

Deposition of Benny Jackson, taken May 10, 2017

14

---

Page 53

1  struggling to get up and get to work every day. I was
2  worried that I had COPD because that's what the
3  radiologist had said I had and I knew COPD was bad. I
4  was afraid that there's a possibility that I might not
5  could come back to work at all, but I was assuming at
6  that time that I was probably going to have to be off
7  work for a period of time and --
8      Q.  What did she tell you in this first
9  conversation?
10      A.  We talked about the fact that I could go on
11  family medical leave. We also talked about the fact
12  that I had worked 15 years and that there's a
13  possibility that I could retire. We also talked about
14  if I could come back, if I could work in a different
15  area. I don't recall anything else that we discussed
16  that day.
17      Q.  Okay. Do you know what happened after that by
18  which these papers which are shown as Exhibit 1 were
19  completed in order that you could qualify for FMLA
20  leave?
21      A.  Are you asking me do I remember when I filled
22  the papers out? Is that the question?
23      Q.  Well, yes. Did you fill any papers out for
24  your leave?
25      A.  I don't remember. I really don't remember. I

---

Page 54

1  think I had to come in and sign the papers for that,
2  but I really don't recall.
3      Q.  Okay. Do you recall if anyone asked you to
4  come in and to sign the papers?
5      A.  I don't recall.
6      Q.  Okay. And again, is my understanding correct
7  that the next thing you knew was that you had this
8  second conversation in which you knew that FMLA leave
9  had been approved?
10      A.  I believe that's right. Yes, sir.
11      Q.  Okay. The second conversation, which I
12  believe you said was by telephone, did you call Rhonda
13  or did Rhonda call you?
14      A.  I believe I called her. I think that's what
15  she had requested me to -- once I got out of my
16  doctor's visit that day to call her and inform her of
17  what his decision was or opinion was or what his
18  procedure or plan would be.
19      Q.  Okay. And were -- during this second
20  conversation by Rhonda Barnes, the telephone
21  conversation, is my understanding correct that at that
22  point you were approved for FMLA leave? You were told
23  you were approved?
24      A.  Yes, sir. I believe that's right.
25      Q.  Okay.

---

Page 55

1      A.  Best of my memory.
2      Q.  Okay. Now as I think you previously
3  testified, with regard to Exhibit 1, these are not
4  documents that you've previously seen?
5      A.  I don't recall seeing these. No, sir.
6      Q.  Okay.
7      A.  I mean, I don't see anything that I've signed,
8  so --
9      Q.  With regard to Dr. Wilons' diagnosis that you
10  needed to be away from your work area for a period of
11  time to improve your COPD, did you speak to anyone
12  other than Rhonda Barnes at Oil-Dri about your
13  condition or about your leave?
14      A.  At that time?
15      Q.  Yes.
16      A.  Not that I recall.
17      Q.  Now with regard specifically to breathing
18  problems, was Dr. Wilons the first doctor that you went
19  to with regard to breathing problems?
20      A.  He was the first specialist that I went to.
21  Yes.
22      Q.  Okay.
23      A.  The only one.
24      Q.  Okay. Now did Dr. Wilons subsequently release
25  you to return to work?

---

Page 56

1      A.  He did.
2      Q.  And did he release you without any
3  restrictions?
4      A.  No, sir. He released me with restrictions.
5      Q.  What were the restrictions?
6      A.  That I not be exposed to the same environment,
7  not -- not do the same job.
8          MR. WOODRUFF:  Go off the record a
9  second?
10          MR. MOELLER:  Yes.
11          (After a discussion off the record and a
12  lunch break, the deposition continued as follows:)
13      Q.  (Mr. Moeller)  Mr. Jackson, is it your
14  testimony that you were released with restrictions;
15  that you could not return to the same environment?
16      A.  That's correct.
17      Q.  And that was Dr. Wilons that released you with
18  those restrictions?
19      A.  That's correct.
20      Q.  Okay. And do those restrictions continue to
21  -- through today?
22      A.  Yes, sir.
23      Q.  Do you recall your contact with Oil-Dri when
24  you were released on or about July 15, 2015?
25      A.  To the best of my knowledge, it was a

Deposition of Benny Jackson, taken May 10, 2017

15

---

**Page 57**

1    telephone conversation with Ms. Barnes.

2       Q. Okay. Who called whom?

3       A. I called her.

4       Q. What did you tell her?

5       A. Well, first I asked her -- I asked her had

6    anything changed as far as any job openings that I

7    could do and she said, no. And I told her that if that

8    was the case, then I felt like I'd just go ahead and

9    retire.

10       Q. Now when you said, had anything changed about

11    job openings that you could do, what -- and she said,

12    no, did you discover at anytime later or whatever

13    whether her statements were true or not?

14       A. I would have to say no. As far as later, you

15    know, I don't know any of the circumstances after that.

16       Q. Okay. To make this question simple, based on

17    what she told you that day in that telephone

18    conversation, do you know whether any part of her

19    statement was not true?

20       A. Well, it was my understanding at times before

21    then -- I wouldn't say on July 15th, but at previous

22    times there had been forklift openings and also there

23    was a shipping opening.

24       Q. What do you base your understanding on that

25    there could have been forklift openings at the time

---

**Page 58**

1    around April -- excuse me -- around July 15, 2015?

2       A. Well, again, I will say that I would not be

3    privy to the July 15th information because I had not

4    been at work since April. Just with the conversations

5    on some of the employees during that time, I understood

6    that they were going to have shipping clerks. I don't

7    know at what point in time that they did fill that

8    position. Also, the job openings down there were not

9    always posted. Some of this was internal. If someone

10    in a department quit or changed jobs, you were aware

11    that there would be an opening in that particular

12    position and they were not always posted. Sometimes

13    they were filled by moving someone around in that

14    department. Sometimes they would not hire anyone. The

15    duties would just be assumed by the people that was

16    already employed. So every job was not posted.

17       Q. What were the exceptions with regard to jobs

18    not being posted if you know?

19       A. The exceptions?

20       Q. Yes. You agree, don't you, that if the

21    company just decides not to fill a position, that

22    position has gone away.

23       A. I agree.

24       Q. Okay. And if a company decides to take two

25    jobs and combine them into one, you then only have one

---

**Page 59**

1    job. The other job's gone away, right?

2       A. I agree.

3       Q. Okay. So my question is: What exceptions, if

4    any, for bargaining unit jobs were there in terms of

5    not posting such jobs?

6       A. I'm still not clear as to what you're asking.

7       Q. Okay. Do you know of any exceptions

8    recognized by Oil-Dri to their policy that if there is

9    an opening in a job, it's posted for bidding by

10    employees?

11       A. Give me an example of what you're talking

12    about.

13       Q. Well, let me do this.

14       MR. MOELLER: I'll ask the court reporter

15    to mark as Exhibit 2 the actual job posting policy.

16       (Thereupon, the document referred to was

17    marked as Exhibit No. 2)

18       Q. (Mr. Moeller) Have you seen that before?

19       A. (Witness reviewing document) Not that I

20    recall. It may have been posted on the bulletin board

21    at work, but, no, sir, I would say not that I recall.

22       Q. Okay. Do you see under number one, "purpose"?

23    And quoting from it: Oil-Dri Corporation of America

24    promotes the opportunity for career advancement of its

25    teammates. The company endorses this belief by a job

---

**Page 60**

1    posting procedure that is fair and unbiased. Teammates

2    seeking internal advancement opportunities. Oil-Dri

3    teammates have access to advancement opportunities

4    based on their skill, ability and motivation to enhance

5    their career. End quote. You see that?

6       A. Yes, sir.

7       Q. And you see the scope is all hourly teammates?

8       A. Yes, sir.

9       Q. Were you an hourly teammate?

10       A. I was.

11       Q. Now with regard to the posting policy, are you

12    aware that all actual openings of jobs that are going

13    to exist in the future are posted?

14       A. No, sir. I wasn't aware that all jobs were

15    posted.

16       Q. Okay. Can you give me a single example of a

17    job that was not posted and not filled to the job

18    posting policy of at least giving the employees

19    currently working at the plant at least the first

20    opportunity to bid for the job?

21       A. Not that I recall. No, sir.

22       Q. Okay.

23       A. I couldn't name a specific person.

24       Q. So you can't name a single instance, can you,

25    of a job at Oil-Dri that was not posted that was an

---

Deposition of Benny Jackson, taken May 10, 2017

16

## Page 61

1    hourly job.
2        A.  Whenever our part -- department -- our quality
3    department was reconfigured, we had one employee, in
4    particular, that transferred to a salary position and
5    that job was never posted that I recall.
6        Q.  Who is that employee?
7        A.  Erskin (phonetic) Cummings, Jr.
8        Q.  Erskin Cummings, Jr.?
9        A.  Yes, sir.
10       Q.  What job did he go from and what job did he go
11   to?
12       A.  He went from a -- he was a -- in the quality
13   control department as a lab technician.
14       Q.  Okay.  And he went from that job to what job?
15       A.  He -- at first, he went to the sample
16   department, which was an hourly position, for a short
17   period of time and he began to work in the shipping --
18   I can't think of the exact name of the department.
19   They work with the truck drivers on the shipping orders
20   and he started working in that office part-time and
21   then he became full-time.
22       Q.  Was this a salary position?
23       A.  It was.  It is.
24       Q.  Okay.  And do you know how he got that
25   position?

## Page 62

1        A.  I don't know.
2        Q.  Okay.  You mentioned forklift driver.
3        A.  Uh-huh (indicating yes).
4        Q.  Do you know what the qualifications are to be
5    a forklift driver?
6        A.  Yes, sir.  I was forklift certified.  We had
7    to be certified to drive a forklift.
8        Q.  Okay.  Are you forklift certified?
9        A.  I was.  Yes, sir.
10       Q.  When were you forklift certified?
11       A.  I don't remember the last year we did it.
12   Actually, we were probably behind in our certification
13   as far as the last class that we had had.  The MSHA man
14   -- I can't remember his name -- that retired, he
15   checked on that on an annual basis and --
16       Q.  When was the last time you were forklift
17   certified?
18       A.  I would say probably 2007 or eight.  That's a
19   guess.
20       Q.  Okay.  Did you ever work at Oil-Dri as a
21   forklift driver?
22       A.  My job -- part of my job was using a forklift.
23       Q.  Part of your job as a chemical operator?
24       A.  Yes.
25       Q.  What part of your job as a chemical operator

## Page 63

1    was using a forklift?
2        A.  The materials that we used, the additives,
3    were in packages on a pallet and they were stored
4    somewhere in the warehouse and you would have to go to
5    that particular spot in the warehouse and retrieve your
6    material that you needed, bring it back to your work
7    area and put it way up high on the platform.
8        Q.  Okay.  Why did you not maintain your forklift
9    certification after 2007/2008?
10       A.  You would have to ask someone in management
11   that question.  No one did.  It wasn't -- that was the
12   last forklift class that we had.
13       Q.  Okay.  With respect to the forklift drivers
14   that were driving after 2007/2008 up to the time that
15   you were no longer with the company in 2015, do you
16   know how they maintained current forklift
17   certification?
18       A.  I don't know that we had any certification
19   after that.
20       Q.  Okay.
21       A.  They'd just hire someone to drive a forklift
22   and they'd ask them, have you ever driven forklift
23   before, yes or no.  Sometimes it would be no and they'd
24   still hire them.  That doesn't mean they can't be a
25   good forklift driver.

## Page 64

1        Q.  Did you -- but do you know whether or not, as
2    you pointed out in talking with the MSHA
3    representative, whether or not forklift certification
4    remained a requirement for somebody to operate a
5    forklift at an MSHA-covered facility such as Oil-Dri?
6        A.  I do not know if that was a requirement or
7    not.  I do not know.
8        Q.  Okay.  And when we refer to MSHA, do you agree
9    that we are referring to the Mind, Safety, Health
10   Administration?
11       A.  I do.
12       Q.  Okay.  Mr. Jackson, I believe we have
13   established that you were out on FMLA leave from
14   sometime in April through on or about July 15, 2015; is
15   that correct?
16       A.  Yes, sir.  That's correct.
17       Q.  Okay.  So you were, of course, out on FMLA
18   leave, so you were not available for work during that
19   period of time; is that correct?
20       A.  That's correct.
21       Q.  Now with regard to your possible return on or
22   about July 15, 2015, when you were released, as you
23   say, with restrictions, do you know whether or not
24   there was a forklift position available?
25       A.  On July 15th, no.  I do not positively know

Deposition of Benny Jackson, taken May 10, 2017

---

Page 65

1  that there was or was not.
2      Q.  Okay.  Do you know -- you mentioned the
3  position of packaging operator, I believe, as another
4  possible position that you were interested in.
5      A.  Packaging operator?
6      Q.  Excuse me.  Correct me.  What other position
7  had you mentioned to Rhonda Barnes?
8      A.  I think a shipping clerk.
9      Q.  Okay.  Excuse me.  Shipping clerk.  Now with
10  regard to a shipping/receiving clerk, do you know
11  whether or not on July 15th there was any opening?
12      A.  No, sir, I do not know.
13      Q.  Did you ever post for such an opening?
14      A.  Did I?
15      Q.  Yes.
16      A.  No, sir.
17      Q.  Okay.  And you were aware of the fact that
18  there was a posting policy.
19      A.  Yes, sir.  A policy.  Yes, sir.
20      Q.  Okay.  By way of example, I show you what I'll
21  ask the court reporter to mark as Exhibit 3.
22          (Thereupon, the document referred to was
23      marked as Exhibit No. 3)
24      Q.  Is that a typical job posting notice --
25      A.  Yes, sir.

---

Page 66

1      Q.  -- at Oil-Dri?
2      A.  Yes, sir.
3      Q.  And it's shown -- is that for shipping and
4  receiving clerk sometime in April 2015?
5      A.  Yes, sir.
6      Q.  And do you notice any of the names on that
7  list of people who actually did sign up?
8      A.  Yes, sir.
9      Q.  Okay.  And are those some of the coworkers
10  that you worked with at the time?
11      A.  They were.
12      Q.  Okay.  So were you familiar with the job
13  posting procedure as indicated in that form?
14      A.  Yes, sir.
15      Q.  Now in this conversation that you had with
16  Rhonda Barnes, did you then have a discussion about
17  retirement from Oil-Dri when you spoke to her on or
18  about July 15, 2015?
19      A.  Yes, sir.
20      Q.  What did you tell her about your desire to
21  retire and what did she tell you?
22      A.  Well, as I previously stated, our conversation
23  was fairly brief and, you know, I just recall asking
24  her was there any changes as far as a job that I would
25  be eligible for, I could do, and she said there was

---

Page 67

1  not.  And I said, well, you know, I think I'll just go
2  ahead and retire, I believe was my words.
3      Q.  Okay.  And at that time, did she offer any
4  response to your statement that -- that you said, I
5  think I'll go ahead and retire?
6      A.  I don't -- I don't recall what she said
7  exactly.  I mean, I don't remember if she told me I
8  need to come by and fill out some papers or -- I really
9  don't recall exactly what she said.
10      Q.  Okay.  What's the next thing you recall
11  happening with regard to Oil-Dri and possible
12  retirement?
13      A.  You know, I really don't remember going by and
14  signing the papers, but -- I mean, I know I must have,
15  but I don't recall the day that I went by and signed.
16      Q.  Do you recall having a conversation with any
17  Oil-Dri representative about signing papers or anything
18  else about your employment?
19      A.  Well, just my retirement papers.  Like I said,
20  I don't remember what day that was, but I just remember
21  signing my retirement papers and -- so I could draw my
22  pension and, you know, as far as a conversation that
23  day, I don't -- I don't recall.
24      Q.  Okay.  Do you recall when you may have gone by
25  Oil-Dri to sign the papers about retirement?

---

Page 68

1      A.  I don't.
2      Q.  Okay.  Now, of course, it's established in
3  your complaint that you were not working for Oil-Dri,
4  of course, following July 15th, 2015.  So tell me what
5  was the next contact you had with Oil-Dri after you
6  recall signing these papers?
7      A.  The next -- I suppose the next contact I
8  recall is I had won a contest at work and I went to
9  Chicago to the annual awards banquet and I think that
10  was in August.  I don't recall exactly.
11      Q.  Okay.  Now when you say you won a contest at
12  work, what was the contest?
13      A.  We had a cost-saving contest, ideas contest.
14  If you came up with an idea or you discovered something
15  in the manufacturing process that could be corrected
16  that would save the company time and money, you were
17  nominated for a monthly award and then a quarterly
18  award and I don't know if it was a semi-annual, I don't
19  recall that, but at the end of the year, they select
20  people from different areas of Oil-Dri and you go to
21  Chicago to the annual meeting.
22      Q.  Okay.  And what was your winning idea?  I
23  mean, what was the --
24      A.  Well, I caught a flaw in the production
25  process that was in a formula that one of the engineers

---

Deposition of Benny Jackson, taken May 10, 2017

18

---

**Page 69**

1  had devised on the slurry process. Each process had a
2  formula.
3      Q.  Uh-huh (indicating yes).
4      A.  And the formula was flawed by a fairly large
5  amount. In other words, we were putting a very
6  expensive additive on a product at about 10 times the
7  rate that we were supposed to be applying it and it was
8  -- I forget the cost per ton of this product, but it
9  was fairly expensive.
10     Q.  Do you recall the additive?
11     A.  No, sir, I don't. Right offhand, I don't. I
12  don't recall what it was.
13     Q.  Okay. I understand that you went to an awards
14  ceremony in Chicago?
15     A.  Yes, sir.
16     Q.  And did anyone accompany you to the awards
17  ceremony?
18     A.  My daughters did.
19     Q.  Okay. Did your wife?
20     A.  No.
21     Q.  Okay. And where was the awards ceremony in
22  Chicago?
23     A.  I don't recall the name of the center it was
24  at.
25     Q.  Okay. And was this trip for the weekend or a

**Page 70**

1  day or two or what?
2      A.  It was for -- I believe Oil-Dri paid for one
3  night lodging and they paid me mileage up there and
4  back and expenses.
5      Q.  Okay.
6      A.  Like, two days' expenses.
7      Q.  Did you drive?
8      A.  Yes, sir.
9      Q.  Oh. Okay. Do you recall when the awards
10  ceremony was?
11     A.  No, sir, I don't exactly.
12     Q.  Okay. What was the next contact you had with
13  Oil-Dri following the awards ceremony?
14     A.  I had called Rhonda Barnes and asked her about
15  my retirement check and she had told me that she would
16  check on it, try to find out, you know, what was going
17  on with it.
18     Q.  Yes.
19     A.  And then the next contact I remember was
20  Amanda called me and asked me to come to Ripley.
21     Q.  Amanda Hill?
22     A.  Yes.
23     Q.  Okay. Do you recall when Amanda Hill
24  contacted you?
25     A.  I don't recall the exact date. I believe it

**Page 71**

1  was in September.
2      Q.  And at Amanda Hill's request, did you go to
3  Ripley?
4      A.  I did. Yes, sir.
5      Q.  And did you meet with Amanda?
6      A.  I did.
7      Q.  Did you meet with anybody else?
8      A.  I believe his name was Ron Parks.
9      Q.  Okay. Did you previously know Ron Parks?
10     A.  I had met him when I was in Chicago.
11     Q.  I see. Do you know who Ron Parks is, that is,
12  what his job was?
13     A.  I did. I don't recall what his exact title
14  is, but, yes, I did know who he was. Yes, sir.
15     Q.  Okay. And tell me about the meeting in Ripley
16  with Amanda Hill and Ron Parks. Number one, where was
17  it?
18     A.  It was in the office at Ripley, across the
19  street, I believe. Not positive about which room we
20  were in, but we were in an office at Ripley plant.
21     Q.  Ripley plant is distinguished from the Blue
22  Mountain Production Company plant?
23     A.  Separate. Yes.
24     Q.  Yes. Okay. And who started the conversation?
25     A.  You know, I don't recall. It was a formal --

**Page 72**

1  informal, you know, how you doing, good to see you.
2      Q.  Uh-huh (indicating yes).
3      A.  And I don't remember exactly if it was Ron or
4  Amanda, but one of them said -- paraphrasing here.
5      Q.  Sure.
6      A.  Unfortunately, we've got to tell you that your
7  retirement benefits are not going to be available or
8  you're not going to be able to draw them or -- I don't
9  remember the exact words that was used. And, of
10  course, I wanted to know why and they told me and they
11  also had a printout of the -- my years of service and
12  the number of hours that I worked each year and there
13  were two years that I did not meet the required minimum
14  number of hours according to Oil-Dri policy.
15     Q.  Now the retirement you were seeking, was it an
16  early retirement?
17     A.  No, sir.
18     Q.  It was not?
19     A.  No, sir.
20     Q.  Okay. And so, did they go over with you
21  figures showing that there were two years in which you
22  didn't meet the minimum number of required hours of
23  work?
24     A.  Yes, sir.
25     Q.  Okay. And what was -- what was your reaction

**ADVANCED COURT REPORTING**
**662-690-1500**

**Deposition of Benny Jackson, taken May 10, 2017**

## Page 73

1 or statement to this?
2    A. I don't recall what my statement was. My
3 reaction to it was, you know, this is something that I
4 was not aware of and never heard of and why was I not
5 informed of this before now, before it's too late? Why
6 did we not have an annual review of this? Why don't we
7 look at the annual hours of each employee each year?
8 Is that up to the employee or is that up to management?
9 That was some of my, you know --
10    Q. What was Amanda Hill's or Ron Parks' response?
11    A. I don't recall. I mean, it was cordial. It
12 wasn't -- you know, I don't recall anything -- you
13 know, I hope I wasn't (inaudible), but I was upset. I
14 mean, they -- you know --
15    Q. Was there any further discussion in this
16 meeting?
17    A. There was. They said I had an option and I
18 asked them what that was and they said, if you would
19 come back to work -- and I don't remember the amount of
20 time that I would have to work to qualify, but it would
21 only be a partial -- like, 60 percent, I'm guessing. I
22 don't remember the exact number. It was almost a
23 50 percent reduction in what my benefit would have been
24 and then my next question to them was: Okay. If I
25 come back, what will I be doing? They said, well,

## Page 74

1 you'll be doing the same job that you were doing
2 because we're shorthanded at that position. And I
3 said, well, I mean, that's the reason I'm off now is
4 because that job is what made me sick and my doctor
5 would not release me to go back to that job, so, you
6 know, I just don't think I could do it.
7    And I did tell them that I would think about
8 it for a few days because that was kind of a sudden
9 thing to me and I didn't want to make a decision real
10 quick, but that was my response that day and then I did
11 inform Amanda a few days later -- I don't remember
12 exactly -- that -- and I think I did mention in the
13 meeting that -- that I hoped that I could drive the
14 school bus some. I was a relief driver, but that
15 didn't -- that didn't work out. I think I only drove
16 one time. And that I had started my Social Security
17 and I could only earn so much money during the year and
18 I'd already met that maximum amount for that year and I
19 was already drawing my Social Security, and so, it was
20 kind of a conundrum for me. At that very moment, you
21 know, I couldn't make a decision, but a few days later,
22 I did call her back and inform her that I would not
23 come back if I had to come back to the same -- same job
24 I had when I left.
25    Q. When you called Amanda Hill and told her that

## Page 75

1 you would not be coming back to that job, did she or
2 you have any further discussion?
3    A. Not that I recall.
4    Q. You know, you said -- you mentioned in the
5 meeting with Ron Parks and Amanda Hill that you were
6 driving a school bus and then you said, but it didn't
7 work out. Tell me about that. When did you start
8 driving a school bus?
9    A. I was a relief driver for South Tippah and
10 North Tippah for about three years. The first year
11 that I started doing that, our work at Blue Mountain
12 Production was slow and I would go in in the mornings
13 at 4:45 and get off every day at one o'clock, and so, I
14 would be a relief driver in the afternoons for
15 different drivers in -- our county is -- has a North
16 Tippah and -- we have two school districts.
17    Q. Yes.
18    A. But I was a relief driver for both districts
19 and I drove quite a bit. I drove one particular bus
20 route one day every week and then when our work really
21 started -- begin to pick up whenever we expanded, we
22 did about a -- I forget how many million dollar
23 expansion. We added new products and our business
24 really took off and our hours were increased greatly
25 and I was not available to drive in the afternoons, and

## Page 76

1 so, my name kind of got out of the circle of names that
2 people would call -- they would call me and I'd say,
3 I'm sorry. I can't drive. I can't get off work in
4 time. So once they call you a number of times and you
5 refuse to drive for them, they kind of quit calling,
6 so --
7    Q. But now after July 15, 2015, did you start
8 driving again?
9    A. I only drove one time.
10    Q. One time.
11    A. Yes, sir.
12    Q. Do you recall when that was?
13    A. No, sir. I really don't.
14    Q. Why didn't you continue driving after that one
15 time?
16    A. I think I had two calls after that and both
17 times that someone called me I was in a doctor's office
18 somewhere out of town both times and that's -- I
19 believe that's the only two other calls I had to drive
20 other than the one time that I drove.
21    Q. Okay. Have you made any efforts since then to
22 try to become a relief driver or even a regular school
23 bus driver with North or South Tippah County School
24 Districts?
25    A. No, sir.

Deposition of Benny Jackson, taken May 10, 2017

## Page 77

1    Q. Now with regard to the retirement benefits,
2  what was the retirement benefit you expected to
3  receive?
4    A. That is configured on a dollar basis
5  multiplied times the number of years you worked and I
6  -- my number was, I think, $246. I'm not positive, but
7  it's real close to that number --
8    Q. Okay.
9    A. -- that I expected to receive.
10    Q. Now other than the breathing issues that you
11  have testified about and the FMLA leave that you took,
12  while employed by Oil-Dri, did you have any other
13  actual or possible disability?
14    A. No, sir, not -- not that I recall.
15    Q. Okay. Now are you familiar with the company's
16  EEO policy? Equal Employment Opportunity policy.
17    A. Yes, sir. I think I'm --
18    Q. Okay.
19    A. -- fairly aware of that.
20    Q. And do you know that it prohibits
21  discrimination against disability and that it offers
22  reasonable accommodations for disabilities?
23    A. I know that's what it states. Yes, sir.
24    Q. Okay. Did you -- you know, on -- anytime on
25  or after July 15th when you were -- you say you were

## Page 78

1  conditionally released to return to work subject to
2  restrictions, did you ask for a reasonable
3  accommodation from Oil-Dri?
4    A. Well, I mean, I felt like that's what I was
5  asking for when I was asking for a different job in a
6  different area because the area and the job that I
7  worked in and I was doing was what was causing me to be
8  sick and I was asking to be put in a different area. I
9  would think that would be asking for a reasonable
10  accommodation.
11    Q. Well, you mentioned that -- in your discussion
12  with Rhonda Barnes that you mentioned shipping and
13  receiving clerk and you mentioned forklift driver. Of
14  course, we've already talked about that.
15    A. Uh-huh (indicating yes).
16    Q. Did you mention anything else?
17    A. I don't recall.
18    Q. Okay. Now after your Blue Mountain Production
19  Company employment -- and you've already talked about
20  the school bus driver situation -- did you apply for
21  employment anywhere else?
22    A. Yes, sir.
23    Q. Where did you apply?
24    A. I couldn't -- I could name some. I applied
25  for unemployment benefits and part of the requirements

## Page 79

1  of that is that you apply three different places per
2  week.
3    Q. Okay. Did you do that?
4    A. Yes, sir.
5    Q. Did you do it in all weeks in which you sought
6  to receive unemployment benefits?
7    A. I did. Yes, sir.
8    Q. I'll have the court reporter hand you what I
9  believe is Exhibit 4.
10    (Thereupon, the document to be referred
11  to was marked as Exhibit No. 4)
12    Q. Mr. Jackson, I direct your attention to
13  Exhibit 4, which, of course, at the top is an
14  unemployment compensation form from the Mississippi
15  Department of Employment Security. Says at the top,
16  UI-501 Initial Claim for Benefits. Do you recall
17  filling this out?
18    A. Yes, sir.
19    Q. Okay. And were all of your responses to these
20  questions true and accurate at the time you filled it
21  out?
22    A. Yes, sir.
23    Q. And do they remain true and accurate today?
24    A. Yes, sir.
25    Q. Of course, you'll see about two-thirds of the

## Page 80

1  way down, the question under "employer history", are
2  you receiving or have you applied for a pension --
3  retirement or pension payment of any kind? And you put
4  -- you see your answer is "no"?
5    A. I believe I asked that lady about that
6  question and she told me a railroad pension or -- I
7  mean, I told her that I had applied for my pension with
8  Oil-Dri, but I was not receiving it.
9    Q. Who is the lady that you're referring to?
10    A. I don't remember. At the employment office in
11  Corinth.
12    Q. Okay. But you agree that the question is:
13  Are you receiving or have you applied for retirement or
14  pension payment of any kind?
15    A. Yes, sir. I agree that's what it asks.
16    Q. Okay.
17    A. That would be yes and no, I guess, because I
18  was not receiving, but I had applied.
19    Q. Do you see the section below that,
20  "eligibility information"?
21    A. Yes, sir.
22    Q. Do you see under number one, do you have a
23  disability?
24    A. Yes, sir.
25    Q. And your answer was "no"; is that correct?

**Deposition of Benny Jackson, taken May 10, 2017**

21

---

Page 81

1  A. Yes, sir.
2  Q. Okay. And that answer is correct, right?
3      MR. WOODRUFF: Objection.
4  Q. (Mr. Moeller) Did you not fill this out
5  saying --
6  A. I did.
7  Q. -- you did not have a disability?
8  A. I did. Yes.
9  Q. Okay. So was that true?
10     MR. WOODRUFF: Objection.
11  Q. (Mr. Moeller) I take it that based upon your
12  testimony a minute ago that you said all these answers
13  were true and correct, so is that correct?
14     MR. WOODRUFF: Objection. You can
15  answer.
16  A. Pardon?
17     MR. WOODRUFF: You can answer.
18  A. Okay. Again, I asked -- I asked the lady at
19  the same office up there, she said, have you filed for
20  disability? I said, no, ma'am, I have not. She was
21  talking about Social Security disability. She said,
22  well, then your answer will be no.
23  Q. (Mr. Moeller) Of course, that's not what the
24  question says, is it?
25     MR. WOODRUFF: Objection.

---

Page 82

1  Q. (Mr. Moeller) Okay. And what is the name of
2  this lady?
3  A. I don't recall the lady's name.
4  Q. Now after filling out this form, did you, in
5  fact, file for Social Security disability?
6  A. No.
7  Q. You've never filed for Social Security
8  disability?
9  A. No.
10  Q. Have you filed for any form of disability?
11  A. No, sir.
12  Q. Now in filling out this form, Exhibit 4,
13  weren't you clearly stating that you were ready,
14  willing and able to work?
15  A. Yes, sir.
16     MR. MOELLER: Ask the court reporter to
17  mark as Exhibit 5 the next document.
18     (Thereupon, the document referred to was
19  marked as Exhibit No. 5)
20  Q. (Mr. Moeller) Do you see that document?
21  A. Yes, sir.
22  Q. And have you seen it before?
23  A. (Witness reviewing document). I think I
24  recall getting this letter here from the employment
25  security commission.

---

Page 83

1  Q. Okay. The date on the notice of nonmonetary
2  decision, date mailed to the left-hand corner, what
3  date is that?
4  A. Talking about 12-27, 2015, the -- or date
5  mailed?
6  Q. Correct.
7  A. Date mailed was January 9th, 2016.
8     MR. WOODRUFF: I have another phone CMC
9  at two o'clock. I'm gonna take about five minutes.
10     MR. MOELLER: Sure. Do we need a break?
11     MR. WOODRUFF: Yeah. Shouldn't take more
12  than five minutes.
13     MR. MOELLER: Yeah. We'll have to take a
14  break.
15     (After a recess, the deposition continued
16  as follows:)
17  Q. (Mr. Moeller) With regard to Exhibit 5, do
18  you see the date mailed of the notice of nonmonetary
19  decision?
20  A. Yes, sir.
21  Q. And do you see that -- do you recall receiving
22  that decision?
23  A. I think I recall it. Yes, sir.
24  Q. And do you see where it says in the first
25  line: Information submitted indicates you failed to

---

Page 84

1  meet work search requirements from 12-27, 2015, to
2  January 2, 2016?
3  A. Yes, sir.
4  Q. And do you see the sentence next to it that
5  says: Based on this information, you are not actively
6  seeking work as required by the Mississippi Employment
7  Security Law?
8  A. Yes, sir.
9  Q. Do you agree that you received other notices
10  like this for other weeks in which you were found by
11  the Mississippi Department of Employment Security to
12  have an inadequate work search?
13  A. I don't recall receiving another one. Maybe I
14  did.
15     MR. MOELLER: Mark that as 6.
16     (Thereupon, the document referred to was
17  marked as Exhibit No. 6)
18  Q. (Mr. Moeller) Mr. Jackson, I show you
19  Exhibit 6. Do you see that notice of nonmonetary
20  decision?
21  A. Yes, sir.
22  Q. Do you see in the upper left-hand corner where
23  it's dated in terms of date mailed July 13, 2016?
24  A. Yes, sir.
25  Q. Do you see where the -- the second section,

---

Deposition of Benny Jackson, taken May 10, 2017

22

**Page 85**

1    that is, the section immediately below your name,
2    states: Quote, information submitted indicates you
3    failed to meet work search requirements from June 26,
4    2016, to July 2, 2016?
5        A. Yes, sir.
6        Q. Okay. Do you recall receiving this notice of
7    nonmonetary decision?
8        A. I don't recall this specific one. I do recall
9    receiving --
10       Q. Okay. Do you recall receiving as shown on the
11   top page of Exhibit 5 various e-mails of factfinding by
12   the Mississippi Department of Employment Security
13   indicating other work weeks in which they found that
14   you had an inadequate work search?
15       A. I see that on this document. Yes, sir.
16       Q. Have the court reporter hand you what has been
17   marked for identification as Exhibit 7.
18           (Thereupon, the document referred to was
19   marked as Exhibit No. 7)
20       Q. Okay. Do you recall seeing this doctor
21   certificate filled out by Dr. Michael Wilons, that is,
22   your lung specialist, on your behalf in December 2015?
23       A. Yes, sir.
24       Q. Have you seen this document before?
25       A. I don't recall seeing it, but -- but, yes,

**Page 86**

1    sir. I mean, my signature's on it and it's dated.
2        Q. Do you see where under number four, it says:
3    Did you advise this individual to leave work? And
4    Dr. Wilons puts an X in the "yes" box and says that was
5    on April 27, 2015?
6        A. Yes, sir.
7        Q. Do you see under number five where he says,
8    quote, have you released this individual to return to
9    their usual work, end quote, and he puts an X in the
10   "yes" box?
11       A. See that. Yes, sir.
12       Q. Do you see where in the next line it has a
13   place to explain restrictions?
14       A. Yeah.
15       Q. You see where it says: If no, explain any
16   restrictions. Do you see where he's left that blank?
17       A. Yes, sir.
18       Q. Does that refresh your recollection that
19   Dr. Wilons had released you to do your -- of course, in
20   the words of this form "your usual job"?
21           MR. WOODRUFF: Objection.
22       Q. (Mr. Moeller) Usual work. According to this
23   form, had Dr. Wilons released you to do your usual
24   work?
25           MR. WOODRUFF: Objection. Can I just say

**Page 87**

1    I think you asked two different questions just now, so
2    I'm just not sure which one he's answering. Are you
3    asking is that what the document says or is that what
4    he told -- he told him?
5            MR. MOELLER: No. My question has been,
6    is that what the document says?
7            MR. WOODRUFF: Okay. You understand his
8    question?
9        Q. (Mr. Moeller) That Dr. Wilons says he
10   released you to do your usual work.
11       A. That's what's on this document. Yes.
12       Q. Okay.
13       A. But, again, this is employment security. This
14   is --
15       Q. With regard to your post Blue Mountain job
16   search, did you keep copies of any application of any
17   place you applied for work?
18       A. Did I keep copies of applications?
19       Q. Correct.
20       A. No, sir.
21       Q. Okay. Do you have any records that indicate
22   where you searched for work?
23       A. Yes, sir, I do.
24       Q. Okay. Have you turned those over in this case
25   in discovery?

**Page 88**

1            MR. JACKSON: I believe they have been
2    turned over, haven't they? Do you remember the date
3    book?
4            MR. WOODRUFF: Just answer his question.
5    You talking about -- I think he's referring to the
6    calendar.
7        Q. (Mr. Moeller) Yes.
8            MR. WOODRUFF: Is that what -- hang on.
9        A. That's what I'm referring to.
10           MR. WOODRUFF: Is that what you're
11   referring to, the calendar --
12       A. Yes.
13           MR. WOODRUFF: -- that we gave a copy of?
14       Q. (Mr. Moeller) And do you have any documents
15   other than the calendar about your job search?
16       A. No, sir.
17       Q. Did you incur any expenses related to your job
18   search?
19       A. Yes, sir.
20       Q. Do you have any records of those?
21       A. No, sir.
22       Q. Why don't you have records of those?
23       A. Didn't know that I needed to keep any records
24   of it.
25       Q. Okay. Mr. Jackson, do you recall during your

Deposition of Benny Jackson, taken May 10, 2017

23

---

Page 89

1  employment utilizing the internal job posting process
2  to acquire a job?
3      A.  I do.  Yes, sir.
4      Q.  Okay.  Do you recall utilizing it around 2008?
5      A.  I don't recall a date.  No, sir.
6      Q.  Okay.  What did you utilize it to do?
7      A.  I believe it was a procurement position open.
8  I think that was right.  I think that's what it was
9  called.
10     Q.  Okay.  And did you apply for that position by
11  posting for it?
12     A.  I did.
13     Q.  Did you get it?
14     A.  No, sir.
15     Q.  Okay.  Do you recall who did get it?
16     A.  I really don't recall.  I sure don't.
17     Q.  Was it a coworker who posted also?
18     A.  I don't think it was one of my coworkers, I
19  don't think, but I don't recall.
20     Q.  Okay.  With regard to possibly moving to other
21  positions other than what you've already testified
22  about -- and you've testified about the forklift
23  position.  You've testified about a receiving/shipping
24  clerk position.  Did you have any conversations with
25  anyone who was a -- in management at Oil-Dri about

---

Page 90

1  moving to any other kind of job other than what you've
2  testified about?
3      A.  Only conversation I had was with Charles Davis
4  and at that time, he was over the forklift drivers.
5      Q.  Okay.  What conversation did you have with
6  Charles Davis and when did it occur?
7      A.  I don't recall the verbatim conversation and I
8  don't recall the date.  It would have been -- I'm
9  thinking maybe around the 1st of April, end of March of
10  2015.  Not sure exactly.
11     Q.  Okay.  Where was this conversation?  Where did
12  it take place?
13     A.  Took place in the warehouse, just a casual --
14  it wasn't a formal in-the-office conversation.
15     Q.  Okay.  What did you say or ask Charles Davis
16  and what did he say to you?
17     A.  I don't remember specifically what he said to
18  me.  I just remember that he had a person that was
19  driving a forklift in the warehouse for him that quit
20  and a -- my conversation just consisted mainly of
21  asking him what was his plans, were they gonna replace
22  that guy or were they gonna absorb within, you know,
23  that type of conversation and I don't -- I don't
24  remember his answer specifically.  I think the essence
25  of what he said at the time was he didn't -- he was not

---

Page 91

1  sure what he was gonna do I think would be the best
2  answer I could give you.
3      Q.  I see.  Any other conversations about any job
4  in 2014/2015 with anybody at Oil-Dri?
5      A.  Not that I recall.
6      Q.  Okay.  Now once you said on July 15 that you
7  thought you would retire, did you do anything yourself
8  to confirm your eligibility for 15 years of service?
9      A.  On my own, no, sir.  I assumed that I had met
10  the requirements for full retirement and pension
11  benefits.
12     Q.  And what did you base that assumption on?
13     A.  On my conversation with Ms. Rhonda Barnes.
14     Q.  And, again, I'm not asking you to repeat what
15  you've already said, but is there anything else that
16  she said to you when you say "your conversation with
17  Rhonda Barnes" that we have not -- that you've not
18  already testified to in this deposition?
19     A.  Well, I think I've already testified, but I
20  will -- if I haven't, I will repeat that she did sit
21  down and configure what my monthly payment would be on
22  my pension before we talked about -- you know, we were
23  talking about options at the time.
24     Q.  Okay.
25     A.  What my options would be.

---

Page 92

1      Q.  And did you ask her what your options would
2  be?
3      A.  Well, at the time the options we were talking
4  about were either continue to work -- and at that time,
5  I was not physically able and we both assumed that I
6  could go on family medical leave and then once I got
7  off my family medical leave, depending on what the
8  doctor said, depending on my personal decisions would
9  be whether I wanted to retire or not.
10     Q.  Okay.  And so, at this time, which is -- is my
11  understanding correct either at a time you were on
12  family medical leave or right before you went on family
13  medical leave, Rhonda worked with you to give you some
14  calculations?
15     A.  Yes, sir.
16     Q.  I see.  About if you retired, what she thought
17  your pension might be?
18     A.  That's correct.
19     Q.  And beyond that discussion with Rhonda, was
20  there any further discussion that in any way you relied
21  on about possible retirement?
22     A.  That I relied on?
23     Q.  Yeah.  Conversation from an Oil-Dri
24  representative.
25     A.  I believe Rhonda was the only person that I

---

Deposition of Benny Jackson, taken May 10, 2017

24

---

Page 93

1   talked to while I was on family medical leave.
2       Q.  I see.  Okay.  Now in your complaint, you're
3   claiming damages, so let me go through these different
4   things.  With respect to lost income, how much are you
5   claiming that you are owed in lost wages?
6       A.  I don't know that -- that there's a total
7   amount that we talked about.  I think the last couple
8   of years I worked, I made around $40,000.  After -- I
9   was having 15 percent taken out for my 401(k), so that
10  was coming right off the top.
11      Q.  Okay.  You also allege damages for mental
12  anxiety and stress.  First -- my first question is:
13  How has Oil-Dri caused you mental anxiety and stress?
14      A.  Well, you go from making $40,000 a year to
15  making $1,037 a month on Social Security.  That's quite
16  a shock.  It caused problems with my wife.  You know,
17  she is -- it's hard for her to accept that fact; that
18  I'm not bringing home a paycheck anymore.  It caused --
19  you just feel like you're not valued.  You're not
20  important anymore, you know.  It's caused me a lot of
21  problems at home.
22      Q.  It's now May 2017.
23      A.  Yes, sir.
24      Q.  And you haven't worked at Oil-Dri since before
25  your FMLA leave, which commenced around the end of

---

Page 94

1   April --
2       A.  Yes, sir.
3       Q.  -- 2015, so that's over two years.  Why
4   haven't you gotten a job in the last two years?
5       A.  Well, I guess you would have to ask some of
6   the employers that's turned me down for a specific
7   answer.  As far as my own personal belief, it's hard
8   for someone my age to find a job.  You know, it's --
9       Q.  You say this has caused problems for your
10  wife.  Is that because you're not a breadwinner or
11  there's some other problem?
12      A.  No, no.  It's just because I'm not a
13  breadwinner.  It's because we have obligations to make
14  financially and it puts the burden on her.
15      Q.  Okay.  Does she still work?
16      A.  She does.
17      Q.  What is her job?
18      A.  She's a school teacher.
19      Q.  Where does she teach?
20      A.  She teaches in North Tippah District at
21  Falkner Elementary School.
22      Q.  What grade does she teach?
23      A.  She teaches the special needs and
24  developmentally-delayed children.  They're different
25  ages.

---

Page 95

1       Q.  I see.
2       A.  They're from six years -- I think the oldest
3   child she has is 13.
4       Q.  I see.  Do you have a dollar amount that you
5   are claiming for mental anxiety and stress in this
6   lawsuit?
7           MR. WOODRUFF:  Objection.
8       Q.  (Mr. Moeller)  State it another way.  How much
9   are you claiming for mental anxiety and stress in this
10  lawsuit?
11          MR. WOODRUFF:  Objection.
12      Q.  (Mr. Moeller)  As your Counsel will tell you,
13  you can proceed to answer.  He's made his objection.
14      A.  I haven't thought about an amount.
15      Q.  Okay.  Now in the complaint, it talks about
16  that -- of course, loss of your work at Oil-Dri has
17  caused problems in your marriage and that's also in
18  response to interrogatory number three.  Are there any
19  other problems it's caused in your marriage other than
20  what you've already testified to?
21      A.  Any other problems that it's caused?
22      Q.  Correct.  In your marriage.
23          MR. WOODRUFF:  Since he left his
24  employment.
25          MR. MOELLER:  (Nods head up and down).

---

Page 96

1       A.  It's -- I don't know.  It's just hard for her
2   to adjust to me being at home all the time and -- I
3   don't know.  I may be redundant in what I'm saying, but
4   it's hard for her to adjust to the fact that, you know,
5   I worked all my life and here I am at home every day
6   and, you know, I work at home every day, but it's just
7   hard for her to adjust to and she was used to the fact
8   that I had my girls on my insurance right up till --
9   right before I retired, I took them off my insurance.
10  I had her, my wife, you know, the whole family.  We've
11  had to adjust to not having that anymore.
12      Q.  With regard to your mental stress and anxiety
13  issues and also any marriage issues, have you seen a
14  counselor, a therapist, a psychiatrist, a pastor,
15  clergy or anyone regarding these problems?
16      A.  My pastor.  Yes, sir.
17      Q.  Okay.  How many times have you seen your
18  pastor?
19      A.  I don't know.  Probably four or five times
20  maybe.
21      Q.  In the last two years?
22      A.  Yes, sir.
23      Q.  Okay.  So is my understanding then correct
24  that you are not seeing your pastor or anyone else on a
25  regular, ongoing basis?

---

**ADVANCED COURT REPORTING**
662-690-1500

**Deposition of Benny Jackson, taken May 10, 2017**

## Page 97

1    A.  No, sir.  That's correct.  You're correct.
2    Q.  Okay.  Do you have any other claims for
3    damages that you're aware of?
4    A.  Just what's stated in -- I don't know.
5    Q.  In the complaint?
6    A.  Yes, sir.
7    Q.  Okay.  Do you have any knowledge as to why you
8    are seeking punitive damages?
9    A.  Can you be more specific on what you're
10   asking?
11   Q.  Well, in your complaint, you request punitive
12   damages.  Do you know why you are seeking punitive
13   damages?
14   A.  Okay.  Will you define "punitive damages".
15        MR. WOODRUFF:  Objection.  Calls for a
16   legal conclusion.
17   Q.  (Mr. Moeller)  Yeah.  That's a -- that calls
18   for a -- that does call for a legal conclusion.
19   A.  Okay.
20   Q.  I take it you have no personal knowledge as to
21   why or why not or why the punitive damages allegation
22   is in the complaint; is that correct?
23   A.  I guess that's correct.  Yes, sir.
24   Q.  Okay.  Now in the initial disclosures, you
25   listed a number of people that you believe might have

## Page 98

1    knowledge about this case.  I'm just gonna briefly try
2    to go through them and tell me what these individuals
3    know, if they know anything about your case and your
4    complaint.
5        MR. WOODRUFF:  You mean about the facts
6    of the case --
7        MR. MOELLER:  Correct.
8        MR. WOODRUFF:  -- or about the actual
9    lawsuit?
10        MR. MOELLER:  About the facts of the
11   case.
12        MR. WOODRUFF:  You understand what he's
13   asking?  What you think they know.
14   Q.  (Mr. Moeller)  Tracy Smithey.  What does he
15   know about the facts of your case?
16   A.  Well, I omitted his name before when you were
17   asking me were there people that -- I named Danny
18   Yancy, Mike Johnson, different ones, but I had talked
19   to Tracy Smithey about the working conditions where I
20   worked at.
21   Q.  Okay.
22   A.  And he was aware and he knew that the
23   conditions were bad and he had promised me he would
24   work on it and try to resolve some of the problems and
25   they -- they did put some equipment in, but they never

## Page 99

1    activated it.  They never completed the complete
2    hook-up where the vacuum system would work where I was
3    working.
4    Q.  So you used the words that -- you know, not --
5    that they never activated it; is that correct?
6    A.  That's correct.
7    Q.  Okay.  What is the equipment that they never
8    activated?
9    A.  Well, it was suction equipment.
10   Q.  Is it still at the plant?
11   A.  I don't know.
12   Q.  I mean, was it at the plant when you -- the
13   last time you were in the plant?
14   A.  Yes, it was.
15   Q.  Okay.  With regard to your exposure to dust
16   and to additives at the plant, were you exposed to dust
17   in any greater way than the typical employee working in
18   that plant?
19   A.  Yes, sir.
20   Q.  How were you exposed to dust in a greater way
21   than the typical employee?
22   A.  Because I had direct contact with the chemical
23   agents, the compounds that we used that no one in the
24   plant had.  No one else in the plant had the exposure
25   that I had in that job.

## Page 100

1    Q.  What about the person that you said was doing
2    your exact job on a different shift?
3    A.  He had the same exposure.
4    Q.  Okay.  Anyone else in the plant had the same
5    exposure?
6    A.  No, sir.
7    Q.  Okay.
8    A.  But let me also elaborate if it's okay.
9    Q.  Yes.
10   A.  The person on the second shift was always
11   someone that was there maybe a year and they
12   transferred to another job.  That happened over and
13   over and over and I stayed in the same job for
14   15 years.  I would train someone for the second shift
15   or the third shift and they would sign up for a job
16   posting on the day shift after a year, maybe two years
17   at the most and they would get transferred to a day
18   shift job in a different area.  Then I'd train someone
19   else.  It was just a -- for 15 years, I stayed in the
20   same place.
21   Q.  Do you agree that for those 15 years, you had
22   the same posting and bidding opportunities as all other
23   employees, that is, to move to a different job?
24   A.  Yes, sir.  Again, let me elaborate on that.
25   Our policy at the time was that you could not bid what

**Deposition of Benny Jackson, taken May 10, 2017**

26

Page 101

1  we call sideways. If you were going to bid, you had to
2  bid on jobs that was a higher pay grade.
3  Q. A promotion.
4  A. Yes, sir. And with the exception of the
5  procurement job, I can't think of maybe -- very few
6  opportunities I had that there was a job that I could
7  sign up for. That was true in the forklift job and the
8  shipping clerk job. That would have been -- one would
9  have been a demotion and the forklift job, I'm not sure
10  if it would have been a demotion or --
11  Q. So you're saying that much of the time you
12  couldn't bid sideways. Was that at some point changed?
13  A. I couldn't answer about now. There were
14  exceptions made at times.
15  Q. For people to bid laterally?
16  A. Yes, sir.
17  Q. Rhonda Barnes is another person named in the
18  initial disclosures. Other than what you've already
19  testified about -- I'm not asking you to repeat what
20  you've already said, but other than what you've already
21  testified about, does she know any other facts that
22  involve your case?
23  A. Not that I can think of. No, sir.
24  Q. Okay. Same question with regard to Danny
25  Yancy. Again, I'm not asking you to repeat what you've

Page 102

1  already testified about, but are there any other facts
2  that he knows about your case that you haven't
3  testified about?
4  A. Not that I can think of. No, sir.
5  Q. Okay. Same question with regard to Donald
6  Yancy. Does he know any facts that you haven't
7  testified about yet?
8  A. No, sir. I don't think so.
9  Q. Same question about Amanda Hill.
10  A. No, sir. I don't think so.
11  Q. Erskin Cummings, Sr., same question.
12  A. No, sir.
13  Q. Robert Moore, same question.
14  A. No, sir.
15  Q. Harvey Rutherford, same question.
16  A. No, sir.
17  Q. Kevin Jones, same question.
18  A. No, sir. I don't think so.
19  Q. Ronnie Hall, same question.
20  A. No, sir.
21  Q. Bobby Greer, same question.
22  A. No, sir, can't think of anything.
23  Q. Doug Miller, same question.
24  A. No, sir. Let me stop you right there just a
25  minute and what we're talking about is -- I'm

Page 103

1  testifying that they're aware of the same working
2  conditions that we've already gone over.
3  Q. No. No. The question is: Do they know facts
4  that involve your case that have not been covered so
5  far in your testimony?
6  A. Well, no, sir.
7  Q. Okay.
8  A. Again, I just wanted -- try to be as clear as
9  I can.
10  Q. Certainly. And I want you to be clear. Bobby
11  Greer, same question. Doug Miller, same question.
12  A. No, sir.
13  Q. Wanda Jackson, same question.
14  A. No, sir.
15  Q. Does she know any facts about your case?
16  A. No, sir.
17  MR. WOODRUFF: Talking about -- you know,
18  these are mental anxiety and stress. So you added
19  about the facts of the case or facts about his mental
20  anxiety and stress?
21  MR. MOELLER: Well, there's an allegation
22  in the case about mental anxiety and stress, so that is
23  included in the question.
24  MR. WOODRUFF: All right. Just so you
25  understand, he's asking you what they know about your

Page 104

1  mental anxiety and stress. They don't know anything,
2  obviously, about what happened at the plant.
3  Q. (Mr. Moeller) Okay. Natalie Jackson. What
4  does she know about your case?
5  A. Well, that's my oldest daughter. She's
6  noticed, as my wife has, a change in my personality, my
7  habits, my socialization. You know, when you get
8  depressed, you just kind of stay at home. You don't go
9  anywhere. You just -- you know, you don't have any
10  incentive, seems like, to do some things that you used
11  to do.
12  Q. Okay. Is there anything -- you know, any
13  other facts that Wanda Jackson knows -- excuse me.
14  Natalie Jackson knows that support your case?
15  A. No, sir.
16  Q. Okay. Richie Lockhart. What does he know, if
17  anything?
18  A. Well, that is my pastor.
19  Q. Oh, okay.
20  A. That's what I told you, I confided in him --
21  Q. Okay.
22  A. -- about not only my depression and anxiety,
23  but also my problems with my wife and family and, you
24  know, so -- that's -- he is my pastor.
25  Q. I see. Dennis Bogue. Does he know anything?

Deposition of Benny Jackson, taken May 10, 2017

27

### Page 105

1    A.   Yes, sir.
2    Q.   What does he know?
3    A.   Just what I was talking about with my
4    daughter, Natalie, there.  He's a real close friend of
5    mine.  We're church members.  We work at Good Samaritan
6    Center together, Sunday School class members.  We go on
7    day trips together and also I think maybe the next name
8    you might have might be Wendy Bogue.
9    Q.   Correct.  I assume his wife.
10   A.   Husband and wife.  Yes, sir.
11   Q.   I see.
12   A.   So, you know, we've talked about this and
13   basically the same things that I was talking about with
14   my daughter, you know, the socialization and depression
15   and withdrawal.
16   Q.   I see.  Wayne Hill.  Does he know anything
17   about your case?
18   A.   Wayne Hill and Phyllis Hill?
19   Q.   Yes, sir.  That's correct.
20   A.   It would be the same as Dennis and Wendy Bogue
21   and my daughter.  It's the same -- they would be privy
22   to the same information about my depression, withdrawal
23   from activities and, you know.
24   Q.   There's also listed a Ricky Childers and a
25   Woody Childers.  Who are they?

### Page 106

1    A.   They are two of my best friends.  They -- in
2    fact, they bought the Jackson Insurance Agency that
3    belonged to my dad for so many years.  We've been
4    life-long friends.  We -- Woody was a banker in Ripley
5    for a long number of years and just retired.  He was my
6    banker.  Ricky was my insurance agent.  All three of us
7    went to high school basketball games all the time and I
8    quit going by to see them.  I quit going to basketball
9    games.  I just kind of withdrew and, you know, we
10   talked about that, so they are aware of the same issues
11   that I just related about socialization and being
12   withdrawn and being depressed.  So they are aware of
13   those problems.
14   Q.   I see.  And Kenny Cook.  Does Kenny know
15   anything?
16   A.   Yes, sir.  Kenny Cook is my best friend, my
17   next door neighbor.  We've grown up in the same little
18   community and he is a deacon in his church and I'm an
19   elder in my church and -- and we just talk about our
20   problems, and so, he's -- I've talked to him about this
21   and he's aware of not necessarily the -- the
22   work-related issues as he is the result of it as far as
23   the depression and anxiety, withdrawal.
24   Q.   I see.  You've also made some supplemental
25   disclosures, of course, through your attorney and some

### Page 107

1    additional people identified include Ron Parks.  Of
2    course, there's already been testimony about Ron Parks,
3    but does he know anything -- or do you know anything
4    that Ron Parks knows about your case beyond what you've
5    already testified to?
6    A.   No, sir.  Not that I'm aware of.
7    Q.   Also Kevin Lange.
8    A.   No, sir.  I don't know anything different.
9    Q.   Charles Davis, which you've mentioned.
10   A.   Only thing that I mentioned while ago is --
11   yes, sir.  That's the only thing.
12   Q.   Okay.  And Frankie Bradley.  Who is Frankie
13   Bradley?
14   A.   He's a former employee that was in the
15   maintenance department.  He was -- he worked on the
16   second shift, but he also had to work when we were
17   working seven days a week.  The maintenance people
18   rotate on weekend shifts and I didn't have that
19   opportunity, I had to work, so I had different
20   maintenance men on the weekends and Frankie Bradley was
21   one of the maintenance men and he was aware of the same
22   working conditions that Doug Miller, Donald Yancy, all
23   the rest of them.  So nothing different with him.
24   Q.   I see.  Danny Strickland.
25   A.   Danny Strickland was a maintenance man on my

### Page 108

1    shift and on my job area.  He was one of my maintenance
2    men, and so, he was aware of the working conditions
3    that we've already gone over.
4    Q.   Okay.  Brian Bates?
5    A.   That would be the same for Brian.
6    Q.   Okay.  And, of course, Dr. Michael Wilons
7    we've talked about.  Is there anything beyond what
8    you've already testified about that he knows about your
9    case?
10   A.   Not that I can think of.  No, sir.
11   Q.   And Melinda Quinn, we've already talked about
12   her.
13   A.   Yes.
14   Q.   She's the nurse practitioner.
15   A.   Yes, sir.
16   Q.   Is there anything that she knows about your
17   case beyond what you've already testified about?
18   A.   Not that I'm aware of.
19   Q.   There's also an Anita Turner, who's a nurse
20   practitioner.
21   A.   Yes, sir.
22   Q.   Who is she?
23   A.   She's at the Nurse Med in Ripley.
24   Q.   Excuse me?
25   A.   Nurse Med.

Deposition of Benny Jackson, taken May 10, 2017

## Page 109

1  Q. Nurse Med. Ripley?
2  A. It's the name of the clinic in Ripley.
3  Q. I see. Okay. Clinic. Does she know anything
4  about your case?
5  A. Not anymore than what Melinda Quinn or -- you
6  know, not anything more than what we've talked about.
7  Q. I see. Now have you filed a Workers'
8  Compensation claim against Oil-Dri?
9  A. I have, yes, sir.
10 Q. Okay. And has it been settled?
11 A. Yes, sir.
12 Q. Okay. Did you execute a statement regarding
13 facts concerning your claim as part of the settlement?
14 A. I don't know.
15      MR. WOODRUFF: Objection.
16 Q. (Mr. Moeller) Okay.
17      MR. WOODRUFF: You're asking did he or
18 did his attorney?
19      MR. MOELLER: I'll ask the court reporter
20 -- and unfortunately, I only have one copy --
21      MR. WOODRUFF: I'll run copies.
22      (Thereupon, the document referred to was
23 marked as Exhibit No. 8)
24 Q. (Mr. Moeller) You have in front of you what
25 is marked as Exhibit 8, Mr. Jackson. If you'll turn to

## Page 110

1  page six -- of course, review very quickly pages one
2  through six -- is that a statement that you signed as
3  part of the approval process for the settlement?
4  A. (Witness reviewing document).
5  Q. In other words, on page six, is that your
6  signature?
7  A. That is my signature.
8  Q. Okay. Did you read pages one through six
9  before you signed page six?
10 A. Yes, sir.
11 Q. Okay. And statements made in pages one
12 through six, are they true and correct?
13      MR. WOODRUFF: You need to -- you have a
14 right to go back and read pages one through six before
15 you answer that question. Take your time and read
16 pages one through six and then answer the question.
17 A. (Witness reviewing document).
18 Q. (Mr. Moeller) Mr. Jackson, now that you've
19 had an opportunity to review pages one through six
20 including the signature page that you signed, are the
21 statements that you made and the, of course, statement
22 that you signed true and correct?
23 A. I believe them to be. Yes, sir.
24      MR. MOELLER: Give me just a minute.
25      (After a recess, the deposition continued

## Page 111

1  as follows:)
2  Q. (Mr. Moeller) Okay. Mr. Jackson, just one or
3  two final questions. Are there any other facts that
4  you know of that support your complaint and your claims
5  in this case that we have not covered today?
6  A. Not that I can think of. No, sir.
7      MR. MOELLER: Well, of course, I believe
8  there's going to be redirect, but otherwise, we reserve
9  the right to reopen the deposition if additional facts
10 come forward; otherwise, this deposition for our
11 purposes is concluded.
12      MR. WOODRUFF: We object to that, to you
13 reopening the deposition. Only get one bite at the
14 apple, but anyways, we'll fight that out with the judge
15 later if it comes up. Let me just follow-up.
16
17      EXAMINATION
18 BY MR. WOODRUFF:
19 Q. Mr. Jackson, did you do an unemployment
20 hearing around March 11th, 2016, little over a year
21 ago? Do you recall doing that?
22 A. I don't recall.
23 Q. A phone hearing with a -- concerning your
24 unemployment?
25 A. I recall a phone hearing. Yes, sir.

## Page 112

1  Q. Okay. It was by phone and I believe -- is it
2  your recollection that no representative for -- for the
3  Defendant testified at that hearing?
4  A. Yes, sir. I do recall that.
5  Q. Did you understand you were testifying under
6  oath at that time?
7  A. Yes, sir.
8  Q. And did you testify honestly?
9  A. Yes, sir.
10 Q. And after that, you were awarded your
11 unemployment; is that correct?
12 A. That's correct.
13 Q. Now you've talked a lot about this chemical
14 platform and -- this job area, does it have a
15 particular name or station? What do they call that
16 area?
17 A. Well, that was -- that was the name that was
18 given.
19 Q. What was it called?
20 A. Chemical platform. That's all I ever heard it
21 called.
22 Q. And you heard Mr. Moeller talk about the dust.
23 Was it the dust that was causing your problem or was it
24 the chemicals in the dust that was causing your
25 problem?

Deposition of Benny Jackson, taken May 10, 2017

---

**Page 113**

1   A. It was the chemicals in the dust.
2   Q. And is that your understanding of what the --
3   your physician stated that -- did he ever say it was
4   the chemicals he thought was causing the problems?
5   A. Well, that's what he stated to me, but I think
6   he actually noted that it was dust and I think that was
7   a fairly ambiguous --
8   Q. I understand, but there's also things in there
9   where he talks about chemicals in the dust.
10  A. Yes, sir. He was aware -- I made him aware
11  that it was chemicals and not the dust and that's --
12  that was his assertion.
13  Q. So if I was going to identify this area to
14  another employee, what -- would I call it the chemical
15  platform?
16  A. Yes, sir.
17  Q. Okay.
18  A. They would know where you was talking about.
19  Q. And to -- from your experience working there,
20  was that the -- the place that was hardest for you to
21  work because of the chemicals?
22  A. Health wise?
23  Q. Yes.
24  A. Yes, sir.
25  Q. Now Mr. Moeller asked you some questions about

---

**Page 114**

1   disability in regard to a form you filled out for
2   unemployment. Are you an attorney?
3   A. No, sir.
4   Q. Do you understand what the -- what the
5   standard is for a disability pursuant to an
6   unemployment claim?
7   A. No, sir.
8   Q. Do you understand what the legal standard is
9   for a disability in regard to a Social Security
10  disability claim?
11  A. No.
12  Q. Do you know what the legal standard is for --
13  for a disability for an Americans with Disability Act
14  claim?
15  A. No.
16  Q. Could you have done the job either as a
17  shipping clerk or a forklift driver in that plant?
18  A. I feel like I could have.
19  Q. Could you do the job on the chemical platform?
20  A. No, sir.
21  Q. And you talked about discussions you had, I
22  believe, with Rhonda Barnes about wanting to work as a
23  forklift operator; is that correct?
24  A. (Witness nods head up and down.)
25  Q. That's yes?

---

**Page 115**

1   A. Yes. I'm sorry.
2   Q. Did anyone ever notify you when there was a
3   forklift operator position open?
4   A. No, sir.
5   Q. Did anybody ever notify you when there was
6   either a shipping clerk or a forklift driver position
7   open?
8   A. Yes, sir.
9   Q. I'm sorry?
10  A. Yes, sir.
11  Q. And which one was that?
12  A. That was the shipping clerk.
13  Q. Would you -- did you offer to take that job?
14  A. Yes, sir.
15  Q. And did they offer that job to you?
16  A. Did not offer it to me, no, sir. Just -- I
17  believe her comment was, I don't see how you could take
18  that big a pay cut.
19  Q. Would you have taken that big of a pay cut in
20  order to continue to work there?
21  A. Well, I didn't know exactly how big of a pay
22  cut it would be. I just told her that I would be
23  willing to take a significant pay cut if it meant me
24  still being able to work and keep my benefits and I
25  think I -- I think she asked me how big of a pay cut

---

**Page 116**

1   and I think I told her, you know, maybe three, $4 an
2   hour. I think I was making 16 -- little over $16 an
3   hour at the time, but in order to continue to work and
4   keep my benefits, yeah, you know, that would have been
5   a viable option.
6   Q. Would you have retired in July of 2015 if they
7   would have offered you a job as either a forklift
8   driver or in the shipping department?
9   A. No.
10      MR. WOODRUFF: That's all I got.
11
12          EXAMINATION
13  BY MR. MOELLER:
14  Q. Mr. Jackson, you just testified about a
15  possible shipping clerk job.
16  A. Yes, sir.
17  Q. Okay. As you previously testified, you were
18  out on FMLA leave until July 15, 2015.
19  A. That's correct.
20  Q. So you weren't available for work. Do you
21  have any evidence, any knowledge of an open shipping
22  clerk job as of July 15, 2015?
23  A. No, sir. I don't know if that job had been
24  filled or not, that particular job.
25  Q. And I think we previously covered you don't

---

Deposition of Benny Jackson, taken May 10, 2017

30



**Page 117**

1  have any knowledge of a forklift job being open on
2  July 15, 2015.
3      A.  Not specific job.  No, sir.
4      Q.  Okay.  With regard to this -- your testimony
5  on redirect, based upon the questions of your Counsel
6  in talking about dust versus chemicals, you do recall
7  that your doctor, Dr. Wilons, filled out the FMLA form,
8  correct?
9      A.  Uh-huh (indicating yes).
10     Q.  And I show you once again Exhibit 1.  The
11  third page under number four, does he talk specifically
12  about avoiding exposure to dust?
13     A.  Yes, sir.
14     Q.  And the word "chemicals" is not used, is it?
15     A.  No, sir.
16        MR. MOELLER:  No further questions.
17
18             EXAMINATION
19  BY MR. WOODRUFF:
20     Q.  Let me show you part of these medical records
21  that were produced to Defendant in discovery, Bates
22  stamped JBJ358.  I'll get a copy of this so we can make
23  it Exhibit Number 9.  And does it say what the
24  encounter date is here?
25     A.  July 15, 2015.

**Page 118**

1      Q.  And can you tell me what the impression is,
2  just read that first sentence, please.
3      A.  Persistent respiratory infection with complete
4  clearance and resolution after removal from the work
5  environment where he has exposure to dust and
6  chemicals.  He has resolved his issues.
7        MR. WOODRUFF:  Thank you.  Anything else?
8        MR. MOELLER:  I have no further
9  questions.  Just make that an exhibit and I think we're
10  done.
11          (Thereupon, the document referred to was
12  marked as Exhibit No. 9)
13          (Whereupon, the deposition was concluded
14  at 3:17 p.m.)
15
16
17
18
19
20
21
22
23
24
25

**Page 119**

1            C E R T I F I C A T E
2
3  STATE OF MISSISSIPPI )
4  COUNTY OF CHICKASAW  )
5  RE: ORAL DEPOSITION OF BENNY JACKSON
6
7      I, Kathryn H. Boyer, CSR #1349, a Notary Public within
8  and for the aforesaid county and state, duly commissioned and
9  acting, hereby certify that the foregoing proceedings were
10  taken before me at the time and place set forth above; that
11  the statements were written by me in machine shorthand; that
12  the statements were thereafter transcribed by me, or under my
13  direct supervision, by means of computer-aided transcription,
14  constituting a true and correct transcription of the
15  proceedings; and that the witness was by me duly sworn to
16  testify to the truth and nothing but the truth in this cause.
17      I further certify that I am not a relative or employee
18  of any of the parties, or of counsel, nor am I financially or
19  otherwise interested in the outcome of this action.
20      Witness my hand and seal on this 3rd day of June,
21  2017.
22
23                              _____
                                CSR #1349
24  My Commission Expires:      Notary Public
    June 25, 2019
25

**Page 120**

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2                   OXFORD DIVISION
3
4  JAMES BENNY JACKSON                    PLAINTIFF
   VS.            NO. 3:16CV189-DMB-RP
5
6  OIL-DRI CORPORATION OF AMERICA AND
   BLUE MOUNTAIN PRODUCTION COMPANY         DEFENDANTS
7
8              CERTIFICATE
9      I, Benny Jackson, have read the foregoing pages, 1-119,
10  of the transcript of my deposition given on May 10, 2017, and
11  it is true, correct and complete to the best of my knowledge,
12  recollection and belief except for the list of corrections, if
13  any, attached on a separate sheet herewith.  Witness my hand,
14  this the _____ day of _____, 2017.
15
16
17                    _____
                       Benny Jackson
18
19             CERTIFICATE
20  Subscribed and sworn to before me, this the
    _____ day of _____, 2017.
21
22
                    _____
23                  Notary Public in and for the
                    County of _____,
24  My Commission              State of Mississippi
    Expires: _____
25

**ADVANCED COURT REPORTING**
**662-690-1500**