Deposition of Rhonda Barnes, taken May 11, 2017

1

## Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2              OXFORD DIVISION
 3
      JAMES BENNY JACKSON          PLAINTIFF
 4
      VS.        NO. 3:16CV189-DMB-RP
 5
      OIL-DRI CORPORATION OF AMERICA AND
 6    BLUE MOUNTAIN PRODUCTION COMPANY    DEFENDANTS
 7
 8
 9    ********************************************************
10
11         DEPOSITION OF RHONDA BARNES
12    ********************************************************
13
14
15       TAKEN AT THE INSTANCE OF THE PLAINTIFF
         IN THE TIPPAH COUNTY CHANCERY COURT
16    207 NORTH COMMERCE STREET, RIPLEY, MISSISSIPPI
         ON MAY 11, 2017, BEGINNING AT 1:00 P.M.
17
18
19        APPEARANCES NOTED HEREIN
20
21
22    Reported by: KATHRYN H. BOYER, CSR #1349
23
              ADVANCED COURT REPORTING
24              P.O. BOX 761
              TUPELO, MS 38802-0761
25              (662) 690-1500
```

## Page 2

```
 1    APPEARANCES:
 2    For the Plaintiff:   RON L. WOODRUFF, Esquire
                           Waide & Associates
 3                         P.O. Box 1357
                           Tupelo, MS 38802-1357
 4                         (662) 842-7324
 5
      For the Defendants:  ASHLEY E. CANNADY, Esquire
 6                         Balch & Bingham
                           P.O. Box 22587
 7                         Jackson, MS 39225-2587
                           (601) 965-8180
 8
 9    Also Present:        Benny Jackson, Amanda Hill
10
```

## Page 3

```
 1               TABLE OF CONTENTS
 2
 3    WITNESS                              PAGE
      RHONDA BARNES
 4    Examination by Ron Woodruff          4
 5
      EXHIBITS
 6    (No Exhibits)
```

## Page 4

```
 1         RHONDA BARNES, after being duly sworn,
 2    testified as follows:
 3
 4              EXAMINATION
 5    BY MR. WOODRUFF:
 6       Q.  Please state your full name for the record.
 7       A.  Rhonda Kay Barnes.
 8       Q.  Ms. Barnes, where are you currently employed?
 9       A.  Oil-Dri Production and Blue Mountain
10    Production.
11       Q.  And what is your position?
12       A.  HR coordinator.
13       Q.  And are you the coordinator for both
14    facilities?
15       A.  Yes, sir.
16       Q.  Do you have an office in both facilities?
17       A.  Yes, sir.
18       Q.  I'm sorry. Tell me again what your official
19    title is.
20       A.  HR coordinator.
21       Q.  As HR coordinator, what do you do?
22       A.  New hires, termination paperwork, benefit
23    paperwork, that type stuff.
24       Q.  Who is your -- who do you report to?
25       A.  Amanda Hill.
```





Deposition of Rhonda Barnes, taken May 11, 2017

2

Page 5

1  Q. How long have you had your current position?
2  A. Almost four years.
3  Q. So you would have had that position when
4  Ms. Hill became the regional?
5  A. That's when I moved into the position whenever
6  our other guy retired.
7  Q. And the other guy's name was?
8  A. Howell Duncan.
9  Q. How do you spell that?
10 A. Duncan, D-U-N-C-A-N.
11 Q. I knew that.
12 A. Howell.
13 Q. Oh. Powell?
14 A. Howell, H-O-W-E-L-L.
15 Q. Are you involved with the -- handling FMLA
16 leave?
17 A. Yes, sir.
18 Q. When someone requests FMLA leave, are you the
19 person who takes care of it for the company?
20 A. For our locations.
21 Q. Right.
22 A. Yes, sir.
23 Q. I imagine you ain't taking care of it for
24 Texas --
25 A. No.

Page 6

1  Q. -- but for the two facilities in North
2  Mississippi --
3  A. Yes, sir.
4  Q. Does Ms. Hill review the documentation too or
5  you just totally take care of it?
6  A. Everything I process, I let her know.
7  Q. You let her know or do you show --
8  A. Forward it to her.
9  Q. You forward it to her, the documentation.
10 A. Once we get it.
11 Q. Gotcha. So let me show you Exhibit Number 1.
12 Take whatever time you need to look at this
13 documentation and let me know when you're ready.
14 A. (Witness reviewing document). Okay.
15 Q. Do you recognize this document?
16 A. Yes, sir.
17 Q. And it looks like you would send the
18 documentation you filled out to the doctor by fax in
19 this case?
20 A. I only send it by fax if it's requested by the
21 employee to do so.
22 Q. Okay. And it says, from -- to Dr. Wilons'
23 office concerning Benny Jackson. Please complete and
24 fax back. Looks like it was completed, faxed back to
25 you.

Page 7

1  A. (Witness nods head up and down).
2  Q. Is that yes? Yes?
3  A. Yes.
4  Q. All right. Now the second -- the last two
5  pages -- this is actually a different documentation,
6  isn't it?
7  A. That's rights and responsibilities.
8  Q. I'm sorry?
9  A. Rights and responsibilities under the FMLA
10 policy.
11 Q. And is this something you would fill out?
12 A. I fill out the information so the employee
13 knows his rights or her rights and responsibilities.
14 Q. And this is notifying that their request for
15 FMLA leave has been --
16 A. Approved or denied, one or the other. Yes.
17 Q. Do you know why he was taking FMLA leave? Why
18 Mr. Jackson was requesting FMLA leave?
19 A. Yes, sir. It was stated in that form there he
20 was having bronchial spasm problems.
21 Q. Did you have any conversation with Mr. Jackson
22 about the issues he was having that prompted him to
23 request his FMLA leave?
24 A. Yes. He came to me and asked me what his
25 options were. He was having some medical issues and I

Page 8

1  advised him of what we had and then what he was
2  eligible for, could apply for.
3  Q. Did he tell you his work environment was
4  causing problems for his health?
5  A. He told me he wasn't sure.
6  Q. Did he say he thought that was what's causing
7  his problems?
8  A. He told me he wasn't sure.
9  Q. He just said -- did you ask him, what's
10 causing your problems?
11 A. He just said he was having problems. He
12 wasn't sure what was causing it.
13 Q. Okay. Did you have any discussion -- and I'm
14 talking about in April -- around April when he was
15 asking for FMLA leave, any discussion about him moving
16 to another position?
17 A. He asked about positions that we had open and
18 if there were positions open, I would have told him
19 that he could apply.
20 Q. And you recall him asking about other
21 positions that were open.
22 A. At one point during his -- either preparing
23 for leave or on leave, yes, sir.
24 Q. Did you discuss an opening -- a potential
25 opening as a -- in the shipping department?

Deposition of Rhonda Barnes, taken May 11, 2017

3

### Page 9

1  A. Yes, sir.
2  Q. And my understanding is they were adding a
3  couple new positions in the shipping department?
4  A. Correct.
5  Q. Do you recall telling him that he wouldn't
6  want that because it would be a cut in pay?
7  A. I never told him he wouldn't want it. I don't
8  know what he would want. I told him what we would
9  have.
10 Q. Did you tell him it would be a cut in pay?
11 A. It would be a cut in pay.
12 Q. My question is: Did you tell him it would be
13 a cut in pay?
14 A. I told him it was a different job grade.
15 Q. Okay. And it would be -- it would pay less
16 money?
17 A. Each grade that's below where you're at,
18 that's just -- yes, pays less money.
19 Q. Okay.
20 A. I don't recall telling him or advising him
21 anything any different. It'll be posted.
22 Q. What efforts did you take in April of 2015 to
23 accommodate his disability?
24         MS. CANNADY: Objection. You can answer.
25 A. I gave him his FMLA paperwork and his

### Page 10

1  short-term disability paperwork. That's what he
2  requested.
3  Q. (Mr. Woodruff) Anything else?
4  A. That's what he requested.
5  Q. Well, he was asking you also about
6  transferring to another position, wasn't he?
7  A. Not while he was currently working.
8  Q. Well, what -- after he asked you about
9  transferring to other positions, what effort did you
10 make to accommodate transferring him to another
11 position?
12         MS. CANNADY: Objection. You can answer.
13 A. You're asking me -- he was on leave. He
14 wasn't currently working.
15 Q. (Mr. Woodruff) Let's break it down. Before
16 his FMLA started -- I believe it was around April 23rd,
17 right around there -- did you have any discussions with
18 him about -- did he ask you about transferring to
19 another position?
20 A. He never asked for a transfer, no, sir.
21 Q. My question is: Did he ask you about
22 transferring to another position?
23 A. He never asked for a transfer. If we had an
24 open job --
25 Q. Ma'am --

### Page 11

1  A. -- he would have had opportunity to --
2  Q. Ma'am, that was not my question. Let me
3  repeat it one more time. I didn't say, did he ask you
4  for a transfer. My question was: Did he ask you about
5  transferring --
6  A. No.
7  Q. -- to -- so your testimony here under oath,
8  that he never had any discussion with you before he
9  went out on leave about transferring to another
10 position.
11 A. I don't recall him asking me about
12 transferring to any other open position.
13 Q. And during the time he was out on leave, did
14 you have any discussion with him about potentially
15 transferring to another position?
16 A. I don't recall that. Anything while he was on
17 leave discussing coming back to work was our concern.
18 Q. I thought you just said -- I thought you just
19 testified a few minutes ago that you discussed moving
20 to the shipping clerk position.
21 A. The shipping clerk position was the only thing
22 we talked about that we had open. That's it.
23 Q. Okay. Did you -- did he ever mention that
24 he -- about --
25 A. I thought we had that clear. Sorry.

### Page 12

1  Q. Did -- well, what I didn't understand was
2  when. I was trying to understand when you had that
3  discussion with -- was that discussion prior to him
4  going on leave or while he was out on leave?
5  A. When he came to me with a medical condition,
6  his concern was leave.
7  Q. Gotcha. When did you have the discussion
8  about the shipping clerk position?
9  A. I don't recall a specific date.
10 Q. Would it --
11 A. It would have been in the time frame that we
12 had those job openings. A specific date, I don't know.
13 Q. Would it have been before he'd gone on leave?
14 A. I don't recall a specific date.
15 Q. All right. Did you ever have any discussions
16 with him about moving to a forklift driver position?
17 A. We didn't have any forklift driver positions
18 open.
19 Q. I understand. My question, though, is: Did
20 you have any conversation with Mr. Jackson about moving
21 to a forklift position?
22 A. If we would have had a conversation -- I don't
23 recall that exact conversation, but if we would have
24 had a conversation, we just had a conversation about
25 what we -- what jobs we had open.

Deposition of Rhonda Barnes, taken May 11, 2017

4

Page 13

1  Q. Okay. So you don't recall whether or not --
2  A. I can't move someone where there's not a job.
3  Q. I understand, ma'am. I'm asking you very
4  specific questions about conversations and I'm just
5  trying to get your testimony under oath because --
6  A. Yeah.
7  Q. -- Mr. Jackson's testified under oath about
8  conversations, so I want to know pretty much whether or
9  not you are going to admit you had those conversations
10 or basically claim that those conversations didn't
11 exist.
12      MS. CANNADY: Objection, but if you can
13 answer.
14 Q. (Mr. Woodruff) That wasn't a question. That
15 was explaining the process because we seem to be, like,
16 butting heads here and not getting too much done, so
17 let's see -- let me try it again. Did you have a
18 conversation with Mr. Jackson -- do you recall having a
19 specific conversation with Mr. Jackson about
20 transferring to a forklift driving job?
21 A. I do not recall that.
22 Q. Fair enough. Do you recall any other
23 conversations you had with him while he was out on
24 leave?
25 A. We had conversations while he was on leave.

Page 14

1  Q. How many conversations did you have?
2  A. A specific number, I couldn't tell you.
3  Anytime someone's on leave, I try to touch base with
4  them as often as possible and I ask, as you will see in
5  the paperwork, anytime you go to the doctor, I have to
6  have documentation to support the continuation of your
7  leave.
8  Q. And so, you -- would these conversations be in
9  person or by phone?
10 A. Both.
11 Q. With Mr. Jackson, were they in person or by
12 phone?
13 A. Both.
14 Q. All right. Tell me what you recall about any
15 of those conversations you had with him while he was
16 out on leave.
17 A. We would just discuss how he was doing and
18 what his plans were.
19 Q. And what, if anything, did he tell you about
20 what his plans were and how he was doing?
21 A. He was uncertain until a specific date.
22 Q. During that period of time, did he ever tell
23 you that the doctor said he can't go back and work at
24 that same work area that he was working in?
25 A. I don't recall that conversation.

Page 15

1  Q. Let me show you what's been introduced as
2  Exhibit Number 2. Have you ever seen this document
3  here?
4  A. Yes, sir.
5  Q. Had you ever heard about a rule whereby you
6  could not transfer to a lateral position? You could
7  only put in a bid for a promotion position.
8  A. We follow what our policies are.
9  Q. Ma'am, my question is: Have you ever heard
10 about Oil-Dri having a policy that you could only apply
11 for a lateral position and -- you could not apply for a
12 lateral position. You could only put in a bid for a
13 promotion position.
14 A. Okay. To clarify, you can bid on anything you
15 want regardless of whether it's lateral, up, down. You
16 can bid on anything you want. That's your right as an
17 employee.
18 Q. Even a demotion.
19 A. You can bid on anything you want.
20 Q. You don't have to get permission from the
21 plant manager; is that correct?
22 A. To bid, you can bid on anything you want.
23 Q. All right. And you said that Mr. Jackson had
24 to keep you informed of his visits to the doctor when
25 he was gone.

Page 16

1  A. Correct. Per paperwork. That's stated in
2  FMLA paperwork.
3  Q. All right. And let me show you what's part of
4  the medical records from Dr. Wilons about his visit on
5  7-15. Do you recall receiving that regarding
6  Mr. Jackson?
7  A. (Witness reviewing document). Yes, sir. We
8  received a documentation stating that he did go to the
9  doctor that day. Whether this is the exact form -- I
10 mean, we're talking two years ago, so I mean -- but I
11 remember seeing a form to release him from his doctor
12 stating he could come back to work.
13 Q. This is a document provided by Dr. Wilons with
14 a certification of authenticity from his office.
15 A. Uh-huh (indicating yes).
16 Q. Do you have any reason to doubt this is an
17 authentic document?
18 A. No, sir.
19 Q. Okay. And do you see it talks about dust and
20 chemicals in there?
21 A. I see that.
22 Q. Okay. And going back to the request for FMLA
23 leave, Dr. Wilons does talk about being chronic
24 congestive; is that correct? Does he use the term
25 "chronic"?

Deposition of Rhonda Barnes, taken May 11, 2017

5

Page 17

1  A. That's what the doctor used. I'm not a
2  doctor. I can't say anything. I just know what the
3  doctor's got on the FMLA papers. We granted him his
4  leave. What's the issue?
5  Q. The issue is I'm doing a deposition, ma'am,
6  and I'm asking you questions under oath and I expect
7  you to answer them.
8  A. I did, but I mean, I'm telling you it's right
9  there. You know what the doctor wrote. I'm not a
10 doctor.
11 Q. You just trying to be a smart ass or what?
12 A. No. I'm just telling you it's right there.
13 Q. I understand what's there. It's called making
14 a record. If you go to law school, you'll understand
15 what I'm doing.
16 A. Okay. If you work in my department, you'll
17 understand what I'm doing.
18 Q. I don't know what you do --
19 A. Okay.
20 Q. -- because I don't work in your department.
21 A. Okay. And I'm not a lawyer, so there we go.
22 Q. There we go. So we'll see if we can get
23 through this. And it says: He needs to be removed
24 from his work environment to avoid exposure to dust,
25 doesn't it?

Page 18

1  A. And he was. He took leave.
2  Q. I'm just asking -- the question, ma'am, is:
3  Is that what that says?
4  A. That's what it says.
5  Q. And you read this before you approved his FMLA
6  leave; is that correct? You reviewed this document
7  before you did --
8  A. Here's the thing. The document states --
9  Q. Ma'am, answer my question yes or no. Did --
10 A. Can I review these documents?
11 Q. Take whatever time you need.
12 A. Okay.
13 Q. But then you need to answer my question.
14 A. I will answer your question, but I gotta see
15 when I gave him his paperwork. Okay? Because as an
16 employee, a full-time employee, you have the right to
17 FMLA. We have to have paperwork after that date. On
18 4-27, he came to me informing me that he needed leave
19 beginning on 4-27. No. I did not receive those papers
20 on 4-27. I received them afterwards. You have a
21 certain amount of time to get them back to us.
22 Q. And you did receive this and you did read
23 this; is that correct?
24 A. Yes.
25 Q. So you knew that his doctor had -- wanted him

Page 19

1  to be removed from his work environment to avoid
2  exposure to dust.
3  A. Yes.
4  Q. And whatever time you got these documents
5  back, which is -- the doctor's dated 5-8, so we know
6  it'd be sometime after 5-8; is that correct?
7  A. Correct.
8  Q. Was Mr. Jackson qualified to be a forklift
9  driver?
10 A. I don't do qualification tests. All I can
11 tell you is the job he did. That's it. I'm not the
12 one that qualifies him for a forklift test.
13 Q. Does a person have to be qualified to be a
14 forklift driver?
15 A. Every job that we have has requirement
16 specifications.
17 Q. Who makes the decision whether he would be
18 qualified to be a forklift driver?
19 A. You would have to apply -- I mean, you would
20 have to do whatever's required for that specific job
21 and it would be the supervisor in that area.
22 Q. Okay. And who was the supervisor over the
23 forklift drivers between April of 2015 and July of
24 2015?
25 A. I'm not certain, but I think it was Charles

Page 20

1  Davis.
2  Q. Were you -- were you aware of whether or not
3  Mr. Jackson drove a -- had to be able to drive a
4  forklift in order to be a lab technician?
5  A. No, sir.
6  Q. Have you ever looked at the lab technician job
7  description?
8  A. Yes, sir.
9  Q. And can you tell me what it says for number
10 2.15.
11 A. Okay.
12 Q. Can you tell me what it says.
13 A. Retrieve additives from warehouse with
14 forklift.
15 Q. Do you agree that it's part of his job
16 description as a lab technician to --
17 A. It's part of a lab technician's job to --
18 Q. Let me finish --
19 A. -- drive a forklift according to that.
20 Q. Let me finish my question, please. Would you
21 agree that part of his job description is he has to be
22 able to drive a forklift?
23 A. That's part of the job specifications.
24 Q. Let me show you Exhibit Number 11. Who puts
25 out these job -- are you involved in putting out these

Deposition of Rhonda Barnes, taken May 11, 2017

6

### Page 21

1 job bid forms?
2  A. Yes, sir.
3  Q. Are you the person who does that or is it
4 someone else?
5  A. It's either Amanda Hill or myself. It's HR.
6 It's an HR function.
7  Q. So it'd be one -- either one of you two?
8  A. Yes, sir.
9  Q. Do you know whether or not this first page,
10 which is JBJ52, whether or not it was you or Ms. Hill
11 that put that out?
12  A. I can't recall. That was over two years ago.
13 It's an HR function. One of us put it out. That's all
14 I know.
15  Q. And this is for -- there's two different jobs
16 here. One is for a daytime, one's for a nighttime
17 shipping/receiving clerk; is that correct?
18  A. That's correct.
19  Q. Do you recall when -- according to discovery
20 responses, Kristen Knight was hired for the day shift
21 and Sheena (phonetic) Echols was hired for the night
22 shift. Do you know when they were hired?
23  A. Specific hire dates, no, sir.
24  MR. WOODRUFF: All right. We're going to
25 request that in discovery. You didn't put that in the

### Page 22

1 discovery responses.
2  Q. (Mr. Woodruff) Would you agree that this bid
3 was put out on April 16th, 2015?
4  A. Yes, sir.
5  Q. How long is the process generally for a --
6 from the time a job is bid out before people are
7 interviewed and someone selected? How long's this
8 process generally take?
9  A. We have a process and we follow our process.
10  Q. My question is: How long does the process
11 generally --
12  A. Can I refer to a document that you gave me on
13 a transfer job posting?
14  Q. Sure. Is that Number 2? You can look at any
15 document that would help refresh your recollection.
16  A. And as it states here in 6-1: Under normal
17 circumstances, job postings will be posted for a
18 minimum of four working days. The process would have
19 been followed.
20  Q. Okay. And wouldn't you agree that these were
21 posted within a few -- within two weeks of Mr. Jackson
22 requesting FMLA leave?
23  A. Yes, sir, because the date on his paperwork
24 was 4-27. What's -- can I ask a question? No?
25  Q. Unless it's about the process --

### Page 23

1  A. Okay.
2  Q. If it's about the process, I'll be happy to
3 answer your question, but if it's --
4  A. Why are we questioning this because --
5  MS. CANNADY: Let Mr. Woodruff ask the
6 questions.
7  A. Okay. All right. Okay. Sorry.
8  Q. (Mr. Woodruff) All right. Let me ask you
9 about -- according to responses in discovery,
10 interrogatories, Kristen Knight and Sheena (phonetic)
11 Echols were hired to be shipping/receiving clerks,
12 right?
13  A. Yes, sir.
14  Q. And we asked about any people hired -- hired
15 or transferred in to be forklift drivers and Justin
16 Tidwell was hired on July 15th. Cody Lansdale was
17 hired on July 30th. Jason Hall was hired on
18 October 1st.
19  A. Uh-huh (indicating yes).
20  Q. Zachary Pannell was hired on October 19th.
21 And Don Medlock, M-E-D-L-O-C-K, was hired on
22 December 15, 2015. Do you have any reason to doubt
23 that?
24  A. No, sir.
25  Q. So was Mr. Jackson ever notified that -- about

### Page 24

1 these forklift postings?
2  A. Mr. Jackson retired on July 15th.
3  Q. My question was: Was he ever notified about
4 these forklift postings?
5  MS. CANNADY: Objection. You can answer
6 if you know.
7  Q. (Mr. Woodruff) I know when he retired. I've
8 got the documentation. I'm asking you --
9  A. I don't recall.
10  Q. All right. So you don't recall. You think
11 you might have notified him if there was --
12  A. I don't recall. That's my answer.
13  Q. All right. And you understand you're under
14 oath, right?
15  A. I know I'm under oath. Yes, sir.
16  Q. And if you say you don't recall when you do
17 recall, that would be perjury.
18  A. I don't recall or I would not say, I don't
19 recall.
20  MS. CANNADY: Ron, she's already answered
21 that for you twice and she took the oath. There's no
22 indication that she's not being truthful.
23  MR. WOODRUFF: None at all.
24  Q. (Mr. Woodruff) All right. What did you do to
25 engage in the interactive process to try to find

Deposition of Rhonda Barnes, taken May 11, 2017

7

### Page 25

1  Mr. Jackson a position at the Oil-Dri plant in Blue
2  Mountain?
3  A. I did everything from his leave that he asked
4  me to do.
5  Q. All right. My question is: Did you make any
6  effort whatsoever to have conversations with him about
7  jobs he could perform at the plant?
8  A. When an employee is on leave, they're on
9  leave.
10  Q. How many times you want me to ask the
11  question?
12  A. How many times you want me to answer it? When
13  somebody's on leave, I can't offer them a job. They're
14  on leave.
15  Q. I want -- I didn't ask you about offering a
16  job. My question --
17  A. That's what you asked me. What accommodations
18  did I make to give him a job? He was on leave.
19  Q. Are you done?
20  A. I'm done.
21  Q. My question was -- and I'll say it very slow.
22  What efforts did you make to engage in an interactive
23  process between you and Mr. Jackson to attempt to find
24  him a job he could do at the factory?
25  A. Mr. Jackson didn't ask me for another job. He

### Page 26

1  asked to retire.
2  Q. Yes or no, did you engage in any interactive
3  process with Mr. Jackson in order to try to find him a
4  job in the factory?
5  MS. CANNADY: I'm going to object. She's
6  answered your question.
7  MR. WOODRUFF: No. She didn't answer the
8  question.
9  MS. CANNADY: Yes, she did.
10  MR. WOODRUFF: She --
11  MS. CANNADY: The interactive process, as
12  you know, can involve a lot of things. She told you
13  what she did.
14  Q. (Mr. Woodruff) All right. Is that all you
15  did was not offer him a job?
16  A. I did not say that.
17  Q. All right. Well, your testimony will speak
18  for itself. Other than what you've already testified,
19  did you do anything else to engage in the interactive
20  process in order to try to find Mr. Jackson a job at
21  the factory?
22  MS. CANNADY: Same objection.
23  Q. (Mr. Woodruff) You can answer.
24  MS. CANNADY: Answer if you can.
25  A. I can't recall.

### Page 27

1  Q. (Mr. Woodruff) All right. Fair enough. Do
2  you recall having a conversation with Mr. Jackson on or
3  about July 15, 2015?
4  A. Yes, sir.
5  Q. Was it by phone or in person?
6  A. By phone.
7  Q. And tell me what you recall about that
8  conversation.
9  A. He called me and told me he was leaving his
10  doctor. He was fully released and that he wanted to
11  retire.
12  Q. He told you he wanted to retire?
13  A. Yes.
14  Q. Did he ever tell you that he couldn't go back
15  to work and his doctor would not release him to go back
16  to his position that he was working at the time he
17  left?
18  A. He told me he was fully released, but he
19  wanted to retire.
20  Q. And any other -- anything else he told you at
21  that time?
22  A. I don't recall. That's all I recall from that
23  conversation.
24  Q. All right. Do you recall him ever telling you
25  he could not go back and work his job as a lab tech

### Page 28

1  because of his lung condition at anytime?
2  A. The last conversation that I had with him in
3  regards to his job was that he was fully released and
4  he wanted to retire. That's all I recall.
5  Q. So you don't recall whether or not at anytime
6  -- not the last conversation -- anytime did he ever
7  tell you his doctor said he couldn't go back and work
8  that position?
9  A. Besides the point where he took leave. But he
10  did say -- I do not recall the fact that he said he
11  could never do it. He just could not do it for awhile
12  based on the documents submitted under FMLA.
13  Q. Do you recall on July 15th telling him that
14  because he was 65 -- 62 and sick and 15 years fully
15  vested, he could retire with a pension?
16  A. No, sir.
17  Q. Did you have any discussion with him on or
18  about July 15th about him getting --
19  A. I told him he needed to come fill out an
20  application for retirement. As far as the pension, I
21  don't handle that.
22  Q. So you never suggested to him that he might
23  qualify for a pension?
24  A. I told him he could submit the application to
25  determine the pension process. It is a process. We

**Page 29**

1  give them an application to fill out. Corporate
2  calculates pension eligibility, not us.
3      Q. Would that be -- Exhibit 13 would be the
4  document he filled out?
5      A. That's correct.
6      Q. Exhibit 14 is the short-term disability claim.
7  Would you be the person for Oil-Dri that would handle
8  that?
9      A. Yes, sir.
10     Q. And it looks like this was filled out, signed
11 by Mr. Jackson on 5-5-15 and the last page is from the
12 doctor. Do you recall receiving this document
13 concerning his -- his request for short-term
14 disability?
15     A. Yes, sir. I received his short-term
16 disability documents.
17     Q. So you received this document here.
18     A. Yes, sir.
19     Q. And can you tell me what you think the doctor
20 said in this box right here (indicating).
21     A. I can't read the doctor's writing. I mean, I
22 can't tell you word for word what that says.
23     Q. Did you call the doctor and find out what he
24 said there if you couldn't read it?
25     A. That's not my job. Short-term disability is

**Page 30**

1  handled through an outside source. It's not my job to
2  determine their medical condition.
3      Q. Who handles that?
4      A. That company.
5      Q. Mutual of Ohama?
6      A. Yes, sir.
7      Q. And you did review this document when he
8  submitted the application before it went to Mutual of
9  Omaha?
10     A. Instructions on the form says: When document
11 is complete, the doctor sends it to them.
12     Q. Okay. So do you recall whether or not you
13 ever saw this page of this document here?
14     A. We request a copy for our file, for records,
15 but we don't determine their short-term disability
16 eligibility or denial.
17     Q. So you --
18     A. We do not determine that.
19     Q. But you did receive -- in fact, that's your
20 signature --
21     A. I sign it before I give it to the employee.
22     Q. Let me finish my question, please. That is
23 your signature; is that correct?
24     A. What's the date on the document?
25     Q. It has your name and it's 5-15-15.

**Page 31**

1      A. Okay. That's the date the document was faxed
2  back.
3      Q. 5-6, 2015.
4      A. That's when it was faxed to --
5      Q. There's a date up here, looks like a fax date
6  and it looks like it was faxed to Blue Mountain
7  Production.
8      A. Okay. Well, I --
9      Q. Is that the fax number for Blue Mountain
10 Production, 662-685-4386?
11     A. What I sign is what I'm stating. I'm not
12 signing to what the doctor states.
13     Q. Ma'am, my question is: Is that the fax number
14 for --
15     A. That's our fax number, but you asked me did I
16 sign this. I sign what I fill out. I don't sign what
17 the doctor does because I'm not a medical professional.
18 I sign that I'm stating here my correct title and what
19 he does. I'm not signing to what the doctor states.
20     Q. Would you agree that this was, according to
21 this document, faxed to Blue Mountain Production on
22 5-6, 2015, from the --
23     A. If that's what that says. If that's what it
24 says, it was faxed to us then.
25     Q. And if it was faxed to Blue Mountain

**Page 32**

1  Production, would you have received this?
2      A. Yes, sir.
3      Q. Would you have reviewed it once you received
4  it?
5      A. I would have put it in his file. Would have
6  reviewed and put it in his file.
7      Q. Do you recall any discussions in August of
8  2015 about whether or not Mr. Jackson was eligible for
9  early retirement pension?
10     A. Yes, sir.
11     Q. Have you ever seen this document here
12 (indicating)?
13     A. Yes, sir.
14     Q. And that was, in fact, sent to you; is that
15 correct?
16     A. Yes, sir.
17     Q. Did you have any conversations with Mr. Lange
18 about whether or not Benny Jackson qualified for early
19 retirement benefits?
20     A. When an application is processed, it's
21 forwarded to corporate. The only thing that we do is
22 the application. Corporate determines the benefits
23 side of it. Mr. Lange, as you see, sent this to me.
24     Q. My question --
25     A. He sent an e-mail.

Deposition of Rhonda Barnes, taken May 11, 2017

9

Page 33

1  Q. My question to you is --
2  A. That's his explanation to me.
3  Q. I understand. I can see the e-mail sent to
4  you. My question is: Did you have any conversation
5  with Mr. Lange about Mr. Jackson's request for early
6  retirement benefits?
7  A. We would have -- he sent me the e-mail. He
8  called me to say, I'm sending you the e-mail. I'm sure
9  -- I mean, I don't recall an exact conversation about
10 it, but I'm sure if he sent this to me, then --
11 Q. After he sent the e-mail, did you have any
12 conversations with Mr. Lange about early retirement
13 benefits?
14 A. I don't recall.
15 Q. Let me show you Exhibit Number 18. Do you
16 recognize this document?
17 A. (Witness reviewing document). Can I refer
18 back to this document?
19 Q. You can look at anything you need to to answer
20 these questions.
21 A. I received that document on the 26th. This
22 document is dated the 25th. Okay. Yes, sir.
23 Q. It's from you, right?
24 A. Right.
25 Q. And it's to --

Page 34

1  A. Mr. Benny.
2  Q. Benny Jackson.
3  A. Yes, sir.
4  Q. And tell me, what was the purpose of this
5  document?
6  A. I have to submit an article to the newsletter
7  about your retirement. When an employee retires, we
8  put an article in our corporate newsletter along with
9  their photo and their plans for retirement.
10 Q. Would that be for any --
11 A. That would be for any person retiring that
12 wishes to have it submitted.
13 Q. Do they have a choice of whether they want it
14 submitted or not?
15 A. They can say they don't want it.
16 Q. Do you recall whether you received an answer
17 from Mr. Jackson on that?
18 A. I don't recall.
19 Q. Exhibit Number 19, have you ever seen this
20 document before?
21 A. Can I say something? Can I, like, scratch
22 that and -- I did talk to him about it because he was
23 supportive of it. He actually allowed us to take a
24 picture and do an article.
25 Q. Do you recall whether it was submitted?

Page 35

1  A. The article was -- I'm almost certain was in
2  the newsletter. Like I said, I'm sorry, it was two
3  years ago. I can't really remember, but I remember us
4  taking a picture and submitting it.
5  Q. That's why we depose people because a lot of
6  times when we depose them, it's several -- may be a
7  couple of years after the facts and I just want to know
8  what you can testify as you're sitting here today
9  because we'll assume that that's what you'll testify to
10 at trial if we call you at trial.
11 A. Okay.
12 Q. I understand that nobody's got perfect memory.
13 I just want to know what you know as you're sitting
14 here today.
15 A. Okay.
16 Q. Have you ever seen this document here before,
17 Ms. Barnes?
18 A. Yes, sir. I do recall seeing that.
19 Q. Okay. Show you what's been introduced as
20 Exhibit Number 20, a meeting between Ms. Hill and Ron
21 Parks on, I believe, 9-23-15. Were you involved in
22 that meeting?
23 A. No, sir.
24 Q. Did you ever have any discussions with
25 Ms. Hill or Mr. Parks about what was discussed in that

Page 36

1  meeting?
2  A. I was not involved in that meeting.
3  Q. My question is: Did you have any
4  conversations with Ms. Hill or Ms. -- Ms. Hill or
5  Mr. Parks about what was discussed in that meeting?
6  A. No, sir. Amanda -- well, let me rephrase it.
7  Amanda told me they were meeting with him and that he
8  was getting back to them. That's all I knew.
9  Q. That he was getting -- I didn't understand
10 what you said.
11 A. He would let them know his decision. He was
12 getting back to them.
13 Q. Gotcha. So that would have been after the
14 meeting.
15 A. That would have been -- she let me know prior
16 to the meeting that they were meeting because I do
17 report to her and we have that communication, but as
18 far as any facts in that, I don't know.
19 Q. Exhibit Number 21, have you ever seen this
20 document before?
21 A. I don't recall seeing this document, this
22 actual document.
23 Q. Were you aware -- did you have any
24 conversation --
25 A. I did know. She told me because I had to

Deposition of Rhonda Barnes, taken May 11, 2017

10

**Page 37**

1  process anything that we had to process on our end, but
2  at that point, he was already -- but she did let me
3  know. We work together. We're a team. So she did let
4  me know that he wasn't coming back.
5      Q. Gotcha. And that would have been after this
6  9-30 --
7      A. After her meeting. Yes, sir.
8          MR. WOODRUFF: Give us just a second.
9          (After a recess, the deposition continued
10 as follows:)
11         MR. WOODRUFF: Thank you, Ms. Barnes. I
12 have no other questions. I tender the witness.
13         MS. CANNADY: I have no questions.
14         (Whereupon, the deposition was concluded
15 at 1:44 p.m.)

**Page 38**

1           CERTIFICATE
2
3  STATE OF MISSISSIPPI )
4  COUNTY OF CHICKASAW )
5  RE: ORAL DEPOSITION OF RHONDA BARNES
6
7      I, Kathryn H. Boyer, CSR #1349, a Notary Public within
8  and for the aforesaid county and state, duly commissioned and
9  acting, hereby certify that the foregoing proceedings were
10 taken before me at the time and place set forth above; that
11 the statements were written by me in machine shorthand; that
12 the statements were thereafter transcribed by me, or under my
13 direct supervision, by means of computer-aided transcription,
14 constituting a true and correct transcription of the
15 proceedings; and that the witness was by me duly sworn to
16 testify to the truth and nothing but the truth in this cause.
17     I further certify that I am not a relative or employee
18 of any of the parties, or of counsel, nor am I financially or
19 otherwise interested in the outcome of this action.
20     Witness my hand and seal on this 3rd day of June,
21 2017.
22
23     _____
       My Commission Expires:   CSR #1349
24     June 25, 2019      Notary Public
25

**Page 39**

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2                    OXFORD DIVISION
3
   JAMES BENNY JACKSON                        PLAINTIFF
4
   VS.             NO. 3:16CV189-DMB-RP
5
   OIL-DRI CORPORATION OF AMERICA AND
6  BLUE MOUNTAIN PRODUCTION COMPANY           DEFENDANTS
7
8           CERTIFICATE
9      I, Rhonda Barnes, have read the foregoing pages, 1-38,
10 of the transcript of my deposition given on May 11, 2017, and
11 it is true, correct and complete to the best of my knowledge,
12 recollection and belief except for the list of corrections, if
13 any, attached on a separate sheet herewith. Witness my hand,
14 this the _____ day of _____, 2017.
15
16
17         _____
                  Rhonda Barnes
18
19          CERTIFICATE
20 Subscribed and sworn to before me, this the
       _____ day of _____, 2017.
21
22
           _____
23         Notary Public in and for the
           County of _____,
   My Commission       State of Mississippi
24 Expires: _____
25

**Page 40**

1          ADVANCED COURT REPORTING
                  P.O. BOX 761
2          TUPELO, MISSISSIPPI 38802-0761
3               CORRECTION LIST
   James Benny Jackson vs. Oil-Dri Corporation of America and
4  Blue Mountain Production Company
   Federal - No. 3:16CV189-DMB-RP
5
6  May 11, 2017       Rhonda Barnes
                      _____
7  DATE OF DEPOSITION   DEPONENT'S NAME
8  PAGE LINE  CORRECTION         REASON
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22
23         _____
24                Rhonda Barnes
25