Michael Wilons, M.D. 8/17/2017

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

---

JAMES BENNY JACKSON, )
)
)
    Plaintiff, )
)
VS. ) NO. 3:16-CV-189-DMB-RP
)
)
)
OIL-DRI CORPORATION OF )
AMERICA AND BLUE MOUNTAIN )
PRODUCTION COMPANY, )
)
    Defendant. )

---

DEPOSITION

OF

MICHAEL D. WILONS, M.D.

AUGUST 17, 2017


EXHIBIT H

Michael Wilons, M.D. 8/17/2017

Page 2

1  The deposition of MICHAEL D. WILONS, M.D.,
2  is taken on this, the 17th day of August, 2017, on
3  behalf of the Defendants, pursuant to notice and
4  consent of counsel, beginning at approximately
5  6:58 a.m. in the offices of Memphis Lung Physicians,
6  6025 Walnut Grove, Suite 508, Memphis, TN 38120.
7    This deposition is taken pursuant to the
8  terms and provisions of the Federal Rules of Civil
9  Procedure.
10    All forms and formalities, including the
11  signature of the witness, are waived, and objections
12  alone as to matters of competency, irrelevancy and
13  immateriality of the testimony are reserved to be
14  presented and disposed of at or before the hearing.

Page 3

APPEARANCES

FOR THE PLAINTIFF:
RON WOODRUFF, ESQ.
Waide & Associates, P.A.
P.O. Box 1357
Tupelo, Mississippi 38802
662.842.7323
waide@waidelaw.com

FOR THE DEFENDANTS:
ASHLEY ELEY CANNADY, ESQ.
Balch & Bingham LLP
188 East Capitol Street
Suite 1400
P.O. Box 22587
Jackson, Mississippi 39201
601.965.8180
acannady@balch.com

REPORTED BY: SANDRA MARCHKY, RPR/RMR/CRR

Page 4

INDEX

EXAMINATION INDEX

MICHAEL D. WILONS, M.D.
BY MS. CANNADY ............... 5
BY MR. WOODRUFF ............. 31

EXHIBIT INDEX

1  Medical Records            13
2  FMLA Paperwork             15
3  Letter dated 7/15/15       18
4  Application for Approval of Compromise 21
   Settlement

5  Plaintiff's Designation of Expert  21
   Witness

CERTIFICATE OF COURT REPORTER    35

Page 5

1    MICHAEL D. WILONS, M.D.,
2  having been first duly sworn, was examined and
3    testified as follows:
4    EXAMINATION
5  BY MS. CANNADY:
6    Q. Dr. Wilons, my name is Ashley Cannady.
7  I'm a lawyer for Oil-Dri who are the defendants in
8  this case. And I'm here to take your deposition in
9  a lawsuit that one of your patients has filed
10 against my companies.
11    So if you would, we're -- I don't know if
12 you've ever given a deposition before.
13    A. I have.
14    Q. You have. So you're familiar with the
15 process?
16    A. Yes.
17    Q. So then we'll get going.
18    A. Okay.
19    Q. And please don't be offended by any
20 questions that I ask. Most of them are very
21 standard and I'm not trying to indicate that you are
22 anything less than the utmost professional.
23    So, if you would state your name.
24    A. Michael David Wilons.

2 (Pages 2 to 5)

Michael Wilons, M.D. 8/17/2017

Page 6

1  Q. How old are you?
2  A. I'll be 70 next month.
3  Q. What's your business address?
4  A. 6025 Walnut Grove, Suite 508, Memphis Lung
5  Physicians Foundation.
6  Q. And describe for me your formal education
7  beginning with college. Where did you attend?
8  A. I attended the University of Tennessee in
9  the late '60s. And then I started medical school in
10 '69 at the University of Tennessee, graduating in
11 1972.
12 Q. Where did you do your residency?
13 A. I did my internship at the City of Memphis
14 Hospital and my residency and fellowship at Baptist
15 Memorial Hospital.
16 Q. What was your fellowship in?
17 A. Pulmonary medicine.
18 Q. What year did you complete that
19 fellowship?
20 A. '77. My 40th year of practice.
21 Q. Congratulations.
22 A. Thank you.
23 Q. Have you published any articles or
24 journals or papers in the last ten years?

Page 7

1  A. I have been offered a co-author in some
2  respiratory therapy work that was done.
3  Q. Do you recall what publication those would
4  have been in?
5  A. No.
6  Q. On respiratory therapy you said?
7  A. Yeah. And I have been director of
8  respiratory therapy at Baptist and director of the
9  pulmonary laboratory. I worked with the respiratory
10 therapists who were doing some publications.
11 Q. What do you do in your practice to stay
12 current on the latest information and technology and
13 research in your field?
14 A. Well, by state and by our practice at the
15 hospital, we do continuing medical education, doing
16 40 hours of continuing medical education every year.
17 Q. And do you do anything other than attend
18 those continuing medical education classes?
19 A. I used to go to some of the meetings, but
20 I've stopped going to the meetings.
21 Q. Do you regularly read any journals or
22 other publications?
23 A. That's part of the continuing education,
24 yeah.

Page 8

1  Q. Where are you licensed?
2  A. Tennessee. I was licensed in Mississippi,
3  but I no longer practice at our DeSoto office, so
4  I've stopped renewing my license.
5  Q. And when did you receive your license in
6  Tennessee?
7  A. I think I got my license in 1973 when I
8  started practice as an intern.
9  Q. And in Mississippi, do you recall when you
10 received that license?
11 A. I got my Mississippi license -- we opened
12 our office in '98 or '99, so I had my license at
13 that time.
14 Q. And what is the process for obtaining a
15 medical license in Tennessee?
16 A. Graduating from school and taking state
17 boards or national boards.
18 Q. State and national?
19 A. Or, either way. I took both. But you
20 only have to do the state.
21 Q. Has your license ever been suspended or
22 revoked?
23 A. No.
24 Q. Or otherwise limited?

Page 9

1  A. No.
2  Q. In either state?
3  A. Either state.
4  Q. Are you board certified?
5  A. No.
6  Q. Have you ever been board certified?
7  A. No.
8  Q. Have you ever taken the exam to be board
9  certified?
10 A. No, I haven't.
11 Q. Have you ever been investigated regarding
12 your professional practice by a state licensure
13 board?
14 A. No.
15 Q. A district or state attorney?
16 A. No.
17 Q. The local police?
18 A. No.
19 Q. Any professional organization?
20 A. No.
21 Q. Have you ever been sued in your
22 professional capacity or had a claim against you?
23 A. I've been listed and dropped one or two
24 times. I've never been sued.

3 (Pages 6 to 9)

Michael Wilons, M.D. 8/17/2017

Page 10

1 Q. You're lucky in this day and age.
2 A. Uh-huh.
3 Q. Have you ever been the subject of a
4 disciplinary action by a hospital or other medical
5 group?
6 A. No.
7 Q. Have you ever been denied hospital
8 privileges?
9 A. No.
10 Q. Do you belong to any professional
11 organizations?
12 A. American College of Chest Physicians.
13 Q. Are there any requirements for membership
14 other than paying your dues?
15 A. No.
16 Q. Do you serve in any official capacity
17 within that organization?
18 A. No.
19 Q. Your current practice is Memphis Lung
20 Physicians?
21 A. It has been, yes.
22 Q. Do you have a title or are you just one of
23 the physicians?
24 A. I'm one of the officers, the senior member

Page 11

1 as one of the two founders of the practice.
2 Q. How long has this practice been in
3 existence?
4 A. 40 years.
5 Q. And other than practicing medicine, what
6 are your responsibilities within the group?
7 A. Act on the board. I've been managing
8 business partner, became a partner of the Baptist
9 Medical Group four years ago. So we're not totally
10 managing our business as we did in the past. And I
11 was past president of the Baptist medical staff.
12 Q. Have you ever served as an expert witness?
13 A. Yes.
14 Q. How many cases?
15 A. Two or three.
16 Q. And would you have been serving as a
17 witness for the plaintiff or the defendant?
18 A. Both.
19 Q. Do you recall the names of those cases?
20 A. Not really. I know there's one in --
21 let's see, it was around my 50th birthday, I did --
22 railroad was being sued by employee for lung
23 complications and I was a witness for the railroad.
24 Q. Was that in State or Federal Court, do you

Page 12

1 recall?
2 A. I do not remember.
3 Q. Would your office manager have a listing
4 of these cases?
5 A. That was 20 years ago. Somewhere we would
6 have some record. All I did was a deposition based
7 on the patient's medical complaints.
8 Q. Do you recall any of the other ones?
9 A. There was a -- I did a case of a patient
10 who had a family who had carbon monoxide poisoning
11 in an apartment and I was representing the
12 plaintiffs in that case.
13     I had one that I did deposition of a
14 patient of mine who had lung problems that was
15 injured in a car accident that changed the course of
16 the disease. I did a deposition in that case and
17 then spent ten hours in court.
18 Q. Has your testimony ever been disallowed by
19 a court?
20 A. No, only by ability to be on a jury.
21 Q. Do you have any experience as an expert in
22 cases involving Americans with Disabilities Act?
23 A. Not specifically, no.
24 Q. Do you have any working knowledge of the

Page 13

1 Americans with Disabilities Act?
2 A. Not in detail.
3 Q. Were you aware that Mr. Jackson had
4 designated you as an expert witness in this case?
5 A. I was aware that I was his physician and
6 he had a respiratory issue.
7 Q. But you didn't know that they designated
8 you as an expert?
9 A. No.
10 Q. We'll mark that in a minute. Has
11 Mr. Woodruff or any attorney from Mr. Jackson asked
12 you to review any documents prior to your testimony
13 today?
14 A. No, they haven't.
15 Q. Have you reviewed any documents in
16 preparation for today?
17 A. Only my records.
18 Q. And I assume it's safe to say you haven't
19 conferred with Mr. Woodruff or Mr. Jackson regarding
20 your testimony today?
21 A. No. I haven't seen Mr. Jackson since the
22 last time he was in the office or talked to him.
23 Q. Give me one second to get my records out.
24     (Thereupon, Deposition Exhibit No. 1

4 (Pages 10 to 13)

Michael Wilons, M.D. 8/17/2017

Page 14

1 was marked for identification.)
2 Q. When did you first begin treating
3 Mr. Jackson?
4 A. First time I saw Mr. Jackson was on
5 4/27/15.
6 Q. What was the purpose of his visit?
7 A. He came to the office because he had been
8 ill since December with recurrent respiratory
9 issues, been treated with multiple rounds of
10 antibiotics and steroids and had not improved. And
11 he was I believe referred by his physician to see if
12 there's anything else we could do to improve his
13 pulmonary status.
14 Q. And what was his diagnosis?
15 A. At that time I think they were talking
16 that he might have COPD. But our pulmonary studies
17 showed that he had some air flow obstruction but had
18 significant reversibility and tests suggested that
19 there was lateral reversibility to his airway
20 problems.
21 Q. And so what course of treatment did you
22 recommend?
23 A. Well, I started him on an active program
24 of bronchodilators and steroids and suggested since

Page 15

1 he had been going on four months and hadn't improved
2 that we might remove -- go on some short term
3 disability to get away from the work environment, so
4 that we could have an opportunity to see if we could
5 get it under control.
6 Q. But at that time you felt that if he was
7 removed from the environment the problem would
8 resolve?
9 A. I felt that that would give us a better
10 chance to stop the wheezing since he failed with
11 methods that should have given him some response
12 with his kind of symptoms over the last four months.
13 Q. And do you recall filling out what I'm
14 going to mark as Exhibit 2 which is his FMLA
15 paperwork. Do you recall filling that out?
16 (Thereupon, Deposition Exhibit No. 2
17 was marked for identification.)
18 A. I think it was filled out by my staff,
19 yeah.
20 Q. Okay. Well, if you look at the last page,
21 it appears to have your signature?
22 A. Yeah, I signed it, yes, and I filled out
23 part of the last page.
24 Q. And do you recall how long you expected

Page 16

1 him to be off of work?
2 A. I think we talked about probably six to
3 eight weeks.
4 Q. So, once you saw Mr. Jackson in April,
5 when was the next time that you --
6 A. Exactly a month later he came back on the
7 second visit.
8 Q. And what was his status on the second
9 visit?
10 A. He had significantly improved. His air
11 flow obstruction was really not present. His
12 pulmonary studies showed normal flows. The small
13 airway problems that he had had significantly
14 improved.
15 Q. And at that point, what was your
16 recommendation regarding his work status?
17 A. We talked about trying to see if we could
18 work to reduce some of the medication. I think he
19 stayed -- I think he was going to stay off work a
20 little longer until we started adjusting the
21 medication.
22 Q. And this visit was when, was in May?
23 A. May 27th.
24 Q. 2015, correct?

Page 17

1 A. Uh-huh.
2 Q. When was the next visit with Mr. Jackson?
3 A. July 15th.
4 Q. Tell me about the July 15th visit.
5 A. He was starting to try to taper some of
6 the medications. His breathing studies were still
7 normal but had dropped a little bit. They were
8 still in the normal range.
9 Q. Do you recall any discussion that he was
10 considering retiring during that visit?
11 A. Yes, he had mentioned that he considered
12 the possibility of retiring. I think he complained
13 about some back problems and they had found that he
14 had had some problems with his back in the past. He
15 also talked about having been in accidents and had
16 some concussive injuries and he was concerned about
17 those issues.
18 Q. Did you discuss any restrictions he might
19 under if he did return to work during that visit?
20 A. I think we talked about since his work as
21 he described to me was exposures to a lot of dust
22 and some chemicals that those kind of things could
23 re-trigger the breathing issues. And I was
24 concerned that he would repeatedly have

5 (Pages 14 to 17)

Jackson
Gulfport
Brooks Court Reporting
1-800-245-3376
Meridian
New Orleans

Michael Wilons, M.D. 8/17/2017

Page 18

1  re-exacerbations of what he went through that took
2  several months to get over.
3     Q. If you would, I'm going to hand you
4  Exhibit 1, because when I reviewed your record of
5  that visit, I see no mention of any work
6  restrictions at all.
7     A. Actually, I remember talking with him,
8  asking him did they have any opportunities for you
9  to do something where you are not exposed to the
10 dust and the chemicals. I got the complete record
11 here. And I don't specifically have anything
12 documented. But that was part of our discussions,
13 trying to limit exposure.
14    Q. Is that not something you would normally
15 include in your records if you had a discussion
16 about limiting exposure at work?
17    A. Normally it would be. But there's a lot
18 of times you say things in a discussion with a
19 patient, you don't document every word.
20    Q. I'm going to mark this letter as Exhibit
21 3.
22        (Thereupon, Deposition Exhibit No. 3
23 was marked for identification.)
24    Q. So, this letter is dated July 15, 2015 and

Page 19

1  it's to Mr. Jackson, correct?
2     A. Uh-huh.
3     Q. And it indicates that his respiratory
4  problems have resolved and his pulmonary function
5  test is normal, correct?
6     A. Right.
7     Q. It doesn't say anything about any work
8  restrictions, correct?
9     A. No, it doesn't. Also, it's not there
10 either, but when I have a patient who's had
11 respiratory issues and it's possibly related to
12 work, I usually say one of the only ways we are
13 going to find out if the work is really the source,
14 if you go back and you have recurrent episodes, that
15 sort of confirms it.
16    Q. Do you know whether Mr. Jackson attempted
17 to return to work after your July 15, 2015 visit?
18    A. I don't specifically know, but I think he
19 really talked about retiring and didn't return to
20 work.
21    Q. So you never filled out any sort of
22 paperwork that indicated that he had work
23 restrictions; is that correct?
24    A. I don't believe so, unless that FMLA --

Page 20

1     Q. Other than the FMLA paperwork --
2     A. Yeah.
3     Q. -- you've never filled out any paperwork?
4     A. No, not that I remember.
5     Q. Let me get my question out so she can put
6  it on the record.
7     A. Okay.
8     Q. Other than FMLA paperwork, you haven't
9  filled out any paperwork or given any statements
10 that he would have any restrictions at work; is that
11 correct?
12    A. I don't believe so.
13    Q. But that is correct, yes?
14    A. That's correct, yes.
15    Q. Do you know whether Mr. Jackson has ever
16 filed for Social Security Disability benefits?
17    A. I don't know.
18    Q. Do you know whether he has filed for
19 disability retirement? Like sometimes you can get
20 early retirement because you're disabled. Do you
21 know whether he's filed for that?
22    A. I do not know.
23    Q. Do you know whether he filed for Workers'
24 Comp benefits?

Page 21

1     A. I do not know.
2        MS. CANNADY: I'm going to mark Exhibit 4.
3        (Thereupon, Deposition Exhibit No. 4
4  was marked for identification.)
5     Q. Mr. Jackson did file for Workers' Comp
6  benefits and I'm going to hand you his settlement
7  paperwork.
8        Do you recall this document that you
9  received from his Workers' Compensation attorney?
10    A. I don't recall it specifically. But I
11 apparently saw it.
12    Q. If you would, look down at question 3 and
13 read that into the record for me, please.
14    A. What time was Mr. Jackson unable to work?
15 Your response 4/27 to 6/30/15.
16    Q. If would you flip over to number 4 and
17 read that question and the response for me.
18    A. What permit restrictions would you assign
19 secondary to the condition you diagnosed? I said no
20 restrictions.
21       MS. CANNADY: We're marking the
22 designation as number 5.
23       (Thereupon, Deposition Exhibit No. 5
24 was marked for identification.)

6 (Pages 18 to 21)

Michael Wilons, M.D. 8/17/2017

Page 22

1  Q. Have you ever seen this document before,
2  Dr. Wilons?
3  A. I do not recall seeing this document.
4  Q. If you would, look over the portion that's
5  related to you.
6      Do you have any opinions to offer
7  regarding that we haven't discussed regarding
8  Mr. Jackson's diagnosis?
9  A. No. I think the thing about returning
10 back to work was after we talked about going back to
11 work and he's talking about retirement, I said
12 that we asked -- I asked him about any options at
13 work that would not put you in harm's way and he
14 said there weren't any. I said the only way we
15 could tell the work was totally a problem that was
16 causing your breathing issues is if you went back
17 and started over.
18 Q. You don't know whether if Mr. Jackson went
19 back to work his problem would return?
20 A. I did not know. That's how we determine
21 that the environment is part of the problem.
22 Q. Elimination?
23 A. Elimination, yeah, unless there was a
24 number of people who all are having the same kind of

Page 23

1  problem at the same time. In an individual case,
2  you have to look and see -- re-challenge and see if
3  the re-challenge produces the problems.
4  Q. Do you know whether Mr. Jackson applied
5  for any available positions at Oil-Dri prior to
6  taking his FMLA leave?
7  A. I do not.
8  Q. I'm going to go over the list of what the
9  ADA's major life activities are. This is straight
10 from the regulations. And I'm asking with regard to
11 July 15, 2015 when you saw Mr. Jackson.
12 A. Uh-huh.
13 Q. That's the time frame that I'm referring
14 to.
15     MR. WOODRUFF: Ashley, I object to this
16 because the statute clearly says the list is not
17 exhaustive.
18     MS. CANNADY: That's fine. I think that's
19 an objection to the form. But I'm going to read
20 what's in the statute and with the understanding
21 that we know what the statute says.
22 Q. So, on July 15, 2015, did Mr. Jackson have
23 a physical or mental impairment?
24 A. His breathing had been significantly

Page 24

1  improved being away from work.
2  Q. But did he have an impairment on that
3  date?
4  A. Breathing tests were normal.
5  Q. Did he have any impairment that affected
6  his ability to care for himself?
7  A. Not from the respiratory standpoint. But
8  his complaints that he talked about were other than
9  pulmonary which I have no expertise nor could I
10 describe how the limitations related to those.
11 Q. So your area of expertise in reference to
12 Mr. Jackson is limited to the pulmonary function?
13 A. Yes.
14 Q. That's fine. We can agree that that's
15 what we're discussing?
16 A. Yeah, uh-huh.
17 Q. Was his ability to perform manual tasks
18 limited with regard to his pulmonary function?
19 A. That's what the whole point of going back
20 to work to see what happens. The day I saw him not
21 in the environment his breathing was normal.
22 Q. His ability to see?
23 A. I don't evaluate his seeing.
24 Q. And I understand that some of these are

Page 25

1  totally not within your area.
2  A. I can't really comment on those
3  limitations based on those things. I know that he
4  had back problems. He had some chronic pain
5  problems. I know eight months later or so he had
6  corneal surgery. So, apparently, he was having some
7  visual issues. I don't know the details and could
8  not comment on his abilities related to that.
9  Q. And that's fine. I'm just going through
10 this checklist. What about his ability to hear?
11 A. I had no difficulty communicating with
12 him.
13 Q. His ability to eat?
14 A. There was no apparent problem with eating.
15 Q. His ability to sleep?
16 A. He had problems with sleep. He had been
17 to a sleep doctor in the past and was still having
18 some symptoms.
19 Q. Were those related to his lungs?
20 A. They can be. He may have had some
21 obstructive sleep apnea.
22 Q. Do you have any knowledge regarding any
23 limitations beyond what he told you?
24 A. No, because he had a sleep doctor. And we

7 (Pages 22 to 25)

Michael Wilons, M.D. 8/17/2017

Page 26

1 did discuss going back and having reassessment. He
2 hadn't followed through completely.
3    Q. Do you know who that sleep doctor was?
4    A. Doctor was in Tupelo, I believe. I don't
5 know though.
6    Q. What about his ability to walk?
7    A. Not from the breathing standpoint.
8    Q. Stand?
9    A. Not from the respiratory standpoint.
10   Q. Lift?
11   A. Not from the respiratory standpoint.
12   Q. Bend?
13   A. Not really, no, not bending specifically.
14   Q. Speak?
15   A. Not from the respiratory standpoint.
16   Q. Breathe?
17   A. Not on that day.
18   Q. Learn?
19   A. No reason for impairment from my
20 standpoint.
21   Q. Read?
22   A. No.
23   Q. Concentrate?
24   A. No. But I think he had other problems

Page 27

1 that may have had impact on that.
2    Q. I'm going to come back to that in just a
3 moment. What about his ability to think?
4    A. I think that's related to the other
5 issues. I can't really evaluate nor really comment
6 on those.
7    Q. But those would not be linked to any lung
8 problem?
9    A. Not to his breathing problems, no.
10   Q. Communicate?
11   A. No.
12   Q. Work?
13   A. No.
14   Q. And then with regard to these major bodily
15 functions, did he have any impairment in July of
16 2015 that would affect his immune system?
17   A. Some of the medications that he's taking
18 to control the breathing had a tendency to possibly
19 lower your immune response.
20   Q. Do you know whether he, Mr. Jackson, had
21 any issues with his immune system?
22   A. I wasn't aware of any.
23   Q. Normal cell growth?
24   A. Nothing from the breathing standpoint.

Page 28

1    Q. His digestive system?
2    A. Not from the respiratory.
3    Q. His bowels?
4    A. No.
5    Q. Bladder?
6    A. No.
7    Q. Neurological functions?
8    A. Not from the respiratory standpoint. But
9 that's where the other issues that he mentioned
10 would be involved.
11   Q. His brain?
12   A. The other issues that he was dealing with.
13   Q. His respiratory system?
14   A. His respiratory system was under control
15 on medication.
16   Q. And you testified that he had been weaning
17 off of the medication at that point, correct?
18   A. I was trying to see if we could cut down
19 on some of the medication.
20   Q. Was he off medication or he was just at a
21 reduced level?
22   A. We were reducing the level.
23   Q. Do you know what level of medication he
24 was on in July of 2015?

Page 29

1    A. We had been off steroids. That was
2 completed. He was still using the inhalers, long
3 acting inhaler and a rescue inhaler.
4    Q. Do you have any opinion as to whether he
5 was substantially limited in his respiratory
6 function, because I believe you testified that his
7 PFT had returned to normal?
8    A. Yes.
9    Q. So at that point he was not limited?
10   A. He was not limited from the pulmonary
11 standpoint.
12   Q. What about his circulatory system?
13   A. I didn't evaluate his circulatory system.
14   Q. Endocrine?
15   A. I didn't evaluate that.
16   Q. Reproductive functions?
17   A. I have no evaluation of that.
18   Q. You mentioned his concentration and
19 thinking and neurological functions. Does
20 Mr. Jackson have any problems with his memory?
21   A. Mr. Jackson and I discussed this to the
22 extent that he played contact sports and had been in
23 an accident and there was some question of
24 concussive problems in the past.

Michael Wilons, M.D. 8/17/2017

Page 30

1  Q. Do you know whether he is seeing any
2  physician for the possibility of an Alzheimer's
3  diagnosis?
4  A. I think he mentioned -- you know, that can
5  go along with early signs of dementia when you have
6  those kind of problems. But the doctor who was
7  evaluating for that was talking to him about that.
8  Q. As we discussed, your involvement in
9  Mr. Jackson's treatment is totally limited to --
10  A. Totally limited to his pulmonary status.
11  Q. Okay. Do you know whether prior to
12  December 2014, whether Mr. Jackson had any pulmonary
13  issues?
14  A. Historically, he had no history of any.
15  He was a non-smoker. And he had never really had
16  but maybe some problems related to times he may have
17  had some allergy and leads to some minor problems.
18  But he was -- to me he was clear in describing the
19  problems that started end of 2014 were different
20  than anything he had before.
21  Q. If you will give me one minute to flip
22  through these, we may be finished for me anyway.
23  Does Mr. Jackson continue to have any
24  problems or have they resolved?

Page 31

1  A. Well, I saw Mr. Jackson several more times
2  after that. He came back in February of '16, tried
3  to be off the medications and had a bronchitis and a
4  flare-up which cleared. The last time I saw him on
5  4/19 of this year, he had completely normal
6  pulmonary function status, the best he had been
7  since the beginning.
8  MS. CANNADY: Ron, that's all I have for
9  now, if you have any follow-up.
10  MR. WOODRUFF: I have a few, Dr. Wilons.
11  EXAMINATION
12  BY MR. WOODRUFF:
13  Q. Dr. Wilons, we designated you as a
14  treating physician because in Federal Court you have
15  to designate someone who is going to give expert
16  testimony based upon their specialized knowledge,
17  which of course would be you. Your testimony is as
18  a doctor.
19  What do you consider your specialty?
20  Would it be pulmonary or -- can you tell me what
21  your specialty is?
22  A. Pulmonary medicine.
23  Q. What we call pulmonary medicine?
24  A. Yes.

Page 32

1  MR. WOODRUFF: Angie, I tender Dr. Wilons
2  as an expert on pulmonary medicine based upon his
3  education and training.
4  MS. CANNADY: Well, that's for a Court to
5  decide.
6  MR. WOODRUFF: Do you object or not
7  object?
8  MS. CANNADY: I'm not prepared to make
9  that determination today. That's a Court decision.
10  But go ahead with your questions.
11  MR. WOODRUFF: Okay.
12  Q. Did Mr. Jackson ever discuss with you his
13  particular work area that he worked in and what the
14  levels of dust or chemical he believed he was
15  exposed to at that particular work area?
16  A. Yes. We discussed that the day he first
17  came in because we were trying to determine the
18  factors that may be affecting why the breathing
19  wasn't getting better.
20  Q. Did he ever mention to you that he
21  believed there were other places in the plant where
22  he would not be exposed to the same level of dust
23  and chemicals?
24  A. I think he said they were mentioned in

Page 33

1  some places, but that wasn't the job that he was
2  doing.
3  Q. Did he ever mention to you that he had
4  asked to transfer to any of those places?
5  A. Yes, he did.
6  Q. And did he tell you whether or not he was
7  allowed to transfer to those places?
8  A. No, he really didn't really say that -- he
9  didn't think it was likely he was going to be able
10  to work anyplace else in the plant. And on the
11  second visit he started talking about the
12  possibility of just saying that he needed to not go
13  back to work and retire because of the respiratory
14  issues and some other health issues.
15  Q. And you mentioned I believe it was in July
16  where you released him and returned back to work
17  without restriction. You testified that his
18  respiratory issues were under control with
19  medication; is that correct?
20  A. Correct.
21  Q. Are you aware of how long he continued to
22  take that medication?
23  A. No. I think he at times was helping to
24  assist me in adjusting his medication.

9 (Pages 30 to 33)

Michael Wilons, M.D. 8/17/2017

Page 34

1  Q. And Ashley asked you about certain
2  enumerated disabilities in the statute. All you can
3  testify though is to his pulmonary, would that be
4  the total extent you treated him for?
5  A. Yes.
6  Q. Obviously, as a doctor, you have to have a
7  general idea what other treatments or medicines he's
8  on, I imagine; would that be correct?
9  A. That's correct.
10  MR. WOODRUFF: That's all the questions I
11  have.
12  MS. CANNADY: I don't have anything
13  further.
14  MR. WOODRUFF: Thank you, Dr. Wilons.
15  Thank you, Ashley. And the court reporter if you
16  could talk to Kim in our office she will let you
17  know what we need as far as copy of the transcript.
18  (Whereupon, the deposition was concluded
19  at 7:38 a.m.)
20
21
22
23
24

Page 35

1      CERTIFICATE
2  STATE OF TENNESSEE  )
                       )
3  COUNTY OF SHELBY    )
4
      I, SANDRA MARCHKY, LCR #729, Licensed Court
5  Reporter, in and for the State of Tennessee, do
   hereby certify that the above deposition was
6  reported by me, and the transcript is a TRUE and
   accurate record to the best of my knowledge, skills,
7  and ability.
8      I further certify that I am not related to
   nor an employee of counsel or any of the parties to
9  the action, nor am I in any way financially
   interested in the outcome of this case.
10
       I further certify that I am duly licensed by
11  the Tennessee Board of Court Reporting as a Licensed
    Court Reporter as evidenced by the LCR number and
12  expiration date following my name below.
13     I further certify that this transcript is
    the work product of this court reporting agency and
14  any unauthorized reproduction and/or transfer of it
    will be in violation of Tennessee Code Annotated
15  39-14-104, Theft of Services.
16
17  _____
    SANDRA MARCHKY, RPR/RMR/CRR
18  LCR #492
    Expiration Date 6-30-2019
19  ALPHA REPORTING CORPORATION
    236 Adams Avenue
20  Memphis, Tennessee 38103
21
22
23
24

10 (Pages 34 to 35)