**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**JAMES BENNY JACKSON** **PLAINTIFF**

**VERSUS** **NO.: 3:16cv189-DMB-LDP**

**BLUE MOUNTAIN PRODUCTION COMPANY** **DEFENDANT**

---

**PLAINTIFF'S AMENDED MEMORANDUM BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

This case is before the Court on a motion for summary judgment on a claim of termination in violation of the Americans with Disabilities Act Amendments Act ("ADAAA"), Docket 75, 42 U.S.C. § 12101, *et seq*. Plaintiff James Benny Jackson (hereinafter "Jackson") submits this Amended Brief in response to this Court's Order of March 29, 2018, Docket 99.

## STANDARD OF REVIEW

In deciding a motion for summary judgment, courts are to view the facts "in the light most favorable to the non-moving party." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). Summary judgment may be granted only "if the movant has shown that there is no genuine issue as to any material fact such that the movant is entitled to judgment as a matter of law." *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016).

According to *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150-51 (2000): "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions,

not those of a judge.' *Liberty Lobby, supra,* at 255, 106 S.Ct. 2505[1]."

## FACTUAL BACKGROUND

James Benny Jackson began working for Defendant as a chemical operator, also known as a clay prep operator, in February 2000. Deposition of Benny Jackson, pp. 23, 25-26, Exhibit "A." Jackson kept the same job throughout his employment, although the job evolved over time such that he was spending more time on a chemical platform. Jackson depo., pp. 25-26, 33.

Jackson experienced breathing problems because of the dirty conditions and chemical additives which he was required to put into products. Jackson depo., p. 36. Jackson had more exposure to chemicals and dust than any other employee at the plant. There were workers who had similar jobs on other shifts, but those employees would quit their jobs after a short time. Jackson depo., pp. 99-100.

Beginning in approximately January 2015, Jackson sought medical treatment for "cough and congestion" from Melinda Quinn, a family nurse practitioner. Defendant's Motion for Summary Judgment, Exhibit B thereto, p. 19, PageID #276. Quinn diagnosed Jackson with "[a]cute sinusitis." Defendant's Motion for Summary Judgment, Exhibit B thereto, p. 19, PageID #276. As of March 31, 2015, Jackson could still not get rid of his cold, and Quinn ordered a chest x-ray. Defendant's Motion for Summary Judgment, Exhibit B thereto, p. 21, PageID #278. Quinn referred Jackson to a pulmonologist, Dr. Michael D. Wilons. Defendant's Motion for Summary Judgment, Exhibit B thereto, p. 22, PageID #279; Jackson depo., p. 47.

Jackson began to see Dr. Wilons, a lung specialist, in April 2015, and Dr. Wilons gave Jackson a detailed medical description of the cause of his medical problems. Jackson depo., p. 47.

---

[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Dr. Wilons also informed Jackson that he needed to be removed from his work environment. Jackson depo., pp. 49-50. Jackson then requested medical leave, and Defendant's human resources representative, Rhonda Barnes, granted that leave. Jackson depo., pp. 52-54. Jackson took the medical leave beginning in April 2015, and he was released to return to work on July 15, 2015, with a restriction that he should not return to the same work environment. Jackson depo., p. 56. Jackson was on medical leave from April 2015 until July 2015. Jackson depo., p. 56.

Before Jackson had gone on medical leave, he had requested to be moved to different areas of work. Jackson depo., p. 78. Around the end of March or first of April 2015, a forklift operator quit, and Jackson asked his supervisor about getting that job. Jackson depo., pp. 90-91. The supervisor was unresponsive to Jackson's request. Jackson depo., pp. 90-91. Jackson was qualified to be a forklift operator since he had previously been certified as an operator, Jackson depo., p. 62, and since operating a forklift was one of the job duties that he had as a chemical operator. Jackson depo., p. 62.

Jackson also discussed a forklift operator position with Human Resources Representative Barnes. Jackson depo., p. 114.

In responding to interrogatories, Defendant stated that it posted a forklift operator position on July 17, 2015, two (2) days after Jackson had returned from medical leave. Defendant's Response to Interrogatory No. 15, Exhibit "B." Defendant also posted vacant forklift operator positions on July 30, 2015; October 1, 2015; October 19, 2015; and December 15, 2015. Defendant's First Supplemental Response to Interrogatory No. 15, Exhibit "C."

Jackson also discussed getting a shipping clerk position with Barnes. Jackson depo., p. 15. Barnes, however, responded that Jackson could not afford the pay cut. Jackson depo., p. 115.

Nevertheless, Jackson told Barnes that he was willing to take the job, notwithstanding the pay cut, even if the cut amounted to as much as $4.00 an hour. Jackson depo., pp. 115-16. Defendant's answers to interrogatories admit that it hired shipping clerks, but the answers did not specify the date on which these shipping clerk positions were filled. Defendant's First Supplemental Response to Interrogatory No. 15. According to Job Bid Forms, however, Defendant posted two (2) shipping clerk positions on April 16, 2015. Deposition of Rhonda Barnes, p. 9, Exhibit "D"; Job Bid Form - Shipping / Receiving Clerk, Exhibit "E."

Jackson had specifically told Barnes that he wanted a shipping clerk position, Jackson depo., p. 115, but he did not make a formal bid since such bids were available for only promotions. Jackson depo., pp. 100-01. These jobs were not promotions. Jackson depo., pp. 100-01. The shipping clerk positions were filled while Jackson was on medical leave on April 27, 2015, and June 15, 2015. Personnel Change Forms, Exhibit "F."

In releasing Jackson to return to work on July 15, 2015, Jackson depo., p. 56, Dr. Wilons stated that Jackson has a "persistent respiratory tract infection with complete clearance and resolution after removal from the work environment where he had exposure to dust and chemicals." Plaintiff's Medical Record from Michael D. Wilons, M.D., dated July 15, 2015, Exhibit "G." At deposition, Dr. Wilons testified that returning to the same job could re-trigger Jackson's breathing issues. Deposition of Michael D. Wilons, M.D., p. 17, Exhibit "H." Jackson's respiratory system was under control while "on medication." Wilons Depo., p. 28.

Having been unsuccessful in getting another job before going on leave, Jackson asked Barnes if anything had changed so far as job openings were concerned after he had been released by Dr. Wilons. Barnes responded "no," and also told Jackson about the amount of money could expect to

draw if he were to retire. Jackson depo., pp. 56-57, 66-67, 91-92. Jackson then agreed to retire. Jackson depo., pp. 55-56, 66-67. After Jackson retired, however, two (2) of Defendant's employees informed him that he would not actually be receiving retirement benefits because, during two (2) of his fifteen (15) years of employment, he did not work enough hours per year to qualify for retirement benefits. Jackson depo., pp. 72-73. Jackson then inquired as to whether he could return to work to make up enough hours to earn the retirement. In response to Jackson's inquiry, Defendant's agents informed Jackson that he could return to his old job. Jackson depo., p. 74. Jackson responded that "that job was what makes me sick and my doctor would not release me to go back to that job so, you know, I just don't think I could do it." Jackson depo., pp. 73-74. Nevertheless, Jackson told Defendant's agents that he would think about returning to the job, but a few days later, he informed Defendant that he could not return to the job, reciting that he had gotten some part-time employment driving a school bus. Jackson depo., p. 74.

According to Jackson, he believed his only options were "either retire or quit or go back to the job that was making me sick." Mississippi Department of Employment Security Telephonic Hearing No. 192828, pp. 8-9, Exhibit "I."

## ARGUMENT I.

**THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER JAMES BENNY JACKSON HAS A "DISABILITY" AS DEFINED BY THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT.**

The Americans with Disabilities Act Amendments Act prohibits employers from discriminating "against a qualified individual on the basis of disability. . . ." 42 U.S.C. § 12112(a). According to 42 U.S.C. § 12102(1):

The term "disability" means, with respect to an individual--
**(A)** a physical or mental impairment that substantially limits one or more major life

activities of such individual;
**(B)** a record of such an impairment; or. . .

*Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586 (5th Cir. 2016), noted that Congress has intended that in determining whether one has a disability, the statute is to be construed "in favor of broad coverage," "42 U.S.C. § 12102(4)," and quoted EEOC regulations stating that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis,. . . ." *Cannon*, 813 F.3d at 590-91.

Ignoring the language of the statute, Defendant relies upon "multiple representations in the record that [Jackson] is not disabled." Defendant's Brief, p. 5. Defendant cites various medical records about Jackson's medical condition, and emphasizes that the medical release states Jackson could return to work without restrictions. Defendant's Brief, pp. 3, 5. Defendant argues that Jackson's doctors "have no opinion regarding whether Plaintiff suffers from an impairment that might constitute a disability under the ADA. . . ." Defendant's Brief, p. 5.

The issue, however, is not what opinions the doctors might have about whether Jackson is or is not "disabled" in the medical sense, in laymen's terms, or even according to the definition in the Social Security Act. Instead, the issue in determining whether Jackson has a disability is whether he is unable to "perform a major life activity that the average person in the general population can perform, or [is] significantly restricted in the ability to perform it." *E.E.O.C. v. Chevron Phillips Chem. Co.*, LP, 570 F.3d 606, 614 (5th Cir. 2009). For the purposes of determining whether one has a disability as defined by the ADAAA, "major life activities include, but are not limited to, . . . breathing, . . . and working." 42 U.S.C. § 12102(2)(A).

In this case, Jackson has a "disability" as defined by the ADAAA because one of his major life activities, breathing, is substantially affected. Furthermore, since the definition of "disability"

also includes a substantial effect upon "working," and since Jackson was unable to work from sometime in April 2015 until July 15, 2015, he also has a record of having had a disability within the definition of 42 U.S.C. § 12102(1)(B).

Whether Jackson's breathing problems or his inability to work for several weeks amounts to a substantial limitation on his life activities is a question of fact for the jury. *See Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6 (1st Cir. 2004) (whether federal employee's major depression "substantially limited" major life activity so that the disability was question of fact making summary judgment inappropriate); *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719 (6th Cir. 2000) (where the impairment caused from falling from a horse substantially limited the major life activity of breathing and performing other major tasks was question of material fact); *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775 (6th Cir. 1998) (whether psoriasis substantially limits the major life activities of being able to care for one's self was question of fact); *Roush v. Weastec, Inc.*, 96 F.3d 840 (6th Cir. 1996) (whether bladder condition substantially limited major life activity was factual issue which precluded summary judgment); *McDonald v. Ford Motor Co.*, 208 F. Supp. 2d 837 (N.D. Ohio 2002) (whether employee's foot problems substantially limited his ability to walk was a fact question); *Keck v. New York State Office of Alcoholism & Substance Abuse Servs.*, 10 F. Supp. 2d 194 (N.D. N.Y. 1998) (whether perfume allergy precluded plaintiff from essential activity of working was a question of fact).

## ARGUMENT II.

**THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER THERE WAS DISCRIMINATION BECAUSE OF DEFENDANT'S FAILURE TO ACCOMMODATE JACKSON BY OFFERING HIM VACANT POSITIONS.**

Under the ADAAA, "discrimination" includes the failure to make "reasonable

accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability. . . ." 42 U.S.C. § 12112(b)(5)(A). "[T]he burden of proving inability to accommodate is upon the employer." *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 308 (5th Cir. 1981).

Defendant has not met its burden of proof that it could not accommodate Jackson's disability by giving Jackson another job as a shipping clerk or as a forklift operator. Between April 2015, when Jackson made the human resources department aware of his breathing difficulties, and September 2015, when Jackson called Barnes to inquire about not receiving his retirement check, Jackson depo., p. 70, Defendant had filled two (2) forklift operator positions. Defendant's Response to Interrogatory No. 15; Defendant's First Supplemental Response to Interrogatory No. 15. Also, during the same period of time, Defendant had discussed with Jackson a shipping clerk position, and the sole reason for not giving it to him was that Barnes did not believe Jackson could take such a substantial pay cut. Jackson depo., p. 115. Barnes refused to offer the job to Jackson even though Jackson had told her that he was "willing to take a significant pay cut if it meant me still being able to work and keep my benefits. . . ." Jackson depo., p. 115. Then, when Jackson tried to return to work sometime after September 2015, Defendant's only offer of further employment was for him to return to his old job that made him sick. Jackson depo., p. 74.

Under the ADA, a failure to make reasonable accommodations is a form of discrimination. 42 U.S.C. § 12112(b)(5)(A). One example of a failure to reasonably accommodate is a failure to offer a vacant position to an employee with a disability. 42 U.S.C. § 12111(9)(B).

In this case, Defendant had multiple available positions as a forklift operator while Jackson was out on medical leave because of his breathing impairment. The failure to offer vacant positions is one example of a failure to reasonably accommodate a disability. For example, the Third Circuit

has stated that "an employer has a duty to reassign a disabled employee if an already funded, vacant position at the same level exists." *Mengine v. Runyon*, 114 F.3d 415, 419 (3d Cir. 1997).[2] *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 634 (6th Cir. 1999), held that "[t]he ADA plainly states that reassignment may be required to reasonably accommodate a worker with a disability." *Dark v. Curry Cty.*, 451 F.3d 1078 (9th Cir. 2006), cert. denied, 127 S.Ct. 1252 (2007), held that "[a]n employee is a qualified individual under the ADA if he can perform the essential functions of a reassignment position, with or without reasonable accommodation, even if he cannot perform the essential functions of the current position." *See also, Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154 (10th Cir. 1999), *en banc*, and *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998), *en banc*, both concluding that an employee who could not perform one position must be reassigned without requiring him to compete with other workers who might be better qualified for the potential new position.

Justice Scalia, dissenting in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002), conceded that "[t]he ADA, however, prohibits an employer from firing a person whose disability is the cause of his poor performance without first seeking to place him in a vacant job where the disability will not affect performance." *U.S. Airways, Inc.*, 535 U.S. at 415. Here, Defendant, knowing that Jackson's breathing problems were causing him to be off work, failed to even alert him to the fact that it had posted jobs which he could perform. Additionally, before Jackson went on medical leave, Defendant refused to give him a shipping clerk position because that position would have resulted in a reduction in pay. Jackson depo., pp. 115-16.

Moreover, Jackson was qualified for a forklift operator position because he had been

---

[2] *Mengine* interprets Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which has the same obligations as the ADA. *See* 29 U.S.C. § 794(d).

certified for that position and because driving a forklift had been part of his chemical operator job. Jackson depo., p. 62. Similarly, when Jackson discussed the shipping clerk position with Defendant, no one ever claimed he was unqualified for that position; instead, Defendant argued the pay cut would have been too large. Jackson depo., p. 115.

There are, therefore, at least issues of material fact as to whether Defendant has met its burden of proof by showing that it could not have reasonably accommodated Jackson by offering one of the available positions.

A jury may find it unreasonable to require Jackson to return to the chemical job since "that job was what makes me sick and my doctor would not release me to go back to that job so, you know, I just don't think I could do it." Jackson depo., pp. 73-74. The only matters which Defendant discussed with Jackson after he came out of the retirement – which was based on the misunderstanding that he was going to receive retirement benefits – was to tell him that "you'll be doing the same job that you were doing because we're shorthanded at that position." Jackson depo., p. 74. The record, thus, shows that after Jackson tried to come out of retirement, which he undertook with the mistaken belief that he was going to receive retirement benefits, Defendant never informed him that it had been filling positions in the past which he could perform, nor did it inform him about any plan to fill such positions in the future, although the record indicates that soon after his retirement in September 2015, more forklift operator positions were filled. *See* Defendant's First Supplemental Response to Interrogatory No. 15; Job Bid Opening Notice for Forklift Operator dated June 17, 2015, Exhibit "J"; Job Bid Form for Forklift Operator A, dated July 30, 2015, Exhibit "K"; Jackson depo., pp. 115-16.

## ARGUMENT III.

**THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER DEFENDANT FAILED TO ENGAGE IN THE NECESSARY INTERACTIVE PROCESS WHEN JACKSON LEARNED HE COULD NOT DRAW HIS RETIREMENT BENEFITS, AND SOUGHT TO RETURN TO WORK.[3]**

When a disability precludes an employee from performing a job, the employer must engage in an interactive process to determine whether the disability could be accommodated in some way. In this case, Jackson had asked about positions as a forklift operator and as a shipping clerk. Defendant did not offer Jackson these positions at that time, although Defendant knew Jackson was interested in them. Then, when Jackson returned to work after medical leave and after retirement, Defendant did not inform Jackson about openings that had occurred while he was on medical leave, nor did it tell him about any positions that might be opening in the future.

Several authorities hold that the employer is under a duty to engage in an "interactive process" or, in other words, a simple discussion with Jackson about ways that might allow him to remain employed despite his disability. *See E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 699 (5th Cir. 2014) (plaintiff's "proposed solutions [to her problems created by her disability] were not so unreasonable that they absolved [defendant] of its statutory duty to at least discuss accommodation"); *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 622 (5th Cir. 2009) ("once the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that *together* they can determine what reasonable accommodations might be available" (emphasis in original)); *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("An employer may not stymie the interactive process of identifying

---

[3] Jackson anticipates that Defendant will argue that a failure to engage in the interactive process was not alleged in the complaint. The Supreme Court has established, however, that legal theories need not be pled. *Johnson v. City of Shelby, Miss.*, ___ U.S. ___, 135 S.Ct. 346, 347 (2014).

a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended"); *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999) ("when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA"); *Dillard v. City of Austin*, Texas, 837 F.3d 557, 562 (5th Cir. 2016) (the interactive process "should be an ongoing, reciprocal process, not one that ends with 'the first attempt at accommodation,' but one that 'continues . . . where the employer is aware that the initial accommodation is failing and further accommodation is needed'").

Defendant acknowledges the duty of an interactive process, but claims that rather than accepting his old job, "Plaintiff chose to retire." Defendant's Brief, p. 12. Whether Jackson acted reasonably in failing to return to a job that was making him sick is a question of fact, not an issue of law. "[W]hen the relevant question is how an ordinary person or community would make an assessment, the jury is generally the decisionmaker that ought to provide the fact-intensive answer." *Hana Fin., Inc. v. Hana Bank*, ___ U.S. ___, 135 S. Ct. 907, 911 (2015). "[T]he litigants are entitled to have the jury draw those inferences or conclusions that are appropriate grist for juries." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978). Thus, the issue of whether it was Jackson or Defendant who was responsible for "any breakdown in the interactive process," Defendant's Brief, p. 12, is for the jury to decide.

**CONCLUSION**

There are issues of material fact regarding each of the reasons Defendant has asked for summary judgment. Accordingly, summary judgment should be denied.

DATED, this the 12th day of April, 2018.

Respectfully submitted,

WAIDE & ASSOCIATES, P.A.

BY: ***/s/ JIM WAIDE***
JIM WAIDE
MS BAR NO: 6857

WAIDE & ASSOCIATES, P.A.
ATTORNEYS AT LAW
POST OFFICE BOX 1357
TUPELO, MISSISSIPPI 38802
TELEPHONE: 662-842-7324
FACSIMILE: 662-842-8056
EMAIL: waide@waidelaw.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

This will certify that undersigned counsel for Plaintiff has this day filed the above and foregoing with the Clerk of the Court, utilizing this court's electronic case data filing system (CM/ECF), which sent notification of such filing to the following:

**Ashley Eley Cannady, Esq.**
**Armin J. Moeller, Jr., Esq.**
**Balch & Bingham LLP**
**188 East Capitol Street, Suite 1400**
**Jackson, MS 39201**
**acannady@balch.com**
**amoeller@balch.com**
**pfairchild@balch.com**
**kbrock@balch.com**

DATED, this the 12th day of April, 2018.

*/s/ JIM WAIDE*
JIM WAIDE